No. 13-1973

_____

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA *ex rel*. Kenneth Jones

Plaintiff-Appellant

vs.

BRIGHAM AND WOMEN'S HOSPITAL, *et al.*

Defendants-Appellees

_____

Appeal from the Honorable William G. Young,
U.S. District Court, District of Massachusetts, Case No. 07-11481-WGY
_____

**APPELLANT'S OPENING BRIEF**

Michael D. Kohn
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax: (202) 342-6984
mk@kkc.com

William D. Hughes
HUGHES & NUNN LLP
350 Tenth Ave., Ste. 960
San Diego, CA 92101
Phone: (619) 231-1661
Fax: (619) 236-9271
whughes@HughesNunn.com

Jeremy L. Friedman
ATTORNEY AT LAW
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
jlfried@comcast.net

Attorneys for Appellant and *Qui Tam* Plaintiff

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENTS SHOULD BE HEARD ........................ x

JURISDICTION ........................................................................ 1

ISSUES PRESENTED ................................................................. 1

STATEMENT OF THE CASE ........................................................ 2

    A.    Relator Jones' Claims ...................................................... 3

    B.    Proceedings in the District Court Prior to *Jones I* ............................. 5

    C.    *Jones I* .......................................................................... 7

    D.    Proceedings After Remand ................................................. 10

    E.    Evidence and Rulings During Trial ...................................... 10

    F.    Jury Instructions ........................................................... 13

    G.    Jones' Post-Trial Motion ................................................... 15

STATEMENT OF MATERIAL FACTS ............................................ 15

    A.    Falsity ......................................................................... 15

    B.    Materiality .................................................................... 20

    C.    Killiany's Knowledge ...................................................... 20

    D.    Albert's Knowledge ........................................................ 22

SUMMARY OF ARGUMENT ....................................................... 26

ARGUMENT ........................................................................... 27

    I.    The Judgment Below Should Be Vacated, and Judgment Should Be Entered in Favor of the United States ............................................. 27

        A.    No Dispute Exists As to the Facts of Defendants' Liability .. 28

        B.    Defendants' Failed to Offer Any Evidence to Rebut These Material Facts, Including Saykin's Expert Testimony .......... 29

        C.    There Has Been No Waiver of Jones' Claim that Judgment Should Be Entered in Favor of the United States ................... 31

    II.    Judgment Should be Vacated Because the Verdict is Against The Clear Weight of the Evidence and Jones is Entitled to a New Trial . 33

III.    Jones is Entitled To A New Trial Due To Prejudicial Errors Below  34

    A.    The District Court Erred When it Retained the Action after Remand Without Making Factual Predicate Findings Required by Local Rule 40.1(K)  ............................................  34

    B.    A New Trial Is Warranted Due To Erroneous Evidentiary Rulings Affecting Jones' Substantive Rights  ........................  35

        1.    The District Court Erred When it Denied Relator's Motion *In Limine* No. 1 and Permitted Irrelevant and Confusing Evidence and Argument Regarding "Accuracy" of Killiany's Revisions  ...........................  36

        2.    The District Court Erred When it Excluded the Appendix to Expert Schuff's Report  ...........................  37

        3.    The District Court Erred When it Admitted Albert's Testimony on Jones' Signature  ....................................  37

        4.    The District Court Erred When it Permitted Testimony on Jones' Financial Interests and Other Irrelevant Matters  ....................................................................  38

        5.    The District Court Erred When it Admitted Irrelevant Laudatory Statements About Defendants  ....................  39

        6.    The District Court Erred When it Admitted False Testimony and Argument on Reproduction by Others  39

    C.    A New Trial Is Warranted Due To Erroneous Jury Instructions  ...........................................................................  40

CONCLUSION  ..................................................................  42

CERTIFICATE OF COMPLIANCE  ....................................  43

CERTIFICATE OF ELECTRONIC SERVICE  ...................  43

# TABLE OF AUTHORITIES

## Cases

*Anderson v. United Tel. Co. of Kansas*, 933 F.2d 1500 (10th Cir. 1995) ............. 32

*BC Tech. v. Ensil Int'l*, 2008 U.S. Dist. LEXIS 92187 (D. UT 2008). ................. 37

*Bisbal- Ramos v. City of Mayaguez*, 467 F.3d 16 (1st Cir. 2006) ........................ 27

*Boothe v. Holmes*, 399 F.2d 495 (5th Cir. 1968) ................................................... 28

*Casillas-Diaz v. Officer Romualdo Palau*, 463 F.3d 77 (1st Cir. 2006) ........ 27, 32

*Correia v. Feeney*, 620 F.3d 9 (1st Cir. 2010) ...................................................... 33

*Costa-Urena v. Segarra*, 590 F.3d 18 (1st Cir. 2009) .......................................... 40

*Crowley v. L.L. Bean, Inc.*, 361 F.3d 22 (1st Cir. 2004) ...................................... 35

*Devasto v. Faherty*, 658 F.2d 859 (1st Cir. 1981) ................................................ 35

*Favorito v. Pannell*, 27 F.3d 716 (1st Cir. 1994) ................................................. 27

*Forward Communications Corp. v. United States*, 608 F.2d 485 (Ct. Cl. 1979) .. 37

*Fryar v. Curtis*, 485 F.3d 179 (1st Cir. 2007) ...................................................... 35

*Goulet v. New Penn Motor Exp., Inc.*, 512 F.3d 34 (1st Cir. 2008) .................... 33

*Hoffman v. Tonnemacher*, 593 F.3d 908 (9th Cir. 2010) ..................................... 27

*Jennings v. Jones*, 587 F.3d 430 (1st Cir. 2009) .................................................. 33

*Kearns v. Keystone Shipping Co.*, 863 F.2d 177 (1st Cir. 1988) ......................... 33

*Marcano Rivera v. Turabo Medical Center Partnership*, 415 F.3d 162
(1st Cir. 2005) ......................................................................................................... 33

*Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565
(1st Cir. 1978) ......................................................................................................... 32

*McDonough v. City of Quincy*, 452 F.3d 8 (1st Cir. 2006) ................................. 35

*Negron v. Caleb Brett U.S.A., Inc.*, 212 F.3d 666 (1st Cir. 2000) ....................... 27

*Ortiz v. Jordan*, 131 S. Ct. 884 (2011) ................................................................ 32

*Perez v. Volvo Car Corp.*, 247 F.3d 303 (1st Cir. 2001) ..................................... 28

*Rankin v. Evans*, 133 F.3d 1425 (11th Cir. 1998) ................................................ 32

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) .................. 27

*Rodi v. Southern New England School of Law*, 532 F.3d 11 (2008) .................... 34

*Rodriguez-Garcia v. Miranda- Marin*, 610 F.3d 756 (1st Cir. 2010) .................. 27

*Sanchez v. P.R. Oil Co.*, 37 F.3d 712 (1st Cir. 1994) ........................... 27

*United States ex rel. Jones v. Brigham and Women's Hospital*, 678 F.3d 72
(1st Cir. 2012) ................................... 1, 7-9, 13-16, 20, 26, 28, 29, 40, 41

*United States v. Baird*, 712 F.3d 623 (1st Cir. 2013) ........................... 40

*United States v. Beauchamp*, 986 F.2d 1 (1st Cir. 1993) ...................... 38

*Urti v. Transport Commercial Corp.*, 479 F.2d 766 (5th Cir. 1973) .................. 28

*Vincent v. Louis Marx & Co.*, 874 F.2d 36 (1st Cir. 1989) ................. 35

*Wagenmann v. Adams*, 829 F.2d 196 (1st Cir. 1987) .......................... 27

*Walton v. Nalco Chem.*, 272 F.3d 13 (1st Cir. 2001) ......................... 35

*Young v. Providence*, 404 F.3d 4 (1st Cir. 2005) ................................ 32

## Statutes

28 U.S.C. §1291 ...................................................................... 1

28 U.S.C. §1331 ...................................................................... 1

28 U.S.C. §1345 ...................................................................... 1

31 U.S.C. §3732(a) .................................................................. 1

False Claims Act, 31 U.S.C. §§ 3729 *et seq* ....................................... 1, 2

## Rules

Rule 16, Federal Rules of Civil Procedure ........................................ 10

Rule 50, Federal Rules of Civil Procedure ................................... 15, 27, 31, 32, 33

Rule 56, Federal Rules of Civil Procedure ................................... 15, 27, 31, 32

Rule 59, Federal Rules of Civil Procedure ................................... 15, 27, 33, 34

Rule 403, Federal Rules of Evidence ........................................ 36, 38, 39

Rule 402, Federal Rules of Evidence ........................................ 36, 39

Local Rule 16.5(d) ................................................................. 10

Local Rule 40.1(K) .............................................................. 10, 33, 34

## Regulations

42 C.F.R. §50.103(c) ............................................................. 25

## REASONS WHY ORAL ARGUMENTS SHOULD BE HEARD

Oral argument would be helpful to the Court because this is the second appeal in a unique case involving application of the False Claims Act to recipients of grant funding from the National Institutes of Health.  Argument would allow counsel to address questions on the complex and technical aspects of the extensive trial record, as well as address the issues that were defined by this Court's previous opinion in this case, *United States ex rel. Jones v. Brigham and Women's Hospital*, 678 F.3d 72 (1st Cir. 2012).

## JURISDICTION

Subject matter jurisdiction in the district court for this action under the False Claims Act, 31 U.S.C. §§3729 *et seq.*, is predicated upon 28 U.S.C. §1331 and §1345, as well as 31 U.S.C. §3730 and §3732(a).

Jurisdiction in this Court over the district court's final judgment disposing of all claims is predicated on 28 U.S.C. §1291.  Final judgment was entered May 31, 2013 (Add. 56).   A motion for new trial and for entry of judgment in favor of the United States was filed on June 28, 2013 (Docket Item No. 246).  That motion was denied by an electronic order on July 22, 2013 (Add. 57).  Notice of appeal was timely filed pursuant to Rule 4(a)(1) on July 31, 2013 (Add. 58).

## ISSUES PRESENTED

1.    Whether undisputed evidence in the record establishes defendants violated the False Claims Act as a matter of law by knowingly submitting an application for a grant with the National Institutes of Health (NIH) that was based on false study data and false statements of reliable methodologies, such that judgment should be entered in favor of the United States.

2.    Whether the overwhelming weight of the evidence on issues of falsity, materiality and knowledge is against the verdict, such that Jones is entitled to a new trial.

3.    Whether Jones is entitled to a new trial because the district court judge retained the action after remand without making factual predicate findings required by Local Rule 40.1(K).

4.    Whether Jones is entitled to a new trial because the district court, over relator's objections, admitted evidence and permitted argument by defendants based on "accuracy" of Killiany's revisions, which the First Circuit found to be not at issue.

5.      Whether Jones is entitled to a new trial because the district court, over relator's objections, excluded from evidence the appendix to Expert Schuff's report.

6.      Whether Jones is entitled to a new trial because the district court, over relator's objections, erroneously admitted extrinsic, irrelevant and prejudicial evidence and argument.

7.      Whether Jones is entitled to a new trial because the district court, over relator's objections, gave erroneous and confusing jury instructions inconsistent with the prior First Circuit opinion in this case, including splitting the two theories of falsity (predictability and reliability) between the two individual defendants (Killiany and Albert).

## STATEMENT OF THE CASE

Pursuant to the False Claims Act, 31 U.S.C. §§3729 *et seq.*, relator Kenneth Jones alleges defendants – to obtain NIH grant funds – falsified measurements of MRI brain scans and made false statements they followed rigid and reliable methodologies, finding a way to predict the onset of Alzheimer's Disease.  As a result of their grant submissions (excerpts at App. 102-143), defendants were awarded of over $12 million in federal NIH funds for a five-year funding cycle (2002-2007) of their Program Project Grant (PPG) entitled "Age-related changes in cognition in health and disease."

This is the second time Jones' claims are before the First Circuit.  In 2010, relator appealed from Judge Young's grant of summary judgment in favor of defendants (Case No. 10-2301).  In a previous Opinion (Add. 1-51), published at 678 F.3d 72 (2012) ("*Jones I*"), this Court conducted a "careful review of the record" (Add. 3) – including background on research project, Jones' concerns over a second set of MRI data, the NIH grant application process and testimony over technical issues by the parties' experts – and it defined the legal and factual issues to be adjudicated in the litigation.   *See* Add. 2-16.

## A.    Relator Jones' Claims

Defendant Marilyn Albert was the Principal Investigator on a long-term federally-funded research program project grant ("PPG") studying Alzheimer's Disease (AD)[1] at Massachusetts General Hospital and Brigham and Women's Hospital.  Relator Kenneth Jones was the chief statistician.  Defendant Ronald Killiany, a neuro-anatomist, joined the team as a co-investigator in 1992, and was responsible for using Magnetic Resonance Imaging ("MRI") scans to map out regions of the brain that were used to calculate volumetric measures.

Starting in 1992, the PPG conducted a longitudinal study of a group of 165 subjects, using neuro-psychological testing, genetics and brain imaging.  An overarching goal was to characterize changes in the brain during the "Prodromal phase" of AD – i.e., when the disease's mechanisms are in place and progressing but before it can be clinically diagnosed.  Scientists hoped to develop a model to predict with statistical power which patients would "convert"  to AD from "questionable" status in the years before they met clinical criteria (App. 106).

Between 1992 and 1997, Albert and her co-investigators analyzed the MRI data hoping they would be able to identify brain regions that could be measured to discriminate between normal aging subjects and those with Prodromal AD.  By 1997, however, the scientists had been unsuccessful in finding a region that could predict conversion to AD (App. 130).   Volumetric MRI measurements of the brain looked unpromising in their ability to predict conversion, many of the scientists' findings using the MRI data were negative, and defendants in 1997 chose not to include a separate MRI project in the PPG application (App. 118).

---

[1]AD is a condition of the brain which leads to severe cognitive decline and early dementia.  Scientists agree that known causes of the disease – neuritic plaques and neurofibrillary tangles – develop many years before the dementia can be diagnosed.  Since 1980, the PPG looked for changes in the brain associated  with changes in neuro-cognition and early AD (App. 105).

In October 2001, however, when defendants applied for $15 million for the next five years of NIH funding, they reported a remarkable turnaround with respect to use of MRI scans to predict conversion to AD. In the subject grant application, defendants reported that a one-time volumetric measurement of certain brain regions – including the entorhinal cortex (EC) – could differentiate with 93% accuracy between those with normal brains and those who would later convert to AD (App. 125). Defendants stated these results as "major finding," saying MRI measurements of certain brain regions were "highly predictive" for the course of Prodromal AD (App. 106), with EC volumes proving to be one of the "most discriminating" (App. 114). Overall, defendants reported an ability to predict conversion to AD within 3 years with 94% accuracy (App. 115).[2]

Relator Jones claims that this reported major finding – a centerpiece of the NIH grant application – was based on false MRI data. After Killiany and another scientist (Theresa Gomez-Isla) had agreed upon a reliable method for mapping anatomical boundaries of the EC, Killiany generated a second set of measurements for a select subset of the data, in departure from the agreed protocol and done without consulting other scientists. Initial measures complied with protocol, but the results were not statistically significant for defendants' finding of an ability to predict who would convert to AD. It was only through the selective alteration of certain MRI scans – the plumping out the EC boundaries on MRI scans of the normal subjects who had the smallest initial EC volumes – that defendants were able to claim predictability (App. 38, ¶19).

Relator also claims defendants made false statements that their data results were generated through blinded, reliable methodologies. In the grant application,

---

[2]Because AD is a slow progressive disease and can only be given a probable diagnosis through clinical data, it is much more difficult to predict with accuracy who will be diagnosed with AD in three years, as opposed to, say, one year. The further along towards a clinical diagnosis, the easier it is to predict conversion.

defendants stated that to overcome problems associated with manual drawings, they had adopted "rigid operational definitions" of the anatomical boundaries (App. 142).  Defendants described these methodologies as reliable, stating that they had  followed stated scientific protocols which had been determined to be consistent and reliable  between raters.  Defendants further represented: "to prevent possible bias in the drawing of the manually drawn regions, all operators are blinded" to information related to group status (App. 136).

Rather than follow agreed "rigid" protocols, Killiany's alteration of the MRI measurements – used to generate the results showing predictability – were inconsistent with them, and were without scientific justification.  Defendants did not verify whether the altered measurements affected their claim of reliability; and, in fact, statistical analysis of the altered measurements show that reliability is destroyed.  And while Killiany claims he was "blinded" to ultimate subject status at the time of the alterations, there is no dispute he was not blinded to subject status at baseline, *i.e.*, when they came into the study.  All along, Killiany had in his hands records showing group status of the subjects at baseline, and there is no dispute Killiany's alterations increased EC volumes for only those subjects who were "normal" at baseline, while decreasing EC volumes for those subjects that were "questionable."  The chances of Killiany of being blinded to baseline groupings and still making the selective alterations were 0.8 in 1 million.

**B.    Proceedings in the District Court Prior to *Jones I***

After pleading motions in this *qui tam* action, relator Jones filed his Second Amended Complaint (Docket Item No. 54, App. 33-44).  As the parties approached an initial trial date in October 2010, both sides filed cross-motions for summary judgment (Docket Item Nos. 80 and 85), supported and opposed by Rule 56.1 statements, declarations and exhibits (Docket Item Nos. 82, 83, 96, 97 for defendants; and Nos. 84-87, and 91-92, 98 and 99 for relator).

Relator's motion was supported by declarations from several experts; including Martha Davila-Garcia, an expert on NIH grants, who opined on the responsibilities of grantees and applicants in the peer-review process (App. 47-59); and Norbert Schuff, a leading scientist on MRI volumetric measurements of the brain, who submitted a report and a declaration after reviewing defendants' NIH grant application, the MRI scans and both the initial and revised boundary drawings for the study subjects (App. 147-158; and Docket Item No. 98).[3]   Jones motion was also supported by Relator's Table (Add. 52; App. 297), showing the impact of Killiany's selective revisions to the ranking by volumetric size.[4]

Defendants' motion was supported by a 29-page expert report by Andrew Saykin, with over 70 pages of attachments (Docket Item No. 83-4).   Dr. Saykin did not review all or even a cross-section of Killiany's EC measurements; instead, defendants asked that he look only at the EC measurements which Killiany had altered.  As such, Saykin offered opinions on whether the initial or second measurements were more or less "accurate" to anatomical boundaries, but he was unable to testify on consistency and reliability of the MRI data sets.

A week after argument, the district court issued an order granting summary judgment to defendants and denying Jones' cross motion (Docket Item No. 104).  Approximately one month later, the district court following up with a written memorandum opinion (Docket Item No. 111).  Jones then appealed to this First Circuit Court of Appeals (Docket Item No. 108).

---

[3]Jones also submitted testimony from expert statistician Daniel Teitelbaum (Docket Item No. 87).  Subsequent to *Jones I*, that witness became unavailable (due to pending criminal charges) and the district court permitted Jones to substitute expert Richard Goldstein.  *See* Docket Item Nos. 133, 136.

[4]Relator also asserted claims of falsely certification of compliance with research misconduct regulations, and spoliation of the underlying scientific records at issue.  Docket Item No. 100, 106.   Neither claim is raised on this appeal.

C.     *Jones I*

In its unanimous Opinion (Add. 1-51), the panel reversed the judgment entered by Judge Young and remanded the case to the district court for further proceedings.  After a careful review of the record, this Court held the district court abused its discretion "by excluding or failing to consider certain expert testimony" (Add. 3).   *See* Add. 19-33.  It then evaluated the parties' claims and defenses in light of the statements made in the NIH grant application and the testimony of the experts.  In the process, this Court delineated the legal framework and factual issues remaining in the litigation after remand.

Several key holdings from *Jones I* relate to issues on the current appeal:

1.     With respect to falsity of the reported MRI data, the Court identified several statements in the application that rely upon the results (Add. 27-28).  Although the altered data was not included in the application, falsification of the MRI data under the circumstances of this in this case would constitute a falsity cognizable under the Act.  "In the language of the FCA, they use . . . a false record (Add. 28).[5]

2.     With respect to falsity of the statements of reliability, the Court held "the real issue" is whether Killiany's revisions to the MRI data "substantially deviate[d] . . . from the initial protocol" to the point that "'the initial and new markings [were] no longer consistent' or capable of meaningful comparison" (Add. 29) (ellipses and bracketed words in original).  Any "technique modification" by Killiany meant he was "no longer using the precise ... methodology" that had been conveyed as reliable in the Application (Add. 38).[6]

_____

[5]*See* Relator's Proposed Jury Instruction No. 6 (App. 227), which was not given by the district court.

[6]*See* Relator's Proposed Jury Instruction No. 5 (App. 226), which was not given by the district court.

3. In the context of this case, defense claims over "accuracy" and "scientific judgment" are "not at issue;" as veracity of the revisions turn on whether Killiany exaggerated the EC boundaries of normal subjects to achieve a desired result (Add. 32).[7] To meet Jones' claims here, defendants must address the facts that no reliability study was conducted on the second set of measurements (*see* Add. 37) and use of the revised measures drops the Pearson Correlation from a "very high" 0.96 to the unreportable 0.54 (Add. 36-37).

4. Jones may establish falsity of the statements in the application regarding blinded, reliable methodologies, if he proves Killiany was not blinded or if reliability study data included in the application was not true (Add. 35, 38).[8]

5. As a matter of law, Jones' evidence on alteration of the MRI data would meet the "materiality" requirement of the False Claims Act. "If established, the notion that Killiany had been unblinded and had selectively manipulated data to produce a statistically significant result would certainly have had 'a natural tendency to influence' the reviewers' evaluations" (Add. 43-44).[9] It was an abuse of discretion to not consider the testimony of experts Schuff and Davila-Garcia on issues of materiality (Add. 45-46).

6. With respect to materiality of the statements of reliability, the question on remand is whether the dropping of the Pearson

---

[7]*See* Relator's Proposed Jury Instruction No. 7 (App. 228), which was not given by the district court.

[8]*See* Relator's Proposed Jury Instruction No. 8 (App. 229), which was not given by the district court, even in response to the jury's question(App. 1423-1425).

[9]*See* Relator's Proposed Jury Instruction No. 9 (App. 230), which was not given by the district court with respect to the first sentence.

Correlation from 0.96 to 0.54 or the failure to conduct a reliability study after the alterations "would be capable of influencing the reviewers' decision" (Add. 48).

7.      With respect to Killiany's knowledge, expert testimony and Relator's Table raised questions about his explanation for the altered data and his assertion he was blinded.  "The distribution of altered data among and within participant groups raises the greatest concern" (Add. 29).[10] "As Schuff stated, most of Killiany's revisions were 'quite extensive,' 'biased toward normal subjects,' frequently 'inconsistent with the initially adapted protocol['] agreed to by the raters, and 'not founded on scientific reason'" (Add. 31).  Proof such selective alterations "would necessarily indicate that Killiany was unblinded and aware of participants' group affiliations" (Add. 33).

8.      With respect to Albert's knowledge, the Court held the dispute over whether Jones and co-investigator Johnson asked for "verification" or "re-measurement" of the altered data was not meaningful. "Whether Albert was asked to have the data verified or the scans re-measured, she was on notice that Jones and Johnson had concerns about Killiany's second set of data and, therefore, had reason to look into the matter" (Add. 7-8, n.7).

---

[10]This Court noted the "most frequent and dramatic changes occur in the normal group," with lesser changes to the "questionable" and "converter" groups (Add. 30).  It pointed out that some subject scans in the "questionable" group were also altered, with volume changes ranging as high as 72.5%.  As came out during the trial, however, even these alterations proved falsity.  That is because Killiany was unblinded to subjected status *at baseline*, and the two members of the "questionable" group with dramatic changes (Nos. 150 and 154) were "normal" at baseline.  *See* Relator's Table, Add. 52 (Subject Nos. 150 and 154 have initial ranks of 50 and 52); Trial Exhibit 21, Add. 53 (listing Nos. 150 and 154 with "CDRsum1=0," which meant normal at baseline.

**D.      Proceedings After Remand**

After remand from the First Circuit, defendants filed a one-paragraph "Motion That Further Proceedings Be Conducted Before United States District Judge William G. Young" (Docket Item No. 121).  Relator opposed the motion (Docket Item No. 123), affirmatively requesting reassignment under Local Rule 40.1(K).  In his pleading, relator addressed directly the automatic reassignment required by Local Rule 40.1(K), as well as the factors effecting the findings that the local rule requires for the district court to retain the case (substantial judicial economy and interests of justice).  The following day, the district court entered an electronic order (Docket Item No. 124) (App. 16) granting defendants motion.[11]

In light of the First Circuit's ruling, and in preparation for trial, relator completed his expert discovery.  This included the deposition of defense expert Saykin near his office in Indianapolis.  *See* Docket Item No. 249 (response to motion over payment of Saykin's fees).

In accordance with Rule 16(e) of the Federal Rules of Civil Procedure and Local Rule 16.5(d), prior to the Final Pretrial Conference, the parties filed a Joint Pretrial Memorandum (App. 185-214).  Therein, the parties jointly state all claims and defenses of the case, along with identification of undisputed material facts, and the factual and legal disputes remaining for trial.

**E.      Evidence and Rulings During Trial**

Judge Young presided over a jury trial of relator's claims which took 11 half-days of testimony and a 12th day to receive a verdict, spanning three weeks. Consistent with the First Circuit's evidentiary rulings in *Jones I*, testimony was taken from Jones' experts, including Schuff (App. 623 *et seq.*), Davila-Garcia

---

[11]No findings or reasons were stated by the district court judge in the entry denying automatic reassignment.  Seven weeks later, however, at a status conference, Judge Young referred to his order, stating he would follow the First Circuit's instructions and reassuring the parties he had "no leanings at all" (App. 363-364).

(App. 1043 *et seq.*) and Goldstein[12] (App. 24 *et seq.*).  Jones testified to the information comprising Relator's Table, as well as the documented interactions he had with Albert regarding Killiany's revisions to the data (App. 595 *et seq.*). Killiany (App. 981 *et seq.*; App. 1085 *et seq.*) and Albert (App. 382 *et seq.*; App. 1210 *et seq.*) also testified during trial, on two occasions each.  Both were given a full opportunity to provide evidence – consistent with Rule 26 disclosures – that might dispute or negate the evidence in the record.

Ultimately, defendants chose *not* to call Dr. Saykin to testify before the jury. Thus, defendants presented no evidence from any disclosed expert to rebut or refute the expert testimony addressed by the First Circuit in *Jones I* and submitted into evidence by relator during trial.

During trial, the district court made several rulings relevant to this appeal:

1.    The district court denied relator's Motion *in Limine* No. 1 (Docket Item No. 163), which sought exclusion and limiting instructions (App. 216-218; App. 228) on testimony and argument by the defense regarding "accuracy" of Killiany's revised measurements, consistent with the First Circuit Opinion.  *See* Docket Item No. 181 (App. 21); App. 367-369).

2.    The district court denied relator's motion (Docket Item No. 214) for admission into evidence the appendix to expert Schuff's report (reproduced at App. 153-158), which had been read into the record by Schuff during his testimony, and which had been requested by a juror (App. 1188).  *See* App. 1194-1195 (sustaining defendants' objection).

3.    The district court denied relator's motion (Docket Item No. 205) to exclude highly prejudicial extrinsic evidence on a collateral issue, as it permitted testimony by Albert over the genuineness of Jones'

---

[12]Substituting for Teitelbaum, *see* n. 3 above.

signature on an author's acknowledgment – an issue having nothing to do with matters remaining for trial.  *See* Docket Item No. 227 (App. 27); App. 1263-1265.

4.      Despite relator's Motion *in Limine* No. 14 (Docket Item No. 164), the district court permitted irrelevant and highly prejudicial evidence and argument over the Act's statutory scheme authorizing payment of a relator's share.  It even permitted defendants to make the groundless and inflammatory claim – over relator's objections – that relator delayed disclosure of his allegations for his own profit, when in fact, potential application of the Act's seal requirements required his non-disclosure.  *See* App. 934-943; App. 970-973; App. 1361-1363.

5.      The district court denied relator's motion (Docket Item No. 216) to exclude evidence, extrinsic testimony and argument over alleged disputes between Jones and Albert regarding his role on the PPG, budgetary assignments and Jones' effort.  *See* Docket Item No. 229.

6.      Despite relator's Motion *in Limine* No. 8 (Docket Item No. 163), the district court permitted defendants to offer into evidence statements and make arguments regarding defendants' "hard work," their careful display of scientific knowledge, their alleged contributions to science or other vague, laudatory statements having nothing to do with the material issues for trial.  *See* App. 1352-1355; 1358-1359.

7.      Despite relator's Motion *in Limine* No. 6 (Docket Item No. 163), the district court permitted Albert to testify and defense counsel to argue falsely that the MRI results reported in the grant application regarding predictability had been duplicated by other scientists.  See App. 1237; 1358 (argument by Mr. Rose that defendants' MRI findings had been replicated "two dozen times").

**F.    Jury Instructions**

Rather than read from modified model jury instructions, or ruling on the parties' proposed instructions (Docket Item Nos. 230 and 231) and relator's objections (Docket Item No. 233), Judge Young followed his custom of instructing the jury using a "teaching" style (*see* App. 1388-1389).  In the portion where the district court instructed on the law specific for this case (App. 1399-1406), the district court: (1) defined "fact" to be something based on "the best available data, the most accurate data as the scientists involved reasonably thought they had" (App. 1402); (2) defined "material" as a "fact of sufficient consequence to make a difference to the NIH" (App. 1403), asking succinctly: "did they make a difference to the NIH" (App. 1406);  and (3) defined "knowing misstatement" to include a "reckless misstatement," saying it applied to Albert if she was "deliberately blind to a situation" (App. 1404).

In the process of elaborating on these elements, the district court did not adopt or read from any of relator's proposed instructions (App. 220-234), including those based upon this Court's key legal holdings in *Jones I*, identified above.  *See* nn. 5-9.  Nor did the court take up relator's proposed instructions on: the elements of the claim, including the statement that Jones need not prove a specific intent to defraud (App. 223);  broad view of "falsity" under the Act (App. 224); definition of knowing (App. 231); definition of "deliberate ignorance" (App. 232); and definition of "reckless disregard" (App. 233).[13]

_____

[13]At the charging conference, the district court judge expressly rejected instructing on "willful disregard."  The court stated to counsel "Either this was done intentionally, as the relator's table, at least there's circumstantial evidence would tend to, tend to show, or the case fails in my mind. There's just no evidence, no sufficient evidence to support the conclusion that anyone was walking away from knowing the evidence here" (App. 1272).  This legal conclusion regarding the lack of sufficient evidence to negate Killiany's knowledge was not, however, given in any instruction to the jury.

During instructions, Judge Young also split the two theories of falsity –
exaggeration of the MRI data and statements of blinded, reliable methodology –
between the two individual defendants (App. 1411). As the district court judge
explained that morning during the charging conference, to his mind, Albert is not
liable if there was false MRI data but not false statements of blinded, reliable
methodologies; and Killiany is not liable if there were false statements about
methodology, but no finding of intentional falsification of the data (App. 1273).
Relator's counsel objected further to the division of the theories between the
defendants, pointing out that Killiany caused false statements of blinded, reliable
methodologies; but the district court held this was "not enough" (App. 1276).[14]

Subsequently, the jury twice sought clarification of the instructions from the
judge, asking: "In Question 2, we need a definition of 'reliable methods.' Does
this mean only the intra/inter reliability studies? If no, what does it mean?" (App.
1419, 1423). The best answer to that question was provided by this Court's ruling
in *Jones I*, captured by Relator's Proposed Jury Instruction No. 8 ("Falsity of the
Statements made in the grant application re blinded, reliable methods may be
shown by proof that Killiany was not blinded or that the reliability study data
included in the grant application was not true") (App. 229). But because the
district court did not want to "suggest in any way any factual determinations," the
court answered the jury's request for clarification by referring jurors generally to
statements made in the 400-page grant application about having used blinded,
reliable methods to produce the measurements (App. 1424).

Shortly after this second "clarification" the jury returned a verdict for
defendants (Add. 55), upon which the court below entered judgment (Add. 56).

---

[14]During the sidebar, relator further objected to the instruction on "materiality" and
the refusal to provide relator's instruction regarding "accuracy" of Killiany's
revisions (App. 1413). Subsequently, the court "added" language on the "natural
tendency" test for materiality (App. 1416), but it did not correct its prior erroneous
statement of a but-for causation test for materiality.

### G.     Jones' Post-Trial Motion

After entry of judgment, Jones timely filed a motion for new trial, under Rule 59, and renewal of the motion for summary judgment and judgment as a matter of law, under Rules 56 and 50 (Docket Entry No. 246), supported by a separate Memorandum (Docket Entry No. 247).  Relator submitted with the motion excerpts from the transcript of Dr. Saykin's deposition (App. 249-294); an email from Jones to Albert in March 2001 depicting the groupings within the altered data (Trial Exhibit 21) (App. 295-296); Relator's Table (App. 297); defendants' Research Integrity Policy in effect at the time of the grant application (App. 298-324); and three exhibits related to the unblinding of Killiany with respect group status at baseline (App. 326-361).

In his moving papers, Jones requested an opportunity to reply to any opposition and to be heard in oral argument.  One court day after defendants filed their opposition (Docket Item No. 260), however, the district court entered an electronic order denying relator's motion without a statement of its reasoning (Docket Item No. 261) (App. 31).[15]

### STATEMENT OF MATERIAL FACTS

Material facts of defendants' liability under the False Claims Act – as narrowly delineated by this Court in *Jones I* – are undisputed in the trial record.

### A.     Falsity

False statements in the subject NIH grant application fall into two categories:  statements that rely upon the altered MRI data to claim prediction of subjects who would convert to AD, and statements that defendants followed "rigid" blinded, reliable methodologies in manually tracing EC boundaries used to generate the MRI data results on volumetric measurements.   It is undisputed in this record that both sets of statements were false.

---

[15]Defendants moved to strike Saykin's deposition transcript (Docket Item No. 259), a motion the district court denied as moot (Docket Item No. 262) (App. 31).

As this Court held in *Jones I*, the statements of predictability may be shown to be false if Killiany exaggerated the revised measurements to cause proof of a scientific hypothesis to emerge from the data (Add. 18, 50-51). Such falsification is established if Killiany substantially deviated from the initial protocol to the point that his initial and new markings were no longer consistent or capable of meaningful comparison (Add. 29). Statements in the application regarding the use of "rigid" "blinded," reliable methodologies may be proven false if Killiany was not blinded when he made the revisions, or if reliability study data included in the grant application were not true (Add. 35, 38).

Both categories of statements are shown to be false through undisputed proof of significant alterations in the MRI volumetric data, uncontradicted testimony by experts Schuff and Goldstein, and defendants' own admissions.

Norbert Schuff was the only competent witness qualified to testify about the veracity of the revised measurements, as he was the only expert to review the initial and revised tracings of the MRI scans, and compare them to the tracings by Gomez-Isla and the tracings which Killiany did not revise. Without contradiction, Schuff testified: Gomez-Isla and Killiany reached agreement on a reliable methodology for drawing the EC (App. 640); Killiany's initial drawings were consistent with the methodology, without major errors, but Killiany's changes deviated substantially from that initial protocol (App. 640-656); and no scientific justification exists for the selective, non-random alterations to the normal subjects (App. 661-664). During his testimony (App. 651-656), Schuff read from the Appendix to his report (App. 153-158), notes he had taken upon his review of each and every altered normal subject, and of the other subjects included in the study. These notes, and Schuff's testimony, constitute the only competent evidence on whether Killiany exaggerated his tracings. It is uncontradicted, and therefore undisputed, that no justification exists for Killiany's alteration of the measures, which were in clear departure from the agreed boundaries and protocol.

There is also no dispute that Killiany's revisions were responsible for the scientific hypothesis stated in the grant application. Jones – the PPG's chief statistician – determined in real time that data generated from Killiany's initial tracings were not statistically significant for predictability of AD, and that it was only through the altered data that defendants were able to claim statistical significance (App. 952-953). These calculations were independently verified by Goldstein. At trial, the expert testified statistical significance was lacking when using Killiany's initial EC measurements, and the revisions responsible for the statistical significance claimed in the grant (App. 1028).

Defendants offered no expert testimony to contradict this evidence. Thus, there is no dispute Killiany exaggerated the boundaries in a select subset of study subjects, without scientific justification and inconsistent with the agreed-protocol; and, further, it was only through the revisions, but not the initial tracings, that defendants were able to claim statistical significance for their scientific hypothesis. The legal standards set by *Jones I* for falsity in the grant application are met.

As to statements of reliability, falsity of those is also not in genuine dispute. In their grant application, defendants claimed they had achieved a "very good" Pearson Correlation of 0.96 (App. 440-441).[16] There is no dispute, however, the reliability study was done using the initial tracings, Killiany selectively revised and enlarged the EC tracings of normal subjects *after* the reliability study was done, and defendants did not conduct another reliability study thereafter (App. 428-429). As Goldstein testified – without rebuttal – it is false to report a reliability coefficient based upon the original data, while at the same time reporting a predictive model based on re-measured data (App. 1040).

---

[16]In the grant application, defendants stated inter-rater reliability for its manually drawn tracings ranged between 0.92-0.99 (App. 125) and 0.94-0.99 (App. 136), referring Killiany's 2000 paper. In that publication, defendants reported the Pearson Correlation ("r") for the EC as 0.96 (App. 239).

Falsity of the reliability statistic reported in the grant application is not disputed.  As demonstrated by Trial Exhibit 177 (App. 248), 4 of the subjects (Nos. 1, 31, 56 and 59) whose tracings were altered by Killiany after the reliability study was conducted were part of the 25 subjects in the reliability study.  Both Jones and Goldstein testified, without contradiction, that substituting the changed numbers for those 4 subjects and running the analysis on 25 subjects shows that reliability is destroyed, dropping the Pearson Correlation from 0.96 to a "very weak" 0.54.[17] *See* App. 774-776 (Jones); App. 1025-1027 (Goldstein).[18]

Defendants' statements of reliable methodologies are thus false whether or not Killiany was "blinded" to subject status when he revised the tracings.  Here, however, on that point too there is no genuine dispute: Killiany was not blinded to the status of the subjects at baseline – *i.e.*, when the subjects began participation. In their study, defendants classified subjects who were "converters" to AD when they had "questionable" CDR[19] status at baseline.  *See* App. 239 ("Converters ... consisted of subjects who met CDR criteria for questionable AD (CDR = 0.5) when they were first examined (at baseline), but within 3 years of follow-up their cognitive difficulties had progressed to the point where they met ... criteria for probable AD").  Killiany could thus "plump out" the smaller EC tracings on subjects who were "normal" at baseline (CDR = 0.0), and be assured he was not also thereby enlarging subjects who would later "convert" to AD.

---

[17]At trial, Killiany admitted one can "always rerun statistic on that data at any point in time" (App. 1003), confirming the method of Jones and Goldstein to calculate reliability of the revised tracings.

[18]Goldstein also testified without contradiction Killiany did not follow protocol when he chose to re-measure some of the MRI scans (App. 1025-1026); and it is improper to change the protocol without agreement and without strong reason, and when doing so, another reliability study is required (App. 1027-1028) ("at the very least the inter-rater reliability coefficient should be recalculated").

[19]CDR means "clinical dementia rating."  *See* App. 1015-1016.

Throughout this litigation, defendants claimed Killiany was "blinded" to the group status; but they deceivingly referred to the 3-year clinical classification, not baseline status.  All along, it was knowledge of the subjects' baseline status that Killiany used to effectuate his selective modification; and yet defendants put forth a false defense based on ultimate clinical status.  Indeed, during trial, defendants and counsel repeatedly referred to "password" protection afforded clinical information (App. 379, 506-507, 1222, 1224).  Through this dissembling, defendants misled relator, and this Court, as to the nature of the unblinding, causing unnecessarily wheel spinning over why Killiany significantly altered two of the "questionables" (Nos. 150 and 154).  *See* n. 10, above.

Killiany had in hand a key to the baseline status.  Killiany admitted he possessed Exhibit 198 (App. 326-349), a November 2002 email from Hyde to Killiany that transmitted the data used in the subject publication.  He also had Exhibit 199 (App. 350-356), a November 1995 email from Killiany to Albert, with an attachment file entitled "CDRS.txt."  Both documents show the baseline grouping for each subject, with CDR of 06 for "normals" at baseline, and CDR of 07 for "questionable" at baseline.[20]  *See* App. 1006-1011.

Killiany asserts that, until he was preparing for the litigation, he did not "know the interpretation" of CDR codes 06 and 07 (App. 1010).  And yet, he had to admit each and every one of the 11 significant enlargements to EC volumetric measurements had a CDR code 06, and none of the subjects with a CDR code 07 was enlarged (App. 1011-1015).  Goldstein testified to the statistical likelihood that Killiany altered the data – changing significantly the top 11 smallest subjects who were normals at baseline – without knowing baseline status.  Without any contradiction by defendants, he calculated that the odds of Killiany being blinded at 0.8 in 1 million, or "very, very low" (App. 1031).

---

[20]*See also* Exhibit at App. 357-360, an April 1995 document containing the same information as the file in Exhibit 199, listing subjects in order.

**B.     Materiality**

In *Jones I*, this Court defined materiality, and held that Killiany's selective manipulation of the data – if proven – "would certainly have a natural tendency to influence the reviewers' evaluations" (Add. 43-44).  Although the Court did not find conclusively that statements of reliable, blinded methodologies were material, it weighed relator's evidence on materiality and held it was error to exclude testimony of Schuff and Davila-Garcia, both of whom opined the statements made by defendants were essential to the NIH funding decision (Add. 45-46).

At trial, Schuff testified without contradiction that statements made in the grant application as to both predictability and reliability were very important, let alone material, to NIH review, the ranking process and the funding decision (App. 623-628).  Albert agreed, saying reports of reliability were a "critical aspect of the NIH's grant review process" (App. 388), and making a string of admissions on materiality (App. 405-408).  *See also* App. 1048-1052, where Davila-Garcia reviews each statement of reliability and testifies to its materiality.

**C.     Killiany's Knowledge**

Whether or not Killiany was "blinded" to ultimate status, he knew he was responsible for tracing the EC boundaries according to agreed protocols, he knew that he had made significant revisions to some of tracings after the reliability study was conducted, and he knew he produced two sets of inconsistent data covering the same scans.  He thus "knew" that the statements about his data showing predictability and the use of blinded, reliable methodologies were false.

Killiany was examined at trial on Relator's Table (Add. 52; App. 297), which depicts the ranking order of the initial EC measurements on the left, and the ranking order of the revised measurements on the right.   Red lines show the selective enlargement of the volumetric EC measurements for subjects who were normal at baseline.  Data on the left – used to claim reliability – had no predictive power, and data on the right – used to claim predictability – was not reliable.

Defendant admitted – as shown in Exhibit 21 (Add. 53-54; App. 295-296) – that his revisions to the MRI tracings resulted in substantial changes in measures of baseline "normal" subjects (including, in one case, 117 pixels on the left, and 115 pixels on the right). And he confirmed the accuracy of the percentage changes and ranking shifts depicted in Relator's Table. *See* App. 994-997.

> Q Okay. And with respect to each one of these normals you're admitting that the percentage change we're identifying here is accurate, correct?
>
> A Yes, I have no reason to doubt that the change you're reporting there is not accurate. [App. 996:5-9.]

Ultimately, Killiany had to admit he changed the smallest EC measurements of normal subjects into volumes that were larger than the largest of the initial measurements, 4.56 to 6.33 (App. 1207-1208).

As to knowledge that he was departing from the agreed-protocol, Killiany testified repeatedly at his deposition that, in making the revisions, he modified the operational definition of the EC boundaries (App. 1179), and that the operational definition "continued to evolve" throughout (App. 1180-1181). He also admitted at trial and in deposition he did not consult with any one about his revisions (App. 998-999). He acknowledged the reliability study used initial measurements, and those were based upon the operational definition to which he and Gomez-Isla had agreed at the time (App.1000-1001). At trial, Killiany did not deny use of initial measurements for reliability, and the second measurements for results (App. 1018).

Even in the near statistical-impossibility Killiany was unaware CDR 06 meant normal, by the time the grant application was submitted, he was on notice to Jones' concerns over the second set of inconsistent data. By then, he "knew" the statements were not true. As Judge Young stated on the record, but not to the jury, there is no issue as to the Killiany's knowledge of the alleged falsities at issue here. *See* App. 1272 ("There's just no evidence, no sufficient evidence to support the conclusion that anyone was walking away from knowing the evidence here").

**D.    Albert's Knowledge**

Killiany and the defendant institutions are liable under the False Claims Act based upon Killiany's falsification of the MRI data and the departure from blinded, reliable methodologies.  Independently, Albert is liable if she actually knew the statements were false, or – as this Court held (Add. 17) – she acted with deliberate ignorance or reckless disregard for the truth.

Determination of the sufficiency of the evidence on the issue of Albert's knowledge must begin with Albert's certification in the grant application and the federal regulations that govern it.  Albert was Principal Investigator ("PI") on the PPG from its inception until just after the subject NIH grant was awarded.  Albert authored the application at issue.  She certified on the cover page (App. 102) that statements made to NIH were "true, complete and accurate," and she accepted responsibility for the scientific conduct of the PPG.  In *Jones I*, the Court measured the level of Albert's "knowledge" in light of this certification (Add. 10, n.9; 28).

At trial, Albert admitted to the responsibilities she assumed as a result of her ink signature certification.

> Q You understood that before the government was willing to give you millions of dollars of taxpayer money they wanted an ironclad agreement that you would be true, complete and accurate in all the scientific data you were to transmit to them, correct?

> A Yes, correct. [App. 387]

Albert understood it was her responsibility "to know the true data generated by [her] team and to report only the true data to NIH" (App. 1347).  At trial, she admitted "by signing the grant application [she] understood that before [she] submitted it [she] had to resolve any doubts about the validity of the data" relied upon in the grant application itself (App. 388).  She also admitted to an affirmative duty to disclose "negative data" to NIH, to the extent it bears on the science presented.  This included disclosure of data showing MRI volumetric measurements were *not* predictive of conversation to AD (App. 1341).

In early 2001, Jones himself learned of Killiany's secret second set of MRI data, with the revised drawings being responsible for statistical significance. As is demonstrated by Trial Exhibit 21, by March 15, 2001 – more than 7 months prior to submitting the grant application – relator disclosed his concerns to Albert, including his express concern that Killiany had made significant enlargements, amounting to hundreds of pixels, for subjects who were "normal" at baseline, while making minor, often negative changes, for subjects who were "questionable" or "probable AD" at baseline. *See* Add. 53-54; App. 295-296.

At trial, Albert admitted that, as a result of the disclosure by Jones, she was aware there were two sets of inconsistent MRI data for the same scans of the same subjects. *See* App. 425 ("we knew that there were two sets of data"); 438 (same). When asked whether she could have contacted Killiany to determine if he made two sets of data, she was clear there was no need, as she was already aware of that fact. "We had both sets of measurements in our hands. We knew that he had" (App. 455). She admitted this prompted concerns Killiany had falsified the data, stating Jones had impugned Killiany's honesty (App. 419-420, 458); had accused Killiany of making disproportionate increases to normals (App. 420-421, 523); and was concerned Killiany had intentionally altered scientific data affecting statistical significance (App. 420-421, 458-460, 1230).

Indeed, Albert testified the chief statistician wanted all of the EC MRI measurements to be redone by an independent rater (App. 532). Albert did not want to have Killiany's measurements redrawn, however, nor subject them to a second reliability study, and she did not have anyone re-measure the boundaries after Killiany altered them (App. 429). She also admitted she knew she was not allowed to change the protocol, after a reliability study was conducted (App. 446). As this Court found in *Jones I*, on these facts there is no dispute that Albert was "on notice" about these concerns "and, therefore, had a reason to look into the matter" (Add. 8, n.7).

Albert admitted Killiany had made dramatic alterations to the original measures, including one that had increased 283% (App. 493).  She also admitted knowing that reliability was reported based upon original measurements, no further reliability was reported even though Killiany altered data on 4 reliability study subjects, and she never told NIH the measurements were invalid (App. 485-490).

Ultimately, Albert cannot deny that – prior to the submission of the grant – she had in hand contemporaneous documentation of Killiany's dramatic and selective changes to the EC data.  Although she claims she did not "look at the details" (App. 1333), Albert acknowledged she was provided Exhibit 21 (Add. 53-54; App. 295-296), undisputedly showing the underlying facts of falsity in plain view.  Indeed, Exhibit 21 is a real-time version of Relator's Table, showing the changes in pixels rather than percentage of volume changes, and tied to group status as baseline rather than 3 years into the study.  Like Relator's Table, this March 15, 2001, document demonstrates significant, positive changes to subjects who were normal at baseline (the five cases in the category of "original CDRsum1 = 0," and the 12 cases in the category of "gold controls," or subjects who started out "normal" and remained so throughout), and minor, negative changes to subjects who were questionable at baseline (CDRsum1 = 1.0 or 1.5).

Saddled with her admissions, her possession of Exhibit 21 and her testimony about Jones' concerns, there is no genuine dispute Albert actually knew Killiany had significantly altered data used to claim predictability *and* reliability; and she was "on notice" that the veracity of the statements made in the grant application required further investigation.  As Albert admitted, the fact that Killiany exaggerated the EC volumetric measurements, in departure from protocol, would mean her application was based upon a "lie" (App. 1347-1348).  Her claim that she did not "look at the details" of Exhibit 21 until trial runs contrary to her admitted duty to "know the true data generated by [her] team and report only the true data to NIH" (App. 1347).

Albert's "reason to look into the matter" (Add. 8, n.7) is informed not only by her certification on the grant application, but also by defendants' Research Integrity Policy. As explained in the first appeal (*see* Add. 24-25), NIH required written policies for appropriate action when employees are suspected of research misconduct (42 C.F.R. §50.103(c); App. 66-71). At trial (App. 1077), Davila-Garcia testified – without contradiction – that Partners' Research Integrity Policy[21] (App. 298-324), effective February 13, 2001, required Albert to report promptly any allegation or suspicion of research misconduct – including possible dishonest alterations of preliminary data – to an independent "Research Integrity Officer" appointed by the research institutions. Under detailed provisions of the policy, Albert had an obligation to report to the "Research Integrity Office" (App. 307-308), who then was tasked to conduct an independent inquiry, investigation and report of the matter to NIH (App. 309-319). After reviewing the relevant testimony, Davila-Garcia stated that referral to the Research Integrity Office and follow-up investigation were undisputedly warranted (App. 1073-1077). On examination by the judge, the expert explained that, following NIH policy and practice, as well as defendants' written policy, a report to the Research Integrity Officer and ensuing procedures would have "gotten to the bottom of the allegations" underlying this case (App. 1077-1078).

Although Jones no longer asserts a false certification claim based upon Albert's failure to comply with NIH regulations, there is no dispute Albert did indeed fail to refer, inquire and investigate as required by the regulations and policy. As the district court stated on the record, but not to the jury, "There is no evidence of any such investigation here" (App. 1069). This failure to adhere to the regulations and policy compels a filding that Albert acted with deliberate indifference to, and reckless disregard of, the truth.

---

[21]"Partners HealthCare" is defendants' parent corporation. On the first day of trial the district court ordered defendants to produce a copy of the policy (App. 367:1).

## SUMMARY OF ARGUMENT

Following remand from the First Circuit, narrow factual questions of defendants' liability under the False Claims Act remained for trial. All of the relevant evidence established – beyond genuine dispute – knowing false statements in the grant application claiming prediction of conversion to AD based on altered MRI data and use of rigid, blinded and reliable methodologies. Testimony by experts Schuff (after review of the MRI tracings), Goldstein (after statistical analysis of the data) and Davila-Garcia (after review of NIH regulations and defendants' Research Integrity Policy) were uncontradicted. Defendants' expert Saykin – whose testimony figured prominently in *Jones I* – was not called. During trial, defendants admitted to knowing – prior to submission of the grant – Killiany had without consultation altered the data in a striking and selective fashion, in terms of both pixels and volume. No dispute exists that these statements were material to NIH review and knowingly false.

Because no substantial evidence exists to support the verdict, and the United States is entitled to judgment as a matter of law, the order below should be vacated, and judgment should be entered in favor of relator. Reviewing Jones' claim for judgment as a matter of law *de novo*, this Court should rule on the issues raised in Jones' motion for summary judgment, his successful appeal to the First Circuit, and in his post-trial motion. In the alternative, under a more deferential standard, this Court should find an abuse of discretion in the denial of a new trial based upon the clear weight of the evidence.

Jones is also entitled to a new trial due to prejudicial errors: denial of reassignment after remand; admission of testimony and argument on "accuracy," authenticity of Jones' signature, relator's share, budgets, praise of defendants and reproduced scientific results; denial of admission for Schuff's report Appendix; and legally erroneous and confusing instructions on the law, including the refusal to instruct the jury on the dictates this Court enunciated in *Jones I*.

# ARGUMENT

## I.    The Judgment Below Should Be Vacated, and Judgment Should Be Entered in Favor of the United States

No substantial evidence supports the verdict, and no genuine dispute exists as to any material fact of defendants' liability under the False Claims Act.  As such, relator's post-trial motion under Rules 59, 56 and 50(b) should have been granted.  On appeal, the judgment entered on the verdict should be vacated, and the court below should be directed to enter judgment in favor of the United States.

This Court reviews questions of law *de novo* on review of the denial of Jones' post-trial motion for judgment as a matter of law pursuant to Rules 56 and 50(b).  *Rodriguez-Garcia v. Miranda- Marin*, 610 F.3d 756 (1st Cir. 2010); *Casillas-Diaz v. Officer Romualdo Palau*, 463 F.3d 77, 80 (1st Cir. 2006); *Negron v. Caleb Brett U.S.A., Inc*., 212 F.3d 666, 668 (1st Cir. 2000).  Where, as here, the motion contests sufficiency of the proof, "the court of appeals must examine the evidence and the inferences reasonably to be extracted therefrom in the light most hospitable to the nonmovant" – in this case defendants.  *Sanchez v. P.R. Oil Co.*, 37 F.3d 712, 716 (1st Cir. 1994).  The Court "may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir. 1987).

Legal standards under Rules 56 and 50 mirror each other.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Favorito v. Pannell*, 27 F.3d 716 (1st Cir. 1994); *Hoffman v. Tonnemacher*, 593 F.3d 908, 912 (9th Cir. 2010); Rule 50, Advs. Comm. Notes, 1991 Amendment.  Under those standards, the United States is entitled to judgment as a matter of law if there is a complete absence of evidence supporting the verdict, or such overwhelming amount of evidence that reasonable and fair minded persons could not arrive at the verdict against it.  *See Sanchez*, 37 F.3d at 716 (1st Cir. 1994); *Bisbal- Ramos v. City of Mayaguez*, 467 F.3d 16, 22 (1st Cir. 2006).

A district court has no discretion to deny a new trial under Rule 59 when substantial evidence is lacking to support the verdict, and the moving party is entitled to judgment as a matter of law. *Urti v. Transport Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973); *Boothe v. Holmes*, 399 F.2d 495, 499 (5th Cir. 1968). Thus, with respect to this argument, the Court reviews denial of Jones' Rule 59 motion for legal error under *de novo* standards. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 318-319 (1st Cir. 2001) ("Although we typically review a district court's disposition of a Rule 59(e) motion for abuse of discretion," errors of law are "subject to *de novo* review").

### A.    No Dispute Exists As to the Facts of Defendants' Liability

As set forth in the record, and summarized above, each element of liability under the Act – falsity, materiality and knowledge – is met on the undisputed evidence in the record. Killiany's initial and revised MRI tracings still exist, and they are not in dispute. Schuff – the only competent witness to review them – testified without rebuttal that the revisions departed from the agreed protocol and were without scientific justification (App. 640-656). Similarly, the statistical measurements have been recorded, and they too are not in dispute. Jones and Goldstein – the only expert statisticians to testify at trial – both found the initial tracings were not statistically significant for the hypothesis, *and* that the statistical measure of reliability for the revised measures fails (App. 952-953, 774-776 (Jones); App. 1025-1028 (Goldstein)). These facts are central to the question of falsity, and they are established as a matter of law in the record.

Albert, Schuff and Davila-Garcia all agree the statements which rely upon the MRI data and those claiming blinded, reliable methodologies were essential to the NIH review process (App. 388, 405-408, 623-628, 1048-1052). This evidence is more than sufficient to show a 'natural tendency to influence' the reviewers' evaluations", thus satisfying the materiality standard set forth by this Court in *Jones I. See* Add. 43-44.

Killiany admitted he deviated from the agreed protocol when he "modified" the operational definition (App. 1179-1181), in stark contrast to the statement in the application he employed "rigid" protocols (App. 142). And he admitted to the amounts and selective nature of the changes, as displayed in Relator's Table (Add. 52; App. 297) and Exhibit 21 (Add. 53-54; App. 295-296). Killiany clearly knew what he was doing, and even in the 0.8-in-1 million chance he was blinded when he altered the data, by the time of the application, he knew that the veracity and reliability of his tracings were at issue.

As this Court held in *Jones I,* after Jones discovered the two sets of data and approached Albert in March of 2001, Albert was "on notice" and "had reason to look into the matter" (Add. 7-8, n.7). Even though NIH regulations (App. 66-71) and defendants' own Research Integrity Policy (App. 298-324) required prompt referral to the "Research Integrity Officer" for inquiry and investigation, Albert kept it close within the Department. In light of the certification that statements were "true, complete and accurate" (App. 102), her acknowledged duty to resolve all doubts about validity of the data (App. 387-388), and the finding made by Judge Young that there "is no evidence of any such investigation here" (App. 1069), Albert meets the *scienter* requirements of the Act as a matter of law. As Judge Young stated with respect to Killiany, but equally applicable to Albert, there is "just no evidence, no sufficient evidence to support the conclusion that anyone was walking away from knowing the evidence here" (App. 1272).

### B.    Defendants' Failed to Offer Any Evidence to Rebut These Material Facts, Including Saykin's Expert Testimony

Defendants had ample opportunity to introduce facts to rebut these material issues, but they failed to do so, including not calling their expert Saykin. Demonstrating that insufficiency, a review of defendants' opening statement (App. 371-381) reveals the complete absence of any factual matter precluding a finding of False Claims Act violations in this case.

During opening, counsel spoke of defendants' hard work, devotion to science, volunteer work, deceased husband, and scientific knowledge, but none of these claims bear on material issues. He denied Killiany falsified MRI data by "intentionally exaggerating boundaries to prove a point", but he stated no facts, saying only that Killiany was "careful" to be "accurate and consistent in his work" (App. 378). He also denied defendants made false statements about reliable and blinded methodologies, but his only statements of fact were irrelevant attacks on Jones' credibility and a false, misleading statement Killiany was blinded to "password protected" group status – avoiding discussion of Killiany's knowledge of CDR baseline status codes (App. 378-379).

Defendants' failure to submit substantial evidence to dispute relator's proof is even further demonstrated by their failure to call expert Saykin at trial. Although Saykin's testimony figured prominently before this Court in *Jones I*, Saykin was never called to testify. Indeed, defense counsel complained at even the mention of the expert's name (App. 667).

Defendants chose not to call Saykin because the expert did not support them on material issues, and indeed, he admitted to key aspects of relator's claims. Saykin confirmed defendants' report of a 0.96 Pearson Correlation for EC measurements was "excellent" (App. 270:81); and a 0.54 Pearson correlation was very low, which could not be published in any paper (App. 270:82-83). Saykin testified NIH required a report if there is a change in protocol, especially if the changed protocol is found to be less reliable.

> That would be an unusual event to see, for someone to report in a grant application that they were going from a more reliable to a less reliable methodology.
>
> Q  Why is that unusual, and why would the NIH want to know about it, in your opinion?
>
> A  I think grant reviewers would be interested in both the reliability and the validity of the method. [App. 277:110-111.]

Saykin was not even asked to look at any of the MRI measurements which were not altered, demonstrating defendants did not want him to testify on reliability and consistency (App. 285:141). He could not answer whether Killiany stuck to his protocol because "the ones that I didn't review, I can't comment on" (App. 285:141-142). Moreover, Saykin reviewed Killiany's tracings without regard to subject status. Asked to assume group status reflected in Relator's Table, Saykin found the alterations to be "striking and non-random" (App. 288:156). He admitted Killiany made dramatic changes as high as 3 times initial measurements, saying he would not expect changes to be more than 5 or 10% "on the outside," (App. 188:153-154).

Given the complex, technical nature of the issues raised in this litigation, it is no surprise expert testimony figures prominently. But this case is not a battle of experts. All experts at trial, and even non-testifying expert Saykin, agree to the facts underlying defendants' liability.

### C. There Has Been No Waiver of Jones' Claim that Judgment Should Be Entered in Favor of the United States

It is anticipated defendants will argue Jones waived his motion for judgment as a matter of law by failing to file a separate Rule 50(a) motion restating those grounds at trial. Even though every factual and legal issue presented in Jones' post-trial motion (and on this appeal) was also presented in the previous Rule 56 motion, and even though this Court addressed and remanded those same issues for further proceedings, defendants might claim Jones has waived his right to address them here. Defendants' claim would have no merit.

Jones satisfies the Rule 50(b) requirement of a prior motion because he sought judgment as a matter of law on the very same bases raised post-trial in his Rule 56 motion (Docket Item No. 85). No rule precludes Jones from renewing his Rule 56 motion after trial, and no authority requires a Rule 50(a) motion raising the same grounds raised in a pre-trial motion for summary judgment.

"The purpose of the Rule 50(b) requirement is to alert the opposing party to the movant's claim of insufficiency before the case goes to the jury, so that his opponent may possibly cure any deficiency in his case should the motion have merit, and also so that the judge may rule on the adequacy of the evidence without impinging on the jury's fact-finding province." *Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565, 569 (1st Cir. 1978). Technical compliance with Rule 50(a) is not required, and ambiguous arguments and filings may satisfy the requirement. *See Rankin v. Evans*, 133 F.3d 1425, 1432 (11th Cir. 1998); *Anderson v. United Tel. Co. of Kansas*, 933 F.2d 1500, 1503 (10th Cir. 1995).

In the words of this Court in *Casillas-Diaz*, 463 F.3d at 81: this court may look to other motions and "pertinent references contained in the record" to determine if the issues have been raised. Here, in addition to the Rule 56 motion, Jones raised his claims in his previous appeal to this Court, Joint Pretrial Memorandum (App. 185-193, 196-198, 199-206), proposed jury instructions (App. 223-233), objections to jury instructions (Docket Item No. 233) and closing argument (App. 1370-1371).

Courts address post-trial motions for judgment as a matter of law based upon the claims raised in a prior Rule 56 motion.[22] In *Ortiz v. Jordan*, 131 S. Ct. 884, 888-89 (2011), the Supreme Court specifically approved of the practice. There, the appellate court reviewed the denial of a pre-trial motion for summary judgment based upon the record at trial. The high court held that "after trial," the moving parties may continue to urge a pre-trial motion under Rule 50(b). But, as Jones did here, the parties needed to "renew their motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b)." *Id*.

---

[22]In *Young v. Providence*, 404 F.3d 4 (1st Cir. 2005), for example, the trial judge ruled on a renewed summary judgment motion along with a Rule 50(b) motion by other parties. In *Martinez Moll*, 583 F.2d at 572, this Court noted that a Rule 50(b) motion must be preceded by a Rule 50(a) motion, but it looked to the pre-trial summary judgment motion, and the opposition, to determine waiver.

## II.    Judgment Should be Vacated Because the Verdict is Against The Clear Weight of the Evidence and Jones is Entitled to a New Trial

In the event that – contrary to Jones' contention on appeal – the Court finds substantial evidence supports the verdict as to any claim or defendant, Jones is still entitled to a new trial.  Under Rule 59, a new trial should have been granted because the verdict is against the clear weight of the evidence.  *Marcano Rivera v. Turabo Medical Center Partnership*, 415 F.3d 162, 171 (1st Cir. 2005).  A district court has "the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir. 1988).  *See Jennings v. Jones*, 587 F.3d 430, 436-439 (1st Cir. 2009) (comparing standards under Rules 50 and 59).   The trial court must "re-weigh" the evidence, and it does not presume that the verdict is correct; nor does it view the evidence in light most favorable to the party that prevailed at trial. *Correia v. Feeney*, 620 F.3d 9, 11 (1st Cir. 2010); *Jennings*, 587 F.3d at 439.

Ordinarily, the Court employs deferential standards of review under Rule 59. *Goulet v. New Penn Motor Exp., Inc*., 512 F.3d 34, 44 (1st Cir. 2008) ("We review the district court's denial of a motion for new trial for abuse of discretion only"). But the reasons for such deference – *see Jennings*, 587 at 437 – are absent in this case.  None of the issues on appeal turn on "the tenor of the testimony at trial," and the balance of proof was not "close" and did not "hinge on personal evaluations of witness demeanor."  Indeed, all of the issues that remained after remand had already been given the deliberations of this Court, which issued a 51-page Memorandum Opinion detailing the meaning and significance of the relevant expert testimony.  In this case, the district court judge had no "better opportunity ... to appraise the situation" on material points than the Court here.[23]

---

[23]As is pointed out below, by operation of Local Rule 40.1(K), the district court should have reassigned the case after remand.  As this Court found in *Jones I*, the district court previously abused its discretion in analyzing the significance and meaning of the expert testimony.  There is no reason to think the court below –

Jones contends the Court, under the unique circumstances of the case, may thus relax the standards of review under Rule 59. But under even the more deferential standards, denial of Jones' motion was an abuse of discretion. Without a writing, the district court's bare electronic order leaves no basis for judicial review. It is not clear whether Judge Young understood the significance and meaning of the one-sided expert testimony, or whether he impermissibly considered the record in a light most favorable to defendants. After trial, the United States is entitled to have judicial review of the jury's verdict, especially here, where it is against the great weight of the evidence. On this record, it is appropriate for this Court to perform that review in this appeal.

## III.    Jones is Entitled To A New Trial Due To Prejudicial Errors Below

In addition to the absence of substantial evidence to support a verdict in favor of defendants, and the great weight of the evidence in support of his claims, Jones raises on appeal a number of procedural errors by the district court. In the event that judgment is not entered in favor of the United States, Jones asks that the Court grant a new trial and assign error to certain rulings below.

### A.    The District Court Erred When it Retained the Action after Remand Without Making Factual Predicate Findings Required by Local Rule 40.1(K)

Judge Young erred when he granted the Local Rule 40.1(K) motion (Docket Item No. 121) and denied Jones' request for reassignment (Docket Item No. 123), in an unexplained electronic order (App. 16) that did not contain the findings of substantial judicial economy and interests of justice required by the local rule. As the denial does not present a situation for interlocutory appeal, the only remedy available is to seek a new trial after entry of final judgment. *See Rodi v. Southern New England School of Law*, 532 F.3d 11, 19 (2008).

---

even after trial – was in a better position than this Court to understand the meaning and significance of the technical expert testimony which went into evidence.

As this issue relates to application of a local rule, review is for abuse of discretion. *Crowley v. L.L. Bean, Inc.*, 361 F.3d 22, 25 (1st Cir. 2004). Here, however, the district court judge failed to follow the clear terms of the rule, which required reassignment unless the original judge determines "that there will result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge." Its failure to make the predicate findings compels a finding that the court below abused its discretion.[24]

### B.     A New Trial Is Warranted Due To Erroneous Evidentiary Rulings Affecting Jones' Substantive Rights

Jones challenges certain rulings on admissibility of evidence during the trial. This Court reviews evidentiary rulings for abuse of discretion. *Fryar v. Curtis*, 485 F.3d 179, 182 (1st Cir. 2007); *Walton v. Nalco Chem.*, 272 F.3d 13, 24 (1st Cir. 2001). "Erroneous evidentiary rulings are harmless if it is highly probable that the error did not affect the outcome of the case." *McDonough v. City of Quincy*, 452 F.3d 8, 19-20 (1st Cir. 2006). The "inquiry is whether the admission of the evidence affected plaintiffs' substantial rights."

> Our standard for determining whether the admission of such evidence is harmless error is whether we can say "with fair assurance . . . that the judgment was not substantially swayed by the error" The centrality of the evidence, its prejudicial effect, whether it is cumulative, the use of the evidence by counsel, and the closeness of the case are all factors which bear on this determination. [*Vincent v. Louis Marx & Co.*, 874 F.2d 36, 41 (1st Cir. 1989) (citations omitted)]

"This determination must be made in the context of the case as gleaned from the record as a whole." *Devasto v. Faherty*, 658 F.2d 859, 863 (1st Cir. 1981).

---

[24]Judge Young misunderstood the rule to be about whether he had "leanings" either way (App. 363-364). In fact, Jones' reasons for seeking reassignment had more to do with the court's understanding of the evidence, the prospect of a future Rule 59 motion, and settlement possibilities. Other than the error assigned, the district court's conduct of the trial was not only fair and even-handed, it provided a vibrant, comfortable and communicative courtroom for 11 days of testimony.

### 1. The District Court Erred When it Denied Relator's Motion *In Limine* No. 1 and Permitted Irrelevant and Confusing Evidence and Argument Regarding "Accuracy" of Killiany's Revisions

It was prejudicial error to deny Jones' motion *in limine* No. 1, permit defendants to offer testimony and argument on the "accuracy" of Killiany's measurements, and refuse to provide either the limiting instruction (App. 216-218) and jury instruction (App. 228) regarding the "accuracy" defense. As this Court held, "whether Killiany's measurements were more or less accurate than the initial measurements is not at issue" (Add. 32).[25] Rules 402 and 403 of the Federal Rules of Evidence precluded these statements from admission, and the district court's erroneous rulings require a new trial.

During trial, defendants made much use of the claim Killiany tried to make the measurements "more accurate." Each time Albert was confronted with central issues of the case – volumetric changes shown in Exhibit 21, her obligation to secure an independent evaluator, concerns over reliability and the existence of two sets of inconsistent data being used in the same study – defendant volunteered testimony about "accuracy." *See* App. 453, 463, 464-465, 470, 480-481, 488, 494-495, 495:14-15.[26] After several admissions about the grant application being based on a lie, defense counsel had Albert repeat the single reason she had for not thinking it was so: because she had the data checked for accuracy (App. 1348).

As found by the First Circuit, based upon the undisputed expert testimony accuracy of Killiany's initial and revised measurements is not at issue. Admission of these statements at trial and the denial of the requested jury instructions likely misled the jury and prejudiced Jones, permitting Albert to avoid confronting the material issues requiring adjudication.

---

[25]This was also the uncontested expert testimony by Goldstein (App. 967-968).

[26]Jones' motion to strike Albert's testimony on accuracy when being examined on reliability was denied (App. 473).

### 2.    The District Court Erred When it Excluded the Appendix to Expert Schuff's Report

It was prejudicial error to deny admission of the Appendix to Schuff's Report, on which the expert testified at length – and even read into the record – after it was requested by a juror and Jones moved for its admission (App 651-656, 1188, 1194-1195). This Appendix (App. 153-158) contains the most germane evidence in the trial – notes on Schuff's review of the revised MRI tracings where he found each of the enlarged normals to be inconsistent with the agreed protocol. The appendix was clearly relevant, and it was error to exclude it.

Judge Young sustained defendants' objection on grounds of hearsay. But because Schuff – the preparer of the notes – had been present in court, the hearsay rule does not apply. *Forward Communications Corp. v. United States*, 608 F.2d 485, 511 (Ct. Cl. 1979). While admission of the report in its entirety might duplicate testimony and confuse the jury, the Appendix was "admissible as part of the experts' testimony that will be helpful to the jury." *BC Tech. v. Ensil Int'l*, 2008 U.S. Dist. LEXIS 92187 at *4-*5 (D. UT 2008).

Although Jones had filed a Memorandum (Docket Item No. 214) addressing the issue, the judge did not read it (App. 1194). He court concluded the Appendix was hearsay (App. 1195) without considering Jones' argument. This was error. In light of the centrality of the testimony, the paucity of evidence against it and the technical nature of the issues, the error was not harmless.

### 3.    The District Court Erred When it Admitted Albert's Testimony on Jones' Signature

Denying relator's motion (Docket Item No. 205), the district court admitted highly prejudicial extrinsic evidence on a collateral issue: Albert's testimony over the genuineness of Jones' signature on an author's acknowledgment form. *See* Docket Item No. 227 (App. 27); App. 1263-1265. Whether or not Jones signed the form had nothing to do with the trial, and yet, admission of Albert's testimony created the apparent need for a mini-trial on authenticity of the signature.

Judge Young's ruling, coming on the last day of trial, after the parties had committed to put the matter to the jury that morning, put Jones in the impossible position of having to ask to extend trial to call a documents expert on an irrelevant issue, or run the risk of the jury's false belief he had dissembled over his signature.

As stated in *United States v. Beauchamp*, 986 F.2d 1, 3-4 (1st Cir. 1993), "It is well established that a party may not present extrinsic evidence to impeach a witness by contradiction on a collateral matter."   In this case, the district court did not engage in Rule 403 balancing, and it denied Jones' motion as moot after he permitted the testimony, over Jones' objections.  This was prejudicial error, creating a very real possibility the jury found against Jones because it thought he had given false testimony on not signing the acknowledgment form.

### 4.    The District Court Erred When it Permitted Testimony on Jones' Financial Interests and Other Irrelevant Matters

None of the material facts in this case turn on relator's "credibility" or his financial incentives.  Playing into the prejudices and bias of the jury, defendants expended considerable effort putting in testimony attacking Jones' credibility, impugning him on collateral and even irrelevant matters.  In addition to the battle over his signature, the district permitted defendants to attack Jones for his potential financial gain in the litigation, a measure Congress requires for the *qui tam* statute to work.  *See* Supplemental Motion *in Limine* No. 14 (Docket Item No. 164).  During trial (App. 933-936), defendants were permitted to raise an inference and argue that Jones delayed disclosure of the falsities until after the grant had been paid out to maximize his recovery.  Although the court initially provided a limiting instruction regarding the seal requirements (App. 937-939), it denied relator's subsequent objection that the seal applied to *anticipated* litigation, not only filed cases, precluding Jones from *ever* disclosing his allegations from the moment he met with attorneys  (App. 972).  Defendants then made this devastating false argument during closing to the prejudice of the United States (App. 1361-1363).

It was also error to deny relator's motion (Docket Item No. 216) to exclude evidence, extrinsic testimony and argument over alleged disputes between Jones and Albert regarding his role on the PPG, budgetary assignments and Jones' effort. *See* Docket Item No. 229. Such collateral matters, having nothing to do with the material facts at issue, do not provide a basis in substantial evidence to support a verdict for defendants, and were confusing to the jury.

### 5.    The District Court Erred When it Admitted Irrelevant Laudatory Statements About Defendants

It was error for the district court, despite relator's Motion *in Limine* No. 8 (Docket Item No. 163), to permit defendants to offer into evidence and make arguments over statements of defendants' "hard work," their careful display of scientific knowledge, their alleged contributions to science or other vague, laudatory statements about defendants.  These matters are irrelevant under Rule 402, prejudicial under Rule 403, and have nothing to do with the material issues for trial.  And yet, during closing, defense counsel devoted the vast majority of his time on such arguments, affecting Jones' rights.  *See* App. 1352-1355; 1358-1359.

### 6.    The District Court Erred When it Admitted False Testimony and Argument on Reproduction by Others

Error occurred when, despite relator's Motion *in Limine* No. 6 (Docket Item No. 163), the district court permitted Albert to testify and defense counsel to argue falsely that the MRI results reported in the application on predictability of AD had been duplicated by other scientists.  *See* App. 1237; 1358 (argument by Mr. Rose that defendants' MRI findings had been replicated "two dozen times").  These statements do not constitute substantial evidence, and were prejudicial to the rights of the United States.  Albert never issued any Rule 26 report over such testimony, Saykin was never called to testify, and the only competent testimony during trial came from Schuff, who testified that science, eventually, moved away from measuring EC volumes to predict AD because the results were no more significant for prediction than other methods (App. 668).

### C.     A New Trial Is Warranted Due To Erroneous Jury Instructions

This Court reviews *de novo* whether the jury instructions were incorrect as a matter of law. *Costa-Urena v. Segarra*, 590 F.3d 18, 24 (1st Cir. 2009). "An instruction is erroneous if it is misleading, confusing, or incorrect as a matter of law. If the instruction is erroneous, a new trial will be ordered if 'the error, based on the entire record, was prejudicial.' Put differently, a new trial will be unnecessary if the error was harmless." *Id.*

Refusal to give requested instructions predicated on this Court's holdings in *Jones I* (*see ante*, nn. 5-9, and instructions Nos. 5-9 (App. 220-234)), and refusal to instruct on "no specific intent to defraud" (App. 223), broad view of "falsity" (App. 224), and definitions of knowing (App. 231), "deliberate ignorance" (App. 232), and "reckless disregard" (App. 233), are reviewed under a two-part process. *United States v. Baird*, 712 F.3d 623, 627 (1st Cir. 2013). Jones must first present sufficient evidence to be entitled to the instruction.

> This is the same threshold that the defendant must meet when he makes his initial request of the district court. Because this determination 'entails not differential fact-finding, but merely an inquiry into the legal sufficiency of the evidence, the standard of appellate review . . . should be plenary.' Therefore, '[w]e review *de novo* the sufficiency of the evidence supporting the proposed instruction.' Like the district court, '[w]e examine the evidence on the record and . . . draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense.' *Id* (citations omitted).

If, on *de novo* review, the Court finds the evidence, taken in Jones' favor, "was sufficient to support his requested instruction, then we move to a three-part test to decide whether the district court's refusal to give the instruction constitutes reversible error" (*id.*, at 628). Deciding as a matter of law, the Court will reverse if the instruction was substantively correct, not substantially covered by the charge as rendered, and integral to an important point such that its omission seriously impaired Jones' ability to present his case. *Id.*

On this evidentiary record, taken in light of this Court's precise rulings in *Jones I*, the district court's refusal to use Jones' proposed instructions requires reversal. Each proposed instruction cited directly to the authoritative portion of the First Circuit Opinion in this case, each was supported by the evidence admitted at trial pursuant to the "blueprint" of that Opinion, and each was integral to the presentation of the claims.

In addition, as preserved in Jones' objections (App. 1272, 1274, 1413), the district court committed legal error charging the jury on a false fact being based on the "most accurate" data and for stating a but-for causation for materiality (App. 1402-1403), both contrary to this Court's holdings in *Jones I*. After objection, the court added language on the "natural tendency" test and supplemented language on accuracy (App. 1416), but it did not correct the prior erroneous statement of a but-for causation requirement in "materiality" and it did not give Jones' limiting instruction on "accuracy." Moreover, the court gave a confusing definition of "reckless misstatement" if Albert was "deliberately blind" – an instruction that is contrary to law and, on the claims here, a poor choice of words.

Error as a matter of law also occurred when the district court, over Jones' objections (App. 1276), split the two theories of falsity between the two individual defendants (App. 1411). The district court judge believed erroneously that Albert is not liable if there were false MRI data but not false statements of blinded, reliable methodologies; and Killiany is not liable if there were false statements about methodology, but no finding of intentional falsification of data (App. 1273). This instruction finds no support in *Jones I*, and it deeply prejudiced Jones at trial. As a result, Jones was in no position to argue to the jury that Killiany caused false statements in the grant application about reliability of the data, or Albert knew (or acted with deliberate ignorance or reckless disregard) of false statements on predictability. Even under "plain error" standards, these erroneous instructions would require that Jones be given a new trial.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated and the case should be remanded with direction to enter judgment in favor of the United States; and, in the alternative, with direction to hold a new trial.

Respectfully submitted,

/s/Jeremy L. Friedman
Jeremy L. Friedman
ATTORNEY AT LAW
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087

William D. Hughes
HUGHES & NUNN LLP
350 Tenth Ave., Ste. 960
San Diego, CA 92101
Phone: (619) 231-1661
Fax: (619) 236-9271

Michael D. Kohn
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax: (202) 342-6984

February 21, 2014

Counsel for Relator Jones

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,

Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7) because this brief contains 13,681

words, excluding the parts of the brief exempted by Federal Rule of

Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of

Federal Rule of Appellate Procedure 32(a)(6) because this brief has

been prepared in a proportionally spaced typeface using WordPerfect

in 14 point Times New Roman.

/s/ Jeremy L. Friedman
Jeremy L. Friedman
*Counsel for Relator Jones*

Dated: February 21, 2014

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that, on February 21, 2014, I electronically filed the foregoing

document with the United States Court of Appeals for the First Circuit by using the

CM/ECF system. I certify that the parties or their counsel of record are registered

as ECF Filers and that they will be served by the CM/ECF system.

/s/ Jeremy L. Friedman
Jeremy L. Friedman

No. 13-1973

_____

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

_____

UNITED STATES OF AMERICA *ex rel.* Kenneth Jones

Plaintiff-Appellant

vs.

BRIGHAM AND WOMEN'S HOSPITAL, *et al.*

Defendants-Appellees

_____

Appeal from the Honorable William G. Young,
U.S. District Court, District of Massachusetts, Case No. 07-11481-WGY
_____

**ADDENDUM TO OPENING BRIEF**

Michael D. Kohn
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax: (202) 342-6984
mk@kkc.com

William D. Hughes
HUGHES & NUNN LLP
350 Tenth Ave., Ste. 960
San Diego, CA 92101
Phone: (619) 231-1661
Fax: (619) 236-9271
whughes@HughesNunn.com

Jeremy L. Friedman
ATTORNEY AT LAW
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
jlfried@comcast.net

Attorneys for Appellant and *Qui Tam* Plaintiff

# ADDENDUM TO OPENING BRIEF

## TABLE OF CONTENTS

| **Docket No.** | **Title** | **Page** |
|---|---|---|
| 119 | First Circuit Opinion, United States of America *ex rel*. Jones, v. Brigham and Women's Hospital, *et al.*, No. 10-2301, May 7, 2012 ................................ | 1 |
| 248-3 | Relator's Table ................................ | 52 |
| 248-2 | Trial Exhibit 21 – March 15, 2001 email ................................ | 53 |
| 243 | Jury Verdict, entered April 19, 2013 ................................ | 55 |
| 244 | Judgment, entered May 31, 2013 ................................ | 56 |
| 261 | Notice of Electronic Filing, Electronic Order denying post-trial motions ................................ | 57 |
| 177 | Notice of Appeal ................................ | 58 |

# United States Court of Appeals
## For the First Circuit

―――――――――

No. 10-2301

UNITED STATES, ex rel. Kenneth James Jones,
Plaintiff, Appellant,

PRISCILLA PITT JONES and KENNETH JAMES JONES,
Plaintiffs,

v.

BRIGHAM AND WOMEN'S HOSPITAL, et al.,
Defendants, Appellees,

HARVARD MEDICAL SCHOOL, et al.,
Defendants.

―――――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

―――――――――

Before

Lipez, Ripple[*], and Howard,
Circuit Judges.

―――――――――

    Jeremy L. Friedman, with whom William D. Hughes, Michael D.
Kohn, Hughes & Nunn LLP, Kohn, Kohn & Colapinto, LLP, and Law
Office of Jeremy L. Friedman, were on brief, for appellant.
    Alan D. Rose, with whom Lisa A. Tenerowicz, and Rose, Chinitz
& Rose, were on brief, for appellees.

―――――――――

May 7, 2012

―――――――――

――――――――

[*] Of the Seventh Circuit, sitting by designation.

        **LIPEZ**, <u>**Circuit Judge**</u>.  This case requires us to address claims filed pursuant to the False Claims Act, 31 U.S.C. § 3729 (the "FCA"), alleging that the defendants submitted an application to the National Institute on Aging ("NIA") for research on Alzheimer's disease ("AD") which relied on falsified data.  The district court granted summary judgment for the defendants.  We vacate that ruling.

**I.**

        In 2006, Dr. Kenneth Jones ("Jones" or "Relator") filed a qui tam action under the FCA against defendants Brigham and Women's Hospital ("BWH"), Massachusetts General Hospital ("MGH"), Dr. Marilyn Albert, and Dr. Ronald Killiany (collectively, the "Defendants").  Jones claimed that the Defendants violated the FCA by including false statements in a grant application that was submitted to the NIA, an institute within the National Institutes of Health ("NIH").  The NIH is an agency of the United States Department of Health and Human Services.  Jones alleged that statements in the Program Project Grant Application (the "Application") were predicated on falsified data and that the Defendants, knowing of this falsity, failed to take corrective action or disavow the data.  After the parties filed cross-motions for summary judgment, the district court granted judgment for the Defendants.

-2-

Jones timely appeals, maintaining that material factual disputes remain concerning the Defendants' conduct.  He asserts that the record supports a conclusion that the Defendants violated the FCA by (1) "knowingly submitting an application for a grant to the [NIH] that was based on falsified and fraudulently manipulated study data and false statements of blinded, reliable methodologies," and (2) receiving NIH funds while knowingly in violation of regulations that require applicant institutions to investigate and report allegations of scientific misconduct.[1]

After careful review of the record, we conclude that the district court abused its discretion by excluding or failing to consider certain expert testimony.  It then committed an error of law by failing to consider statements of the parties and experts in a manner required by the summary judgment standard.  When properly considered, those statements generate genuine issues of material fact concerning some of Relator's FCA claims.  We begin our explanation of these conclusions by describing the research project in question, Relator's concerns, and the NIH grant application process.  We then recount in some detail the contents of the parties' expert reports. In Part II, we consider the district

---

[1] Harvard Medical School, Harvard University, and Dr. Marie F. Kijewski were also named as defendants in this action.  The parties stipulated to voluntary dismissal without prejudice of the case against Harvard Medical School and Harvard University on March 17, 2009.  Dr. Kijewski moved separately to dismiss the case against her.  After a hearing on the matter, the district court granted Dr. Kijewski's motion to dismiss on July 10, 2009.

-3-

court's failure to examine Dr. Daniel Teitelbaum's expert report in its entirety, its improper evaluation of portions of other expert reports, and Relator's other claims.

## A. The Research Project

The alleged false claims were submitted to the NIA in conjunction with a Program Project Grant ("PPG") proposal focused on AD, a neurodegenerative illness associated with aging. Dr. Marilyn Albert acted as the Principal Investigator (the "PI") on the PPG and oversaw the work of both Killiany and Jones.[2] The individual Defendants and Relator were part of a larger project team working to identify early physical manifestations of AD in certain regions of the brain and differentiate those characteristics from changes related to normal aging. Successfully doing so would enable health care providers to predict who will develop AD years before the individual displays diagnosable symptoms, thereby permitting early intervention. The NIH began funding this research in 1980 under a grant entitled "Age-related changes of cognition in health and disease" (the "Grant"), and continued to fund the project through 2007.

The proposed PPG consisted of four "Projects," long-term research studies focused on related issues, and four "Cores," each of which provided various types of support to the Projects.

---

[2] Both BWH and MGH were parties to the original grant. MGH has since merged with BWH. Albert and Killiany were both affiliated with MGH.

-4-

Killiany, a neuroanatomist, would head "Project 3," and utilize MRI to explore regions of interest ("ROIs"), including the EC, in the brain. Project 3 was a continuation of a study already in progress, the preliminary results of which were published in a 2000 paper authored by Killiany, Albert, and Dr. Mark Moss. During the study, Killiany and another researcher ("rater"), Dr. Teresa Gomez-Isla, developed and agreed to a protocol by which to locate and outline the EC and other ROIs on MRI scans. According to the Application, raters were blinded, meaning they were unaware of participants' cognitive groupings.[3] Raters were provided with participants' identification numbers and sometimes their names. Participant identification numbers were assigned consecutively upon participants' entry into the study; thus the numbers did not communicate information to the raters about participants' cognitive statuses. Using a trackball mouse and "Neuroview" software, the raters manually outlined a number of brain structures, including the EC, on 103 participants' MRI scans.[4] Based on the raters'

---

[3] Study participants were assigned to one of three diagnostic groups - normal, questionable, or converter. Initially, all participants were categorized as either "normal" (also known as "control") or "questionable." Participants were assigned to the normal group if they met the clinical dementia rating for normal cognition or were assigned to the questionable group if they met the clinical dementia rating for questionable cognition. Over the course of the study, some participants' cognitive difficulties progressed such that they met the clinical criteria for probable AD. These participants were reassigned to the "converter" group.

[4] Between approximately 1995 and 1999, Killiany traced the scans of 103 participants. In approximately 1996 or 1997, Gomez-

-5-

outlines, the software calculated the volume of the traced EC, and those calculations were later sent to Dr. Mary Hyde, the Data Manager and Programmer for "Core B," the Data Management and Statistical Core.[5]  Thereafter, members of Core B, supervised by Jones, conducted statistical analyses of the data to determine whether changes in the volume of the EC could help predict which cognitively healthy people would develop AD in the future.

Between 1995 and 1999, Killiany modified his outlining process.  In his deposition, Killiany testified that as he worked through participants' scans, he encountered a number of "anatomical anomalies."  When he encountered such anomalies, he went back and reviewed earlier outlines to ensure that those tracings properly considered the anatomical issue.  If, upon reviewing an outline, he felt that it should be revised, he re-traced the EC boundary, the software recalculated the volumetric data, and he eventually sent the new data to Hyde.

---

Isla traced the scans of a subset of 25 participants.  In 1996 or 1997, members of Core B compared Gomez-Isla's tracings to Killiany's tracings of the same 25 participants to determine inter-rater reliability, an index of how close the volumetric data generated by one rater's measurements is to that generated by another rater's measurements of the same item.

[5] Volumetric data was sent to Core B for statistical analysis periodically over the course of several years.  Killiany stated that he intermittently sent data to Hyde in batches, which sometimes included re-measurements.  Gomez-Isla stated that she did not recall personally sending data to Core B.

**B.  Relator's Concerns About the Study Data**

As noted, the relator in this case, Jones, headed Core B. In that role, he supervised data management, assessed project progress, analyzed project data, and developed new analytic frameworks.  In March 2001, Jones met with Albert and Dr. Keith Johnson, the leader of Project 2.  Jones and Johnson alerted Albert that they had concerns about the data that Killiany produced prior to 1998, which had been used to demonstrate a statistically significant relationship between the volume of the EC and conversion to AD.  Jones noted that there was more than one data set for a number of study participants and expressed concern regarding the quantitative differences between those sets. Killiany had re-measured the scans of 30 participants - thirteen in the normal group, twelve in the questionable group, and five in the converter group.[6]  Jones had particular concerns about 23 of those re-measurements.   Jones told Albert that the alterations were substantial and that, according to his analysis, the alterations were responsible for the apparent statistical significance.  Jones asked Albert to look into the issue.[7]

_____

[6] There is a dispute about the precise number of scans Killiany re-measured and their categorization.  Defendants claim that 31 scans were re-traced, of which twelve were in the normal group, eleven were in the questionable group, two were in the converter group, and six were unclassified.  On summary judgment, we resolve such disputes in favor of the non-moving party.

[7] The parties disagree as to whether Jones asked Albert to have someone "verify" the data, as appellees argue, or "re-measure"

In response, Albert asked Dr. Mark Moss, a noted neuroanatomist who had been involved with the PPG since its inception, to examine for accuracy the 23 re-measurements about which Jones and Johnson expressed concern. Moss reviewed the scans in question and hand wrote notes expressing his opinion of the accuracy of each scan. He concluded that with one exception, Killiany's second set of measurements more accurately outlined the EC. At Albert's request, Moss gave his notes to Killiany. Later, Killiany created a typewritten document ostensibly containing Moss's notes,[8] and sent the document to Jones and Johnson. Albert also received the typed notes and was satisfied with Moss's conclusion that the re-measurements were more accurate than the initial ones. Jones was unsatisfied with Moss's assessment and asked that the scans in question be re-measured. Albert refused. In her deposition, Albert stated that she believed that an

---

the EC on the scans, as appellant argues. In this case, we do not believe that the distinction is meaningful. Whether Albert was asked to have the data verified or the scans re-measured, she was on notice that Jones and Johnson had concerns about Killiany's second set of data and, therefore, had reason to look into the matter.

[8] Since Moss's handwritten notes no longer exist, it is impossible to determine whether Killiany's typed notes are an exact replica. In his deposition, Moss stated that he likely would not have used certain phrases that appear in the version that Killiany typed. Moss said that due to the amount of time that had passed, he could not be sure that the language that appeared in the typed version was what he said in his handwritten notes, but he also noted that he trusted Killiany and "assume[d]" that the typed notes were accurate.

-8-

additional set of measurements would confuse instead of answer the question of which data set was more accurate, so she did not have the scans re-measured.  Jones continued to work with data generated from Killiany's tracings until July 30, 2001, when he told Albert that he would no longer work with Killiany's data without "neutralizing" it.  After that, Jones did not work with any MRI data generated from Killiany's tracings.

## C.   The NIH Grant Application Process

To secure funding from the NIH for age-related research, institutions must submit applications to the Center for Scientific Review and the NIH.  The applications are then forwarded to the NIA, where they first undergo a peer review process conducted by a panel of independent experts in the relevant field.  The panel considers a number of factors, including the quality and originality of the science proposed, the quality of the investigators, and the quality of the facilities in which the research will take place.  Based on these considerations, the Scientific Review Administrator prepares a statement (the "Pink Sheets") summarizing the strengths and weaknesses of a proposal. If the project is recommended for further consideration, the National Advisory Council on Aging will review the application, focusing its evaluation on the perceived scientific quality of the application.  After the Advisory Council's review, final approval is committed to the discretion of the Director of the NIA.

-9-

On October 1, 2001, Albert and MGH submitted a PPG Application for the 2002-2007 NIH funding cycle. As part of the Application, Defendants described the results of relevant preliminary studies, including the MRI study in which Killiany allegedly manipulated data. The Application also outlined the methods that would be used in future research and the protocols that the researchers planned to employ to ensure data reliability. The Defendants did not include the allegedly false underlying data itself, but did include a discussion of the results generated by the data and explained why those results supported the proposed study. The Application did not mention the existence of two sets of data or Jones's allegations of wrongdoing. Before submission, Albert and a representative of MGH certified the truthfulness of the Application's contents on its cover.[9]

---

[9] Albert signed the following certification:

I certify that the statements herein are true, complete and accurate to the best of my knowledge. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties. I agree to accept responsibility for the scientific conduct of the project and to provide the required progress reports if a grant is awarded as a result of this application.

MGH representative Marcia L. Smith signed the following certification:

I certify that the statements herein are true, complete and accurate to the best of my knowledge, and accept the obligation to comply with Public Health Service terms and conditions if a grant is awarded as a result of this application. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to

-10-

**D. The Parties' Experts**

    1. Defense Expert Dr. Andrew J. Saykin

    Saykin is a professor of radiology at the Indiana University School of Medicine and Director of the Indiana University Center for Neuroimaging, with a research focus on "the integration of neuroimaging and genomic data with emphasis on early detection of Alzheimer's disease."[10]  In his report, Saykin stated that outlining "ROIs on brain scans inevitably involves a learning curve for the neuroanatomic rater and some degree of trial and error, especially as methods are refined and solidified." As such, Saykin did "not believe that it was unusual or inappropriate for Killiany to perform re-measurements to improve his accuracy of measurement, as long as he remained blinded to the clinical status of the participants."  Saykin stated that re-measurements like those that Killiany made are normal and need not be reported "unless the re-measurements were undertaken as part of a formal reliability assessment after a change in the protocol for measuring the EC."  He also stated that he believed that "Killiany took great pains to refine and update his measurements, following the protocol or procedural guidelines he had developed, in an attempt to make

---

criminal, civil, or administrative penalties.

    [10] Saykin held these positions as of August 4, 2010, the date of his expert report.

the measurements more accurate."  Saykin concluded that Killiany
was blinded at the time of the re-measurements.

Regarding the allegations of misconduct, Saykin stated
that it was "appropriate for [Albert] to ask a prominent
neuroanatomist to review Killiany's measurements and provide his
analysis demonstrating whether the re-measurements were done in an
attempt at greater accuracy or simply to prove the hypothesis.
Since Albert concluded the former had occurred . . . there was no
need to report what had happened to anyone."  Saykin stated that
if, in fact, "Killiany's first set of measurements did not
demonstrate the predictive value of the volume of the EC, those
measurements were inconsistent with the findings from many other
scientific studies," as "[i]t is now scientifically accepted that
the volume of the EC is a good predictor of conversion to AD."

2.  Relator Expert Dr. Norbert Schuff

Not surprisingly, Relator's expert offered a contrasting
conclusion.  Schuff is a professor of radiology at the University
of California in San Francisco, an investigator at the VA Medical
Center in San Francisco, lead physicist at the Center for Imaging
of Neurodegenerative Diseases at the VA Medical Center in San
Francisco, and a researcher focusing on the development of new MRI
methods and concepts to identify markers of neurodegenerative

diseases, including AD.[11]  He stated that while Killiany and the other rater, Gomez-Isla, had reached an "initial conceptual understanding [of] how to trace the [EC]" and had achieved "high inter-rater reliability" using that protocol for the first set of measurements, Killiany's re-measurements included "extensive" revisions that were "frequently inconsistent with the initially adapted protocol . . . and seemed to introduce greater rater variability."  Schuff noted that any changes to the protocol should have been discussed with Gomez-Isla, after which Gomez-Isla would have revised her tracings and the statistics Core would have retested reliability.  Because Killiany failed to take these steps, Schuff concluded that the only "explanation for the highly selective revisions of the [EC] tracings in [the normal group]" was that such "revisions were made with knowledge of the [participants'] diagnos[e]s."  Schuff noted that the objectivity of the EC measurements was material to the NIH's and the peer reviewers' assessments of the merit of the proposed project.

     3.  Relator Expert Dr. Martha Isabel Dávila-García

     Dávila-García, an Associate Professor at Howard University College of Medicine,[12] explained the NIH application consideration process based on her knowledge as a past application

---

[11] Schuff held these positions as of the date of his expert report, August 2, 2010.

[12] Dávila-García held this position as of the date of her expert report, September 15, 2010.

-13-

reviewer.   She stated, among other things, that the Application contained "a number of statements that were material to the government's funding decision . . . includ[ing] the preliminary data and progress report of the scientists' ongoing research project, as well as the reliability of the blinded methodologies the scientists claimed they followed in validating that data." Dávila-García further suggested that "[e]ach of these statements was required to be made in the grant application, and each is fundamental to the peer review ranking of the application."

Dávila-García also stated that Albert's inquiry into the alleged misconduct was insufficient.   Under 42 C.F.R. § 50.103(d)(8)-(9) (2001),[13] Albert was required to seek out someone free from "real or apparent conflicts of interest" with "appropriate expertise to carry out a thorough and authoritative evaluation of the relevant evidence in any inquiry or investigation."   Dávila-García opined that Moss was an improper

_____

[13] Federal regulation 42 C.F.R § 50.103 describes the responsibilities of awardee and applicant institutions that seek or receive assistance from the Public Health Service division of the United States Department of Health and Human Services, of which the NIH is an agency.   Subsection 50.103(d) describes the various assurances that subject institutions must make to ensure that they are capable of dealing with and reporting possible scientific misconduct, including "[s]ecuring necessary and appropriate expertise to carry out a thorough and authoritative evaluation of the relevant evidence in any inquiry or investigation," § 50.103(d)(8), and "[t]aking precautions against real or apparent conflicts of interest on the part of those involved in the inquiry or investigation," § 50.103(d)(9).   This regulation has since been replaced by 42 C.F.R. § 93.100-319.

-14-

choice to review Killiany's work, as Moss "was Killiany's boss and mentor, and the chairman of the Department of [A]natomy and [N]eurobiology at Boston University School of Medicine," who "would appear to . . . have a conflict of interest and be biased to protect the reputation of his Department and its members."[14]

4.  Relator Expert Dr. Daniel Teitelbaum

Teitelbaum has a Ph.D. in engineering and has experience working with "statistics, data analysis, predictive modeling, building computer simulation, mathematical optimization, [and] logistics and operations research." He stated that in his opinion, "the altered data points undo the validity of the study's conclusions" because "[r]ather than being a systematic visitation upon the study data, Killiany conducted the second set of measurements by cherry-picking the study subjects in a non-random fashion." Moreover, Teitelbaum stated that "the changes themselves were responsible for the significance of the results Killiany claimed to achieve . . . . Had the original data been used, Killiany could not have reported his findings in published

_____

[14] Killiany has held a number of positions in the Department of Anatomy and Neurobiology at Boston University School of Medicine. He was a postdoctoral fellow there from 1991-92, a research associate from 1994-2001, a research assistant professor from 2001-2003, an assistant professor from 2003-2006, and, as of 2006, an associate professor in the department. According to Killiany's curriculum vitae, he has worked on at least four grants for which Moss was the principal investigator, and they have authored more than thirty book chapters and peer-reviewed publications together.

-15-

scientific journals or to the NIH in support of an application for a Program Project Grant."

Regarding the reliability study, Teitelbaum explained that

> [w]hile minor refinements in measures may be appropriate after a reliability study is performed, it would be inappropriate to make significant alterations or to record data in deviation of the protocols subjected to the reliability study.  It would be particularly unusual for there to be any changes to statistical measurements without a full, documented explanation as to why such changes were required.  In this case, the magnitude of the changes clearly conflict [sic] with the extent of normal variations based on a reported 0.96 Pearson Correlation achieved.[15]

Teitelbaum concluded "that the data in Killiany's study which was reported and relied upon in the 2002 PPG Renewal Application was deliberately manipulated in order to achieve statistically significant results that could not be achieved but for the manipulation of the data."  He stated that as a result, "Killiany reported data that had not truthfully been generated pursuant to the stated protocols, and he negated his assertion that those protocols had been proven to be blinded and reliable."

---

[15] The Pearson Correlation coefficient is a statistical value between -1.0 and 1.0 used to indicate the linear relationship between two variables.  A coefficient of 0.0 indicates that there is no relationship between the variables, and a coefficient of 1.0 indicates a perfect positive linear relationship between the variables.

-16-

## II.

When Jones filed his claim in 2006,[16] the FCA imposed civil liability on any person who either "knowingly presents, or causes to be presented to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), or "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," id. § 3729(a)(2).[17]   A person acts "knowingly" if he or she "(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."

---

[16] Under the FCA, the Attorney General may bring an action, 31 U.S.C. § 3730(a), or an individual may bring an action "in the name of the Government," 31 U.S.C. § 3730(b)(1).   An individual who brings an action under the FCA, who is known as a relator, may proceed regardless of whether the Government chooses to intervene and take over the action.   31 U.S.C. § 3730(b)(4)(B).

[17] Our discussion relies on the provision in effect at the time Jones filed his complaint.   See United States ex rel. Susan Hutcheson and Phillip Brown v. Blackstone Medical, Inc., 647 F.3d 377, 380 (1st Cir. 2011), cert. denied, 132 S. Ct. 815 (2011).   The FCA has since been amended by the Fraud Enforcement Recovery Act ("FERA") of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009).   Under FERA, an individual incurs liability when he or she "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," id. § 3729(a)(1)(B).   Application of the amended language would not affect the outcome in this case.

-17-

Id. § 3729(b).[18]  A relator need not show any "proof of specific intent to defraud."  Id.  We have also "long held that the FCA is subject to a judicially-imposed requirement that the allegedly false claim or statement be material."  United States ex rel. Loughren v. Unum Grp., 613 F.3d 300, 307 (1st Cir. 2010).

The district court found that Jones had not generated genuine issues of material fact on any of the elements at issue - falsity, materiality, and knowledge.  Jones argues to the contrary. He notes that the Application relies on Killiany's research and claims that Killiany "fraudulently altered the MRI study data prior to 1998 to produce false results of a statistically significant correlation between conversion to AD and volume of the EC," and did so "after the scientists had conducted a reliability study showing consistency in the manual drawings of EC boundaries."  Jones claims that the alterations led to results that were incompatible with the results of the reliability study that was conducted and with the stated protocols.  He alleges that "Albert and the defendant

_____

[18] The parties do not distinguish how each theory of liability applies to each particular defendant; we leave that issue open for remand.  We note, though, that while Killiany and Albert may have been directly responsible for development of the alleged falsities at issue, MGH and BWH, which has since acquired MGH, may be vicariously liable under the FCA for the misrepresentations of their employees.  We have long held that corporate defendants may be subject to FCA liability when the alleged misrepresentations are made while the employee is acting within the scope of his or her employment.  See United States v. O'Connell, 890 F.2d 563, 568 (1st Cir. 1989) (noting that nothing in the FCA's text proscribes vicarious liability, and application of vicarious liability serves the FCA's dual purposes of restitution and deterrence).

-18-

hospitals submitted the subject application for NIH funding on the entire PPG, including a separate MRI project, without disclosing to NIH the second set of MRI data, its statistical impact or the allegations and appearance of Killiany's misconduct."[19]  Jones also asserts a series of separate errors that he claims undermine the court's ultimate conclusion.

We review the district court's evidentiary determinations, namely, its decisions to admit or exclude expert testimony, for abuse of discretion.  Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 31 (1st Cir. 2004); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142-43 (1997) (noting that abuse

---

[19]  Jones also claims that the district court abused its discretion by not finding that the Defendants had spoliated evidence, including scientific notebooks, MRI images, data files, emails, and any record of the internal inquiry into the allegations of scientific misconduct.  Jones argues that such evidence should have been preserved under 45 C.F.R. § 74.53(b), "Post-Award Requirements Reports and Records."  Under § 74.53(b),

[f]inancial records, supporting documents, statistical records, and all other records pertinent to an award shall be retained for a period of three years from the date of submission of the final expenditure report . . . .

The district court found - as the name of the regulation suggests - that the Post-Award Requirements are forward-looking and apply only once a grant has been awarded.  Thus, because the grant in question was not funded until 2002, the Post-Award Requirements did not apply to records pre-dating 2002.  We agree with the district court that Jones's spoliation claim fails on this basis.  The district court also noted that applicant institutions are required to retain documents related to misconduct inquiries for three years, a time span that terminated in 2004 in this case.  Jones gives us no basis to doubt this determination; indeed, we note that Jones first brought suit in 2006.

of discretion review applies to threshold evidentiary determination made in connection with summary judgment motions).  "Evidentiary rulings have the potential to shape and winnow the scope of the summary judgment inquiry, and a trial court should have as much leeway in dealing with those matters at the summary judgment stage as at trial."  Alt. Sys. Concepts, Inc., 374 F.3d at 31-32.  A court abuses its discretion if it commits "a material error of law," or if it "ignores a material factor deserving significant weight, relies upon an improper factor, or assesses only the proper mix of factors but makes a serious mistake in evaluating them." Downey v. Bob's Disc. Furniture Holdings, 633 F.3d 1, 5 (1st Cir. 2011).

After reviewing the district court's evidentiary determinations and thereby settling the scope of the summary judgment record, we review the court's grant of summary judgment de novo.  Schubert v. Nissan Motor Corp. in U.S.A., 148 F.3d 25, 29 (1st Cir. 1998); see also Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 558 (1st Cir. 2010).  "[W]e will reverse a grant of summary judgment only if, making all factual inferences in favor of the non-moving party, a rational fact-finder could resolve the legal issue for either side."  D&H Therapy Assocs., LLC v. Boston Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011).  Where, as here, the parties have filed cross-motions for summary judgment, we must "determine whether either of the parties deserves judgment as

-20-

a matter of law on facts that are not disputed."  Sch. Union No.
37, 617 F.3d at 559 (quoting Littlefield v. Acadia Ins. Co., 392
F.3d 1, 6 (1st Cir. 2004)) (internal quotation mark omitted).

**A.  Teitelbaum's Expert Testimony**

The Defendants filed a motion in limine to preclude
Relator from offering certain testimony and evidence, including
aspects of the proposed testimony from each of his three expert
witness reports.  Defendants argued, among other things, that as a
statistician, Teitelbaum was unqualified to assess inter-rater
reliability or to opine when a reliability study should be
conducted or what would be expected on the basis of reliability
results.  The Defendants also challenged the admissibility of
various statements in Teitelbaum's report, arguing that his
opinions lacked sufficient support or were ambiguous, misleading,
or otherwise inadmissible.

Jones notes that the district court did not directly
address the motion in limine in the memorandum accompanying its
summary judgment ruling, and, indeed, did not mention Teitelbaum's
report or its admissibility at all.  Although a district court is
afforded great discretion in deciding whether to admit or exclude
opinion evidence, Crowe v. Marchand, 506 F.3d 13, 16 (1st Cir.
2007), it cannot abdicate that responsibility altogether.  In this
case, the district court could not properly conduct its summary
judgment analysis without determining the admissibility of

Teitelbaum's report, which speaks directly to issues at the heart
of Jones's claims.  See, e.g., Cruz-Vázquez v. Mennonite Gen.
Hosp., 613 F.3d 54, 57 (1st Cir. 2010) (noting that it is the
district court's responsibility to "determin[e] whether to admit or
exclude expert testimony" based on an evaluation of whether "the
expert's testimony both rests on a reliable foundation and is
relevant to the task at hand" (internal quotation marks omitted)).
By failing to exercise its discretion, namely, failing to admit or
exclude Teitelbaum's report, the district court committed an error
of law and, thereby, abused its discretion.  See Downey, 633 F.3d
at 5.

        That error, however, does not necessarily mean that we
must vacate the district court's summary judgment ruling.  In the
absence of the district court's analysis regarding the dispute over
Teitelbaum's qualifications, we will make our own determination on
the admissibility of Teitelbaum's testimony in order to determine
the scope of the summary judgment record.  See Boston Duck Tours,
LP v. Super Duck Tours, LLC, 531 F.3d 1, 15 (1st Cir. 2008)
(stating that an appellate court may make a determination on "a
relevant and required issue" where remanding "would be a waste of
judicial resources and incompatible with the urgency of the issue
before us").

        According to the curriculum vitae submitted with his
expert report, Teitelbaum has a Ph.D. in Engineering and Public

-22-

Policy.  Since his graduation in 1998, he has worked in a variety of settings with duties related to statistics, data analysis, predictive modeling, computer simulation, mathematical optimization, and logistics and operations research.  In rendering his opinions, Teitelbaum stated that he analyzed a variety of materials including, among other things, Killiany's original and revised data sets, Killiany's 2000 paper, Albert's deposition testimony, Relator's Table, a data chart illustrating the revisions' effect on reliability, and excerpts from the Application.

        We see no bar to the admission of Teitelbaum's testimony in light of this dispute over his qualifications.  In our judgment, that dispute only goes to the weight of his opinion testimony before a fact-finder.  For purposes of summary judgment, having determined that Teitelbaum's report is admissible, we ask whether his report, along with other record evidence, generates genuine issues of material fact as to whether Killiany falsified data while unblinded to participants' group membership, and, thereby, undermined the study's results and statements made by the Defendants in the PPG Application.

**B. Falsity**

        Jones alleged that Defendants made three different misrepresentations in conjunction with the NIH Application.  First, Jones claimed that the Defendants described and relied on

Killiany's research without reflecting the alleged fraudulent manipulation of the EC tracings, specifically, the unblinded, selective enlargement of certain tracings to produce results that exaggerated group differences.

Second, Jones alleged that the Defendants made false statements regarding reliability methodologies in the Application by reporting a 0.96 Pearson Correlation coefficient. Jones argued that this coefficient corresponded to the first set of tracings that Killiany made, even though the second set was the data that produced the statistically significant result that the Defendants relied upon in the Application. Jones argued that when a reliability study was conducted comparing Gomez-Isla's tracings and Killiany's second set of measurements, the correlation coefficient dropped to 0.54.

Finally, Jones alleged that the Defendants violated the FCA by falsely certifying that they were in compliance with Public Health Services ("PHS") terms and conditions and NIH Scientific Misconduct Regulations. Jones alleged that Defendants failed to meet their obligations under 42 C.F.R. § 50.103(c)(3), which requires applicant institutions to take "immediate and appropriate action as soon as misconduct on the part of employees or persons within the organization's control is suspected or alleged." Jones claimed that Albert's inquiry into Jones's allegations was insufficient and that the Defendants were obligated to conduct a

-24-

full investigation and report the results of that investigation to
the NIH.

The district court considered the parties' claims under
an FCA falsity framework that we have since rejected.  The court
stated:

> There are three theories under which a claim
> may be "false or fraudulent" under the Act.
> These are: (1) factual falsity; (2) legal
> falsity under an express certification theory;
> and (3) legal falsity under an implied
> certification theory.

(Footnotes omitted.)  After the parties briefed this appeal, we had
occasion to clarify the proper framework for analyzing FCA claims.
See generally Hutcheson, 647 F.3d 377; see also New York v. Amgen,
Inc., 652 F.3d 103 (1st Cir. 2011), cert. dismissed, 132 S. Ct. 993
(2011).  In Hutcheson, we rejected rigid divisions between factual
and legal falsity, and express and implied certification, noting
that the text of the FCA does not make such distinctions.  The use
of such categories, in "our view[,] . . . may do more to obscure
than clarify the issues before us."  Hutcheson, 647 F.3d at 385-86.
Instead, we take a broad view of what may constitute a false or
fraudulent statement to avoid "foreclos[ing] FCA liability in
situations that Congress intended to fall within the Act's scope."
Id. at 387 (quoting United States v. Sci. Applications Int'l Corp.,
626 F.3d 1257, 1268 (D.C. Cir. 2010)) (internal quotation marks
omitted).  Taking this broad view does not, however, create
limitless liability.  Indeed, FCA liability continues to be

-25-

circumscribed by "strict enforcement of the Act's materiality and scienter requirements." Id. at 387-88 (quoting Sci. Applications Int'l Corp., 626 F.3d at 1280) (internal quotation marks omitted). We analyze each of Relator's claims by applying the plain language of the FCA in accordance with our decision in Hutcheson.

    1.  Falsified Data Generated by Unblinded Methodology

        a.  Data Generated from Re-measurements

The district court found that Jones "failed to articulate how the supposedly false data relates to a false statement in the Application," as "[t]here is no evidence that the EC data itself was submitted as part of the Application." Moreover, the district court found that "the act of tracing the boundaries of the EC is subjective and requires the exercise of scientific judgment" such that "two scientists who use the same protocol manually to trace the EC may nevertheless obtain different results." In dismissing the significance of the disagreement of the experts, the district court noted that such disputes over the exercise of scientific judgment may not form the proper basis for an FCA claim and cannot "yield a resolution where one can state with reasonable certainty that one conclusion is true and the other false."

Although it is true that the allegedly false EC volumetric data was not itself included in the Application, that fact is not determinative of the false claim allegation. The statute makes it a violation to "use[] . . . a false record or

-26-

statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2).  A number of statements in the Application demonstrate reliance on the study's conclusions and therefore necessarily implicate the allegedly false data.  For example, the Application contains the following statements:

> [W]e found that 3 measures obtained at baseline were highly significant predictors of who would develop AD on follow-up: (1) the volume of the entorhinal cortex, (2) the banks of the superior temporal sulcus, and (3) the caudal portion of the anterior cingulate. When the control subjects were compared with the non-demented individuals with memory impairments who ultimately developed AD (i.e., the 'converters'), the accuracy of discrimination was 93% based on the MRI measure at baseline (sensitivity = 0.95; specificity = 0.90). . . .  One hundred percent (100%) of normal controls could be discriminated from the patients with mild AD based on these 3 baseline MRI measures (Killiany et al., 2000).

> [W]e have demonstrated that to identify individuals in the prodromal phase of AD, regions such as the entorhinal cortex and the caudal portion of the anterior cingulate are highly discriminating.

> Our major finding is that measures of memory and executive function, or SPECT and MRI measures of brain regions related to these domains (such as the entorhinal cortex, the hippocampus, and the caudal portion of the anterior cingulate) are highly predictive of subsequent development of dementia among non-demented individuals with memory problems. . . .  In the current application we propose to expand the longitudinal evaluation of the subjects to permit a more detailed understanding of the variables that predict course during prodromal AD.

-27-

> The most discriminating MRI measures pertain
> to atrophy of the medial temporal lobe
> (particularly the entorhinal cortex), and the
> volume of anterior and posterior cingulate
> (Killiany et al., 2000).

These statements rely on the data challenged by Jones as false.  In the language of the FCA, they "use . . . a false record."  Thus premised, the statements would not be "true, complete and accurate" as required by the certifications signed by Albert and MGH.

We agree with the district court that "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false."  (citing United States ex rel. Roby v. Boeing Co., 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000)).  However, we disagree that the creation of the data in question was necessarily a matter of scientific judgment.  The district court relied on "the undisputed fact that tracing the EC is highly subjective and thus two scientists who use the same protocol manually to trace the EC may nevertheless obtain different results."  This reliance, however, misses the point that the various results produced in this case were obtained by one scientist purportedly using the same protocol.  Although the decision as to which measurement method to employ was a question of scientific judgment, that is not the issue here.  As Schuff noted, Killiany and Gomez-Isla "had reached a conceptual understanding [about] how to trace the [EC]" and used that protocol in their initial measurements, which demonstrated high inter-rater

-28-

reliability.   The real issue is whether, as Schuff opines, Killiany's revisions "substantially deviate[d] . . . from the initial protocol for [the EC] that [he and Gomez-Isla] had established to the point that the initial and new markings [were] no longer consistent" or capable of meaningful comparison.  Indeed, Killiany himself explained that one aim of the project was to substantiate whether "two knowledgeable individuals" could "apply a definition of the [EC] . . . across a large number of MRI scans" and "actually even agree on where the [EC] would be."

        Killiany suggested that over the course of measuring 103 participants' brain scans, he went through a learning curve during which he discovered various anatomical anomalies that required modifications of his measurement technique.  He explained that after he came across this type of anomaly, he would review previously outlined scans and evaluate them in accordance with his now-modified technique.  Although the Defendants' expert Saykin stated that such re-measurements to improve accuracy were not "unusual or inappropriate . . . as long as [Killiany] remained blinded to the clinical status of the participants," the record raises questions about Killiany's explanation.

        The distribution of altered data among and within participant groups raises the greatest concern.  Of the 103 participants in the final study population, 30 participants' scans were re-traced.  Teitelbaum suggested that if the changes were in

-29-

fact revisions for accuracy, one would expect some re-tracings to be smaller than the corresponding original tracing, resulting in a lower volume measurement, and some re-tracings to be larger, resulting in a higher volume measurement. Moreover, Teitelbaum stated, one would expect to see such enlargements and reductions occurring randomly in all groups of participants. Instead, the most frequent and dramatic changes occur in the normal group. Measurements were changed for 13 of 24 normals (54.2 percent), with volume increases from 0.3 to 283.3 percent.[20] Of the 19 "converters," five were changed (26.3 percent), with volume increases between 0.3 and 12.1 percent.[21] Of the 60 participants classified as "questionables," twelve were changed (20 percent), with volume changes between -23.9 percent and 72.5 percent.[22] Moreover, the changes within the normal group did not appear random. The six smallest initial measurements were each increased by over 100 percent. Twelve of the smallest thirteen original measurements were revised, while only one of the eleven largest was (and that one by only 0.3 percent). Of course, it may be that one of the anatomic anomalies that Killiany discovered affected only

---

[20] Participants categorized as "normals" or "controls" met the clinical dementia rating for normal cognition.

[21] Participants categorized as "converters" met the clinical criteria for probable AD.

[22] Participants categorized as "questionables" met the clinical dementia rating for questionable cognition.

-30-

the smallest of the original measurements.  Teitelbaum suggested that if this were the case, however, he would expect to see revisions concentrated within the smallest original measurements in the other groups as well.  Instead, changed data points in the converter and questionable groups appear throughout the range of initial measurements.  Five changes in the questionable group occur in the smallest 1/3 of measurements; four in the middle 1/3; and three in the largest 1/3.  In the converter group, only one change appears in the nine smallest measurements.  The remaining four changes occur in the largest ten measurements.

In essence, moderate revisions occurred seemingly randomly in the converter and questionable groups, but relatively large revisions were concentrated in the smallest half of the control group.  As Schuff stated, most of Killiany's revisions were "quite extensive," "biased toward normal subjects," frequently "inconsistent with the initially adapted protocol agreed to by the raters, and "not founded on scientific reason."  Schuff further explained that "[i]f Killiany had made the second set of measurements as part of his 'learning curve,'" sound scientific practice required him "to generate documentation and work papers in connection with his corrections . . . and share[] what he learned with his colleagues."  Killiany testified that he does not recall discussing his decision to perform re-measurements with anyone on the PPG, and that after he initially discussed the EC boundaries

with Gomez-Isla, the two did not have subsequent discussion on the topic.  The upward revisions in the control group were critical to the predictive value of the study; if normal subjects showed large EC volume changes and moved into the converter or questionable group, the result was physical evidence of potentially great predictive significance.

The revisions in question do not implicate questions of scientific judgment as the district court suggested, because all the measurements in question were purportedly generated by a single protocol that Killiany and Gomez-Isla agreed to before beginning the measurements.  Indeed, as Schuff noted, whether Killiany's measurements were more or less accurate than the initial measurements is not at issue.  Even if Killiany's re-measurements fall within an accepted range of scientific accuracy, a question remains as to whether the data was falsified by intentionally exaggerating the EC boundaries of normal subjects to achieve a desired result.  We conclude that the distribution of revisions presents a genuine issue of material fact as to whether, as Teitelbaum put it, Killiany cherry-picked measurements to revise in a non-random fashion "in order to produce data that would support his hypothesis on the role of EC volume and the prediction of prodromal AD."

b.  Blinded Methodologies

Using data provided by the defendants during discovery, Jones created a data table illustrating the distribution of alterations among and within participant groups ("Relator's Table" or "the Table").  The Table visually demonstrated the distribution and quantitative nature of the re-measurements.  It listed the original and revised data for the 103 participants reported in Killiany's 2000 paper.  On the left side of the Table, participants were ordered from smallest to largest according to their original measurements; on the right side of the Table, participants were ordered from smallest to largest according to their revised measurements.  The significant volume enlargement of eleven normal participants is illustrated by arrows pointing from the participants' original measurements to their revised measurements.  Most of the arrows start from the smallest original measurements and move downward to the same participants' revised numbers, which tend to be among the largest revised measurements.  Relator claimed that the Table demonstrated that "Killiany selectively cherry-picked and substantially altered the normal subjects with the smallest [ECs]."  Such selective alterations would necessarily indicate that Killiany was unblinded and aware of participants' group affiliations.

In his deposition, Killiany stated that he was blinded to the group status of study participants when he was making his

-33-

tracings and transmitting the volumetric data generated from those tracings.  Albert stated that she believed that Killiany had stayed blinded because he did not have access to participants' diagnoses and because he told her that he had been blinded.  Johnson stated that it was "[his] understanding . . .  that the operator who is implementing  the  protocol  . . .  would  be  blinded  to  the classification of the subject being [traced]."  Saykin  concluded that "[b]ased on all the information [he] reviewed, [he] believed that Dr. Killiany did remain blind to the clinical status of the cases he was analyzing or re-analyzing anatomically, as would be standard and appropriate in this type of research."

Relying  on  Albert  and  Johnson's  depositions,[23]  the district  court  found  that  "[a]mple  record  evidence  shows  that Killiany was . . . blinded to the group status of the participants for  which  he  traced  the  boundaries  of  the  EC"  and  to  "the statistical  significance  of  any  data  he  produced."   The  district

---

[23]  Johnson, the leader of Project 2, along with Jones, first reported concerns about the data to Albert.  On appeal, Defendants maintain  that  "Johnson  confirmed  that  Killiany  was  blinded." However, the Johnson deposition excerpt that Defendants cite - and upon which the district court relied - confirms only that Johnson "was  generally  aware  that  those  types  of  [blinding]  procedures would  be  involved."   When  Johnson  was  asked  who  would  know  if blinding  procedures  had  been  violated,  Johnson  stated  that  he "would assume those involved with executing the protocol and those who would be overseeing that execution, which would be Dr. Killiany and perhaps Dr. Moss."   It is apparent from Johnson's statement that  he  would  not  expect  to  hear  if  Killiany  had  breached  the protocol.   Thus,  the  fact  that  Johnson  did  not  hear  of  such  a breach  does  not  conclusively  resolve  the  question  of  whether Killiany was appropriately blinded.

court also noted that "Relator himself admitted at his deposition that he has no evidence that Dr. Killiany was not following proper, blinded methodologies when retracing EC boundaries."

On appeal, Jones maintains that he referred only to his direct personal knowledge when he indicated that he had no evidence that Killiany was not blinded.  Moreover, Jones insists that his personal knowledge is not determinative.  Rather, Jones argues, Teitelbaum's independent analysis of the raw data and the Relator's Table each created a genuine issue of fact as to whether Killiany was blinded.[24]  We agree.  In light of Teitelbaum's independent analysis and Relator's Table, there is a genuine issue of fact as to whether Killiany was blinded or instead deliberately selected certain participants whose data he manipulated to create the statistically significant result that he ultimately reached.  The district court erred in concluding otherwise.

2.  Reliability Study

Jones alleged that the Application contained misrepresentations about the pertinent reliability study - specifically, that the study cited in the Application was conducted on the first set of data, not the second set, which was the data ultimately used.  The Application stated that the methodology used

_____

[24] Although the hearing transcript indicates that Relator's Table was in the courtroom and was provided to the court and the Defendants during the hearing, the district court did not acknowledge the Table in its decision.

-35-

to manually draw image maps had demonstrated an inter-rater reliability coefficient between 0.94 and 0.99. According to Albert, such reliability numbers are "very high" and demonstrate consistency in results between raters, here Killiany and Gomez-Isla. Relator claimed that when the second set of data was tested for reliability, the Pearson Correlation coefficient dropped from 0.96 to 0.54.

The district court disregarded Jones's testimony on this issue. Based on Jones's experience as lead statistician for Core B, the district court thought that Jones was "likely . . . qualified to provide expert testimony regarding a reliability study," but nonetheless rejected his testimony because (1) "it is not clear . . . that the Relator has put himself forth as an expert consistent with [Federal Rule of Civil Procedure] 26(a)(2)" and (2) the Relator failed to provide a proper foundation upon which to accept his conclusions. The district court found Jones similarly deficient as a lay witness, finding that he did "not provide sufficient competent evidence of his personal knowledge," because (1) much of the data he received from Killiany's research came by way of another statistician on the project, and (2) he provided no evidence conveying "when and how the reliability study was conducted, who randomly selected the twenty-five subjects for the study, and who actually conducted the study."

-36-

Jones did, in fact, list himself as a non-retained expert in his Rule 26(a)(2) expert disclosure, <u>see</u> Fed. R. Civ. P. 26(a)(2), and, to form his opinion, relied on personal knowledge obtained as leader of the statistical Core and information provided by the Defendants during discovery, <u>see</u> Fed. R. Evid. 702. The district court abused its discretion in excluding from consideration Jones's reliability study testimony. <u>See</u> <u>Alt. Sys. Concepts, Inc.</u>, 374 F.3d at 32. Moreover, the district court did not account for the apparently undisputed fact that no reliability study was conducted on the re-measurements. For example, Albert was asked during her deposition whether "anybody . . . conducted any reliability studies on the remeasurements?" She replied, "No . . . . We didn't have reliability data for -- we didn't have another rater available. We would have had to redo the reliability studies, and to me the critical thing . . . was that [the measurements] were accurate." As Teitelbaum points out, however, the question was not only one of accuracy, but also one of reliability, specifically whether another reliability study was necessary after Killiany's re-measurements. Albert thought not, saying, "I thought that we were following the guidelines, that they were the same guidelines established in the reliability study, and that we were applying them as best we could."

Teitelbaum, on the other hand, opined that "it was inappropriate to claim that a blinded reliability study had been

used in the generation of preliminary data when the data reported
was not generated pursuant to the reported reliable methodologies"
and had not been subject to a reliability study.  Similarly, Jones
maintains that after he "analyzed the impact of the altered data on
both the reliability study and the reported volumetric data
results," it became clear that the changes that Killiany made were
responsible for the statistical significance of the reported data
and that the altered data resulted in a vastly lower Pearson
Correlation coefficient.  Any technique modifications that Killiany
made after discovering anatomical anomalies meant that he was no
longer using the precise method Gomez-Isla had employed when she
previously outlined ECs under the original methodology.  The
reliability numbers published in the Application conveyed the
reliability between Killiany and Gomez-Isla under the original,
unmodified approach to outlining the EC.  Relator and his experts
suggest that once Killiany deviated from this methodology, another
reliability study should have been conducted and its results
included in the Application.

There are substantial disputes here on the veracity of
the reliability study data included in the Application.  The
district court erred in concluding otherwise.

### 3.  Misrepresentation of Compliance with the PHS Terms and Conditions

Jones alleged that the Defendants misrepresented their
compliance with the Public Health Services ("PHS") terms and

-38-

conditions, which outline investigation and reporting requirements when scientific misconduct is reported.  Regulation 42 C.F.R. § 50.103(d)(1) requires each institution to "inquir[e] immediately into an allegation or other evidence of possible misconduct."  The institution must contact outside authorities and report any situation in which, based on the initial inquiry, the institution determines that an investigation is warranted.  42 C.F.R. § 50.103(d).  Jones claims that the inquiry Moss conducted was patently inadequate to satisfy the requirements of § 50.103(d). Relator also argues that Defendants were required to create a written record of the inquiry conducted about Killiany's alleged misconduct and report the results to the NIH Office of Research Integrity.

Noting that Relator had not properly pled his PHS terms and conditions certification claim in his Second Amended Complaint, the district court stated that Relator made this claim for the first time in his motion for summary judgment.  Further, the district court stated that even if the claim were considered on the merits, it could not withstand summary judgment.  The district court acknowledged that the "Applicant Organization" certification signed by the MGH Director of Grants and Contracts promised that MGH would comply with PHS terms and conditions, including 42 C.F.R.

-39-

§ 50.103.[25]  It found, however, that the certification only promised
compliance once a grant was awarded.  Accordingly, because the
alleged misconduct occurred before submission, it was not governed
by the forward-looking certification.

We focus on the district court's procedural critique of
Relator's pleading.  In so doing, we agree with the court that it
was not until Jones filed his motion for summary judgment that he
propounded the theory that the Defendants' failure to investigate
and report any inquiry was itself a false claim, independent of his
claims regarding the use of falsified data not subject to a
reliability study.  Under Fleming v. Lind-Waldock & Co., 922 F.2d
20 (1st Cir. 1990), that was too late.  Id. at 24 ("[I]nitial
failure to satisfy the [pleading] burden in no way obligates the
district court to allow the parties an opportunity to offer matters
outside the pleadings.  Simply put, summary judgment is not a
procedural second chance to flesh out inadequate pleadings."); cf.
Redondo Waste Sys. v. López-Freytes, 659 F.3d 136, 141 (1st Cir.
2011) (affirming denial of motion to amend where complaint did not
sufficiently "apprise defendants of the claims against them,"

_____

[25] The district court suggested that the certification signed
by MGH was too vague to support what it styled an "express
certification."  We do not address this aspect of the district
court's decision other than to note that we have since rejected the
strict, categorical approach that it employed.  See Hutcheson, 647
F.3d at 385-86.

-40-

which, the court stated, was "[t]he whole point of notice
pleading").

In an effort to avoid this conclusion, Jones points to
three paragraphs in the Second Amended Complaint that he argues
demonstrate that his PHS terms and conditions compliance claim was
properly pled:

> 22.  On the October 2001 grant application,
> defendants Albert and Massachusetts General
> Hospital certified their assurances that the
> information supplied was "true, complete and
> accurate," that they accepted the obligation
> to comply with Public Health Service terms and
> conditions, and that they acknowledged
> liability under federal law for false or
> fraudulent statements or claims.
>
> 23.  During the course of applying for and
> receiving NIH grant funds for the 2002-2007
> funding cycle, defendants, and each of them,
> made or caused to be made statements and
> certifications in grant application forms,
> progress reports, vouchers, requests for
> progress payments and other writings necessary
> for the payment of federal funds.
>
> 27.  On the basis of the false and fraudulent
> statements, defendants were awarded NIH grant
> funds.  These funds were paid out and
> disbursed to defendants over time pursuant to
> the Public Health Service terms and
> conditions.

These statements do not contain any references to the
Defendants' alleged violations of the PHS terms and conditions,
namely, the failure to adequately investigate Jones's allegations
of misconduct or report the Moss inquiry that was conducted in
2001.  Moreover, read in context, paragraph 27's reference to

-41-

"false and fraudulent statements" does not refer to a certification of compliance with the PHS terms and conditions.  Rather, it refers to statements set forth in the complaint (see ¶¶ 24-26) about the validity of the data, the blinding protocols used, and the inter-rater reliability coefficient applicable to the reported data.

The Second Amended Complaint also generally alleged that the Defendants "knowingly failed to take corrective action or disavow the false and fraudulent data after learning that their representations to NIH were false."  But that allegation, too, read in context, does not aver an independent PHS terms and conditions certification claim.  Instead, it relates to Albert's knowledge regarding the validity of Killiany's data and the claims made in the application based on that data.  Thus, as the district court did, we conclude that any distinct, independent FCA claim resting on a statement of adequate investigation or an omission of proper reporting was not originally pled in the Second Amended Complaint. We affirm the district court's grant of summary judgment on this claim.[26]

---

[26] Although we affirm the district court's summary judgment determination on Jones's misrepresentation of compliance with the PHS terms and conditions claim, we do not suggest that the Moss inquiry is irrelevant as a factual matter to other aspects of this case.  The nature and adequacy of the inquiry may still be relevant to Jones's other falsity claims.

-42-

**C. Materiality**

A false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." <u>Loughren</u>, 613 F.3d at 307 (alteration in original) (quoting <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 16 (1999)) (internal quotation marks omitted). Jones claimed that the allegedly manipulated data relied upon and the reliability coefficient reported were material misrepresentations that would have a natural tendency to influence the Application reviewers.[27]

1.  Manipulated Data

Because the district court failed to address Teitelbaum's and Jones's statements and other relevant record evidence, it did not make a materiality determination with regard to Relator's data manipulation claims. On the record before us, we conclude that it is likely that Relator's Table, Jones's testimony, and Teitelbaum's opinions about the manipulation of data - if credited - would be deemed material by a fact-finder. The allegedly false data produced the preliminary research results relied upon in the Project 3 proposal in the Application. If established, the notion that Killiany had been unblinded and had selectively manipulated

---

[27] Jones also claimed that the Defendants' allegedly false certification of compliance with the PHS terms and conditions was material. Because we affirm the district court's summary judgment determination on that issue, we do not address the materiality of that aspect of the certification.

-43-

data to produce a statistically significant result would certainly have had "a natural tendency to influence" the reviewers' evaluations.  See id.

### 2.  Reliability Correlation Coefficient

Having excluded portions of the reports from experts Schuff and Dávila-García, who alleged that the statements regarding the reliability study were material to NIH's decision to fund the Grant, the district court found that Jones "fail[ed] to satisfy the materiality element with respect to the statements concerning the reliability study."

### a.  Schuff's Materiality Determinations

The district court found Schuff unqualified to "testify as to the materiality of a statement regarding the NIH review process" because he did not "list any qualifications regarding the NIH application review process or the peer editing process."  To the contrary, Schuff's curriculum vitae - submitted with his report - listed four NIA/NIH grant proposals on which he was a reviewer between 2006 and 2009 and numerous other experiences as a grant and peer reviewer for other institutions as well.  Schuff's curriculum vitae also stated that he has specialized knowledge and training in relevant topics such as neuroimaging and neurodegeneration, has published more than 150 peer-reviewed articles in those and related fields, and has acted as the Principal Investigator on several clinical trials that utilized MRI to examine ROIs including the EC.

-44-

In light of the information in Schuff's curriculum vitae, we
conclude that the district court abused its discretion by excluding
Schuff's opinions regarding the materiality of the application
statements discussing reliability.  Thus, we treat those statements
as if they had been admitted and consider them in our de novo
review of the district court's summary judgment determination.

      b.  Dávila-García's Materiality Determinations

      The district court similarly excluded Dávila-García's
statement "that the reliability study was material to NIH's
decision to fund the Grant."  Although the court stated that
Dávila-García "appears qualified to opine" on the materiality of
statements in the Application concerning the reliability study, it
rejected her report because it found that she "[did] not support
her opinion with any evidence from the record."  Specifically, the
district court found that although Dávila-García stated that the
reliability analysis was material because it was a required element
of the application, it excluded her opinion because she "[did] not
. . . provide any support for [her] statement from a statute,
regulation, instruction manual, or . . . personal experience[,]
. . . [and did not] cite any of the reviewers' comments from the
Pink Sheets regarding the strengths and weaknesses of the
Application."  Further, the district court found that the record
contradicted Dávila-García's testimony, because the Pink Sheets
stated that "[t]he use of the Pearson correlation coefficients and

Student t-tests to assess reliability, as proposed, is inadequate." Despite the reviewers' disapproval of the proposed reliability methodology, they favorably evaluated the Application.  Therefore, the Defendants argued, the reliability study could not have been material to the NIH's determination.  The district court agreed.

The district court abused its discretion by concluding that Dávila-García did not sufficiently rely on personal experience in formulating her opinion about the materiality of the reliability study.  If a witness relies primarily on experience, she must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note.  Dávila-García had personal experience as a peer reviewer and was familiar with the NIH grant application process.[28]  In her report, Dávila-García expressly stated that "each opinion [in the report] is based upon a reasonable degree of certainty, in light of [her] experience and background."  She explained the peer-review process that grant applications undergo at the NIH:

> In making its ranking decision, NIH
> peer reviewers carefully consider several
> factors, as reflected in the NIH grant

---

[28] According to her curriculum vitae, Dávila-García reviewed four articles between 1999 and 2009, and acted as a grant reviewer on six committees between 2001 and 2010, including one NIH committee.  Dávila-García also acted as a grant consultant on two projects, one with the NIH from 2007-2012.

-46-

application. Instructions require applicants
to include in the proposal a detailed research
plan, describing the specific aims of the
scientific project, preliminary data and
progress reports on the work performed prior
to the grant's submission, the procedures used
and proposed to be used during the course of
the project, and anticipated problems for the
project with proposed solutions. These
disclosures are essential to the peer-review
process, as it is the responsibility of the
reviewers to provide their best assessment of
the chances for success and significance of
that success on any given project.

She then applied her experience and knowledge of the peer review
process to the facts in this case as she understood them:

Within the grant proposal at issue in
this case, the applicants make a number of
statements that were material to the
government's funding decision. Such material
information undisputedly included the
preliminary data and progress report of the
scientists' ongoing research project, as well
as the reliability of the blinded
methodologies the scientists claimed they
followed in validating that data . . . .
Defendants represented that reliability
studies had confirmed a high correlation
between and among blinded raters (measuring in
ranges between 0.94 and 0.99 for Pearson r
correlation coefficients). Each of these
statements was required to be made in the
grant application, and each is fundamental to
the peer review ranking of the application.

Moreover, we note that the Pink Sheet statement cited by

the Defendants and the district court appeared in Section D of the

Application, entitled "Research and Design Methods." Section D

outlined the methodologies that would be employed in future studies

to be conducted if grant funds were awarded. In contrast,

-47-

reliability study <u>results</u> from <u>past</u> studies were presented in Section C, "Progress Report/Preliminary Studies." Although we agree with the district court that the methodology concerns described in the Pink Sheets indicate that the Defendants' proposed method of future reliability testing was immaterial to the reviewers' decision, that conclusion does not satisfy the materiality determination about the results of the reliability study conducted in previous research projects. The alleged falsity in this case does not rest upon the adequacy of the reliability method to be employed in the future, but rather on results allegedly already obtained in a past reliability study and relied upon by the applicants in their proposal.

In sum, the evidence brought forth by Relator on the reliability issue generates an issue of fact regarding materiality, specifically, whether providing a reliability coefficient of 0.54, or stating that no reliability study was conducted on the measurements that gave rise to the scientifically significant results, would be capable of influencing the reviewers' decision.

**D.  Knowledge**

The text of the FCA and our case law make clear that liability cannot arise under the FCA unless a defendant acted knowingly. <u>See</u> 31 U.S.C. § 3729(a); <u>Hutcheson</u>, 647 F.3d at 388. In the district court, Jones pointed to Relator's Table and Teitelbaum's expert report, among other record evidence, as proof

-48-

that the defendants knowingly created falsified data and used that data to support statements in the Application espousing the promise of research demonstrating the significant predictive value of the volume of the EC in determining who will later develop AD.[29]   As noted, the district court abused its discretion by failing to consider Jones's statements and Teitelbaum's report at summary judgment.

Jones also alleged that the parties knowingly submitted a reliability coefficient from Killiany's study that did not incorporate his second set of data, the set from which the study's conclusions were drawn.  The district court found that Jones failed to establish that the parties knew that they were submitting a "statement regarding the Pearson Coefficient [that] was inaccurate."  The district court found that "the record [wa]s silent as to whether the reliability study was conducted on the second set of data and whether the reference to the Pearson Coefficient related to the first or second set of data."

As noted, the district court's conclusion on this matter ignores Defendant Albert's statement that she did not have an additional reliability study performed on the re-measurements because she was focused on the accuracy and did not have another rater available for re-measurements.  See supra Part II.B.2.  Furthermore, Killiany testified that he reviewed Gomez-Isla's

---

[29] The relevant statements are quoted supra Part II.B.1.a.

-49-

tracings sometime in 1996 or 1997 after the reliability study had been conducted. Killiany recognized that in tracing the scans upon which the reliability study was based, Gomez-Isla was "trying to apply the same working definition [that he] was trying to apply at the time." At the same time, Killiany testified that he continued tracing scans into 1998 or 1999, making revisions when necessary, and acknowledged that it is possible that he re-measured scans that were part of the initial reliability study well after that study had concluded.

In light of the foregoing arguments, and construing all facts in favor of Relator, we conclude that Jones generated a genuine issue of material fact as to whether the Defendants acted knowingly when allegedly making false representations in the Application.

### III.

The dispute at the heart of this case is not about resolving which scientific protocol produces results that fall within an acceptable range of "accuracy." Nor is it about whether Killiany's re-measurements, the basis for the preliminary scientific conclusions reported in the Application, are "accurate" insofar as they fall within a range of results accepted by qualified experts. Rather, the essential dispute is about whether Killiany falsified scientific data by intentionally exaggerating the re-measurements of the EC to cause proof of a particular

-50-

scientific hypothesis to emerge from the data, and whether statements made in the Application about having used blinded, reliable methods to produce those results were true. If the jury should find that statements in the Application are false, they must also determine whether those statements were material and whether the Defendants acted knowingly in violating the FCA.

Because we conclude that genuine issues of material fact remain on these central issues, we <u>vacate</u> the district court's order and <u>remand</u> for further proceedings consistent with this opinion. Costs are awarded to the appellant.

<u>So ordered</u>.

**Smallest to Largest Volumes Sorted using Killiany Original Measures**

**Shift in Rank Caused by Killiany Revisions**

**Smallest to Largest Volumes Sorted using Killiany Revised Measures**

Group Status:
- n = Normal
- q = Questionable
- c = Converter

### Killiany Original Measures (left)

| Rank | Subject ID | Killiany Original Measures | Killiany Revised Measures | % Change from Revision | Group Status |
|---|---|---|---|---|---|
| 1 | 32 | 0.91 | 0.91 | 0.0 | q |
| 2 | 53 | 0.95 | 1.04 | 9.5 | c |
| 3 | 56 | 1.08 | 4.14 | 283.3 | n |
| 4 | 55 | 1.46 | 1.46 | 0.0 | c |
| 5 | 155 | 1.49 | 1.49 | 0.0 | q |
| 6 | 113 | 1.66 | 1.66 | 0.0 | q |
| 7 | 161 | 1.74 | 1.74 | 0.0 | q |
| 8 | 123 | 1.82 | 1.82 | 0.0 | q |
| 9 | 103 | 1.83 | 3.83 | 109.3 | n |
| 10 | 164 | 1.83 | 1.83 | 0.0 | q |
| 11 | 72 | 1.85 | 1.85 | 0.0 | c |
| 12 | 43 | 1.94 | 2.62 | 35.1 | q |
| 13 | 47 | 1.96 | 1.96 | 0.0 | q |
| 14 | 95 | 2.02 | 2.4 | 18.8 | q |
| 15 | 136 | 2.06 | 5.01 | 143.2 | n |
| 16 | 142 | 2.07 | 5.05 | 144.0 | n |
| 17 | 50 | 2.1 | 2.1 | 0.0 | c |
| 18 | 30 | 2.1 | 2.1 | 0.0 | q |
| 19 | 127 | 2.11 | 2.11 | 0.0 | q |
| 20 | 10 | 2.16 | 2.16 | 0.0 | c |
| 21 | 130 | 2.21 | 2.22 | 0.5 | q |
| 22 | 96 | 2.21 | 2.21 | 0.0 | q |
| 23 | 118 | 2.23 | 2.98 | 33.6 | q |
| 24 | 129 | 2.24 | 2.24 | 0.0 | q |
| 25 | 112 | 2.27 | 6.33 | 178.9 | n |
| 26 | 19 | 2.31 | 2.31 | 0.0 | q |
| 27 | 16 | 2.33 | 2.33 | 0.0 | q |
| 28 | 1 | 2.35 | 5.35 | 127.7 | n |
| 29 | 42 | 2.37 | 2.37 | 0.0 | c |
| 30 | 36 | 2.41 | 2.41 | 0.0 | q |
| 31 | 119 | 2.41 | 2.41 | 0.0 | q |
| 32 | 92 | 2.43 | 2.43 | 0.0 | c |
| 33 | 109 | 2.57 | 2.57 | 0.0 | q |
| 34 | 98 | 2.61 | 2.61 | 0.0 | q |
| 35 | 79 | 2.61 | 2.6 | -0.4 | q |
| 36 | 122 | 2.65 | 3.65 | 37.7 | n |
| 37 | 80 | 2.7 | 2.7 | 0.0 | c |
| 38 | 140 | 2.72 | 4.72 | 73.5 | n |
| 39 | 151 | 2.72 | 2.8 | 2.9 | q |
| 40 | 2 | 2.77 | 2.77 | 0.0 | q |
| 41 | 159 | 2.78 | 2.78 | 0.0 | q |
| 42 | 62 | 2.8 | 2.8 | 0.0 | q |
| 43 | 141 | 2.82 | 4.82 | 70.9 | n |
| 44 | 78 | 2.9 | 3.22 | 11.0 | c |
| 45 | 54 | 2.9 | 3.1 | 6.9 | q |
| 46 | 24 | 2.9 | 2.9 | 0.0 | q |
| 47 | 135 | 2.9 | 2.9 | 0.0 | q |
| 48 | 18 | 2.93 | 2.93 | 0.0 | q |
| 49 | 173 | 2.94 | 2.94 | 0.0 | c |
| 50 | 154 | 2.98 | 5.14 | 72.5 | n |
| 51 | 29 | 2.99 | 2.99 | 0.0 | q |
| 52 | 150 | 3.01 | 4.31 | 43.2 | q |
| 53 | 27 | 3.01 | 3.01 | 0.0 | n |
| 54 | 20 | 3.07 | 3.07 | 0.0 | q |
| 55 | 59 | 3.09 | 3.77 | 22.0 | c |
| 56 | 167 | 3.12 | 3.13 | 0.3 | n |
| 57 | 121 | 3.14 | 3.14 | 0.0 | q |
| 58 | 124 | 3.15 | 3.15 | 0.0 | q |
| 59 | 14 | 3.18 | 3.18 | 0.0 | q |
| 60 | 17 | 3.23 | 3.23 | 0.0 | q |
| 61 | 69 | 3.24 | 3.24 | 0.0 | q |
| 62 | 101 | 3.3 | 3.3 | 0.0 | q |
| 63 | 29 | 3.31 | 3.31 | 0.0 | q |
| 64 | 162 | 3.32 | 3.32 | 0.0 | q |
| 65 | 27 | 3.34 | 3.34 | 0.0 | n |
| 66 | 4 | 3.34 | 3.34 | 0.0 | q |
| 67 | 156 | 3.34 | 3.34 | 0.0 | q |
| 68 | 45 | 3.36 | 3.36 | 0.0 | q |
| 69 | 31 | 3.36 | 3.45 | 2.7 | n |
| 70 | 67 | 3.4 | 3.4 | 0.0 | q |
| 71 | 160 | 3.41 | 3.41 | 0.0 | q |
| 72 | 81 | 3.43 | 3.43 | 0.0 | q |
| 73 | 114 | 3.45 | 5.45 | 58.0 | n |
| 74 | 149 | 3.48 | 3.9 | 12.1 | c |
| 75 | 97 | 3.49 | 3.49 | 0.0 | q |
| 76 | 90 | 3.51 | 3.67 | 4.6 | c |
| 77 | 172 | 3.52 | 3.52 | 0.0 | n |
| 78 | 49 | 3.52 | 3.52 | 0.0 | q |
| 79 | 104 | 3.52 | 3.52 | 0.0 | q |
| 80 | 39 | 3.56 | 3.56 | 0.0 | q |
| 81 | 157 | 3.56 | 3.56 | 0.0 | q |
| 82 | 152 | 3.57 | 3.57 | 0.0 | q |
| 83 | 100 | 3.61 | 3.61 | 0.0 | n |
| 84 | 117 | 3.64 | 3.64 | 0.0 | q |
| 85 | 120 | 3.73 | 3.73 | 0.0 | q |
| 86 | 52 | 3.74 | 3.75 | 0.3 | n |
| 87 | 5 | 3.78 | 4.82 | 27.5 | q |
| 88 | 132 | 3.78 | 3.78 | 0.0 | q |
| 89 | 83 | 3.89 | 3.89 | 0.0 | n |
| 90 | 25 | 3.98 | 4.05 | 1.8 | q |
| 91 | 144 | 4.09 | 4.09 | 0.0 | n |
| 92 | 102 | 4.1 | 4.1 | 0.0 | n |
| 93 | 85 | 4.14 | 4.14 | 0.0 | q |
| 94 | 89 | 4.15 | 4.15 | 0.0 | n |
| 95 | 153 | 4.15 | 4.15 | 0.0 | n |
| 96 | 106 | 4.17 | 4.17 | 0.0 | n |
| 97 | 15 | 4.17 | 4.17 | 0.0 | q |
| 98 | 76 | 4.31 | 4.31 | 0.0 | n |
| 99 | 133 | 4.34 | 4.34 | 0.0 | n |
| 100 | 40 | 4.47 | 4.47 | 0.0 | c |
| 101 | 85 | 4.51 | 4.51 | 0.0 | q |
| 102 | 131 | 4.56 | 4.56 | 0.0 | q |
| 103 | 9 | 4.9 | 3.73 | -23.9 | q |

### Killiany Revised Measures (right)

| Rank | Subject ID | Killiany Original Measures | Killiany Revised Measures | % Change from Revision | Group Status |
|---|---|---|---|---|---|
| 1 | 32 | 0.91 | 0.91 | 0.0 | q |
| 2 | 53 | 0.95 | 1.04 | 9.5 | c |
| 3 | 55 | 1.46 | 1.46 | 0.0 | c |
| 4 | 155 | 1.49 | 1.49 | 0.0 | q |
| 5 | 113 | 1.66 | 1.66 | 0.0 | q |
| 6 | 161 | 1.74 | 1.74 | 0.0 | q |
| 7 | 123 | 1.82 | 1.82 | 0.0 | q |
| 8 | 164 | 1.83 | 1.83 | 0.0 | q |
| 9 | 72 | 1.85 | 1.85 | 0.0 | c |
| 10 | 47 | 1.96 | 1.96 | 0.0 | q |
| 11 | 50 | 2.1 | 2.1 | 0.0 | c |
| 12 | 30 | 2.1 | 2.1 | 0.0 | q |
| 13 | 127 | 2.11 | 2.11 | 0.0 | q |
| 14 | 10 | 2.16 | 2.16 | 0.0 | c |
| 15 | 96 | 2.21 | 2.21 | 0.0 | q |
| 16 | 130 | 2.21 | 2.22 | 0.5 | q |
| 17 | 129 | 2.24 | 2.24 | 0.0 | q |
| 18 | 19 | 2.31 | 2.31 | 0.0 | q |
| 19 | 16 | 2.33 | 2.33 | 0.0 | q |
| 20 | 42 | 2.37 | 2.37 | 0.0 | c |
| 21 | 95 | 2.02 | 2.4 | 18.8 | q |
| 22 | 36 | 2.41 | 2.41 | 0.0 | q |
| 23 | 119 | 2.41 | 2.41 | 0.0 | c |
| 24 | 92 | 2.43 | 2.43 | 0.0 | c |
| 25 | 109 | 2.57 | 2.57 | 0.0 | q |
| 26 | 79 | 2.61 | 2.6 | -0.4 | q |
| 27 | 98 | 2.61 | 2.61 | 0.0 | q |
| 28 | 43 | 1.94 | 2.62 | 35.1 | q |
| 29 | 80 | 2.7 | 2.7 | 0.0 | c |
| 30 | 2 | 2.77 | 2.77 | 0.0 | q |
| 31 | 159 | 2.78 | 2.78 | 0.0 | q |
| 32 | 151 | 2.72 | 2.8 | 2.9 | q |
| 33 | 62 | 2.8 | 2.8 | 0.0 | q |
| 34 | 24 | 2.9 | 2.9 | 0.0 | q |
| 35 | 135 | 2.9 | 2.9 | 0.0 | q |
| 36 | 18 | 2.93 | 2.93 | 0.0 | q |
| 37 | 173 | 2.94 | 2.94 | 0.0 | c |
| 38 | 118 | 2.23 | 2.98 | 33.6 | q |
| 39 | 29 | 2.99 | 2.99 | 0.0 | q |
| 40 | 21 | 3.01 | 3.01 | 0.0 | q |
| 41 | 20 | 3.07 | 3.07 | 0.0 | q |
| 42 | 54 | 2.9 | 3.1 | 6.9 | q |
| 43 | 167 | 3.12 | 3.13 | 0.3 | c |
| 44 | 121 | 3.14 | 3.14 | 0.0 | q |
| 45 | 124 | 3.15 | 3.15 | 0.0 | q |
| 46 | 14 | 3.18 | 3.18 | 0.0 | q |
| 47 | 78 | 2.9 | 3.22 | 11.0 | c |
| 48 | 17 | 3.23 | 3.23 | 0.0 | q |
| 49 | 69 | 3.24 | 3.24 | 0.0 | q |
| 50 | 101 | 3.3 | 3.3 | 0.0 | q |
| 51 | 29 | 3.31 | 3.31 | 0.0 | q |
| 52 | 162 | 3.32 | 3.32 | 0.0 | q |
| 53 | 27 | 3.34 | 3.34 | 0.0 | n |
| 54 | 4 | 3.34 | 3.34 | 0.0 | q |
| 55 | 156 | 3.34 | 3.34 | 0.0 | q |
| 56 | 45 | 3.36 | 3.36 | 0.0 | c |
| 57 | 67 | 3.4 | 3.4 | 0.0 | q |
| 58 | 160 | 3.41 | 3.41 | 0.0 | q |
| 59 | 81 | 3.43 | 3.43 | 0.0 | q |
| 60 | 31 | 3.36 | 3.45 | 2.7 | n |
| 61 | 97 | 3.49 | 3.49 | 0.0 | q |
| 62 | 172 | 3.52 | 3.52 | 0.0 | n |
| 63 | 49 | 3.52 | 3.52 | 0.0 | q |
| 64 | 104 | 3.52 | 3.52 | 0.0 | q |
| 65 | 39 | 3.56 | 3.56 | 0.0 | q |
| 66 | 157 | 3.56 | 3.56 | 0.0 | q |
| 67 | 152 | 3.57 | 3.57 | 0.0 | q |
| 68 | 100 | 3.61 | 3.61 | 0.0 | n |
| 69 | 117 | 3.64 | 3.64 | 0.0 | q |
| 70 | 122 | 2.65 | 3.65 | 37.7 | n |
| 71 | 90 | 3.51 | 3.67 | 4.6 | c |
| 72 | 120 | 3.73 | 3.73 | 0.0 | q |
| 73 | 9 | 4.9 | 3.73 | -23.9 | q |
| 74 | 52 | 3.74 | 3.75 | 0.3 | n |
| 75 | 59 | 3.09 | 3.77 | 22.0 | c |
| 76 | 132 | 3.78 | 3.78 | 0.0 | q |
| 77 | 103 | 1.83 | 3.83 | 109.3 | n |
| 78 | 83 | 3.89 | 3.89 | 0.0 | n |
| 79 | 149 | 3.48 | 3.9 | 12.1 | c |
| 80 | 25 | 3.98 | 4.05 | 1.8 | q |
| 81 | 144 | 4.09 | 4.09 | 0.0 | n |
| 82 | 102 | 4.1 | 4.1 | 0.0 | n |
| 83 | 56 | 1.08 | 4.14 | 283.3 | n |
| 84 | 85 | 4.14 | 4.14 | 0.0 | q |
| 85 | 89 | 4.15 | 4.15 | 0.0 | n |
| 86 | 153 | 4.15 | 4.15 | 0.0 | n |
| 87 | 106 | 4.17 | 4.17 | 0.0 | n |
| 88 | 15 | 4.17 | 4.17 | 0.0 | q |
| 89 | 76 | 4.31 | 4.31 | 0.0 | n |
| 90 | 150 | 3.01 | 4.31 | 43.2 | q |
| 91 | 133 | 4.34 | 4.34 | 0.0 | n |
| 92 | 40 | 4.47 | 4.47 | 0.0 | c |
| 93 | 85 | 4.51 | 4.51 | 0.0 | q |
| 94 | 131 | 4.56 | 4.56 | 0.0 | q |
| 95 | 140 | 2.72 | 4.72 | 73.5 | n |
| 96 | 141 | 2.82 | 4.82 | 70.9 | n |
| 97 | 5 | 3.78 | 4.82 | 27.5 | c |
| 98 | 136 | 2.06 | 5.01 | 143.2 | n |
| 99 | 142 | 2.07 | 5.05 | 144.0 | n |
| 100 | 154 | 2.98 | 5.14 | 72.5 | n |
| 101 | 1 | 2.35 | 5.35 | 127.7 | n |
| 102 | 114 | 3.45 | 5.45 | 58.0 | n |
| 103 | 112 | 2.27 | 6.33 | 178.9 | n |

**EXHIBIT 178**

Case: 13-1973  Case: 1:07-cv-11488-WGY  Document 248-2  Date Filed: 06/28/13  Page 1 of 2  Filed 06/21/13  Page 1 of 2  Entry ID: 5802980

**From:** Ken Jones <kjj@ix.netcom.com>
**To:** "Marilyn Silagy Albert, PhD" <albert@psych.mgh.harvard.edu>
**Date:** Thursday, March 15, 2001 4:02 PM
**Subject:** Re: Remeasuring Cases

---

To MA
From Ken
15 March 2001

The following cases are candidates for re-evaluation. As you can see 12 are
in our gold normal group. Rhing is the MRI volume for right. Rench and
lench are the changes (in pixels) to the files  Name is a mnemonic assigned
by the SPECT group.

I would think that as these data are pivotal to many of our analyses (they
affect SPECT via ROI definitions) that they should be verified by an
independent evaluator (with all due respect to Ron's hard work).

| MAID | NAME | GOLD_GP | CDRSUM1 | NAME | AGE | GENDER | RENCH | LENCH | RRHING | LRHING |
|------|------|---------|---------|------|-----|--------|-------|-------|--------|--------|
| 114 | vmcin3 | . | .0 | vmcin3 | 77 | 1 | 76.00 | 76.00 | .2674 | .2780 |
| 115 | rmaca | . | .0 | rmaca | 71 | 1 | 76.00 | 76.00 | .2305 | .2516 |
| 126 | dherm | . | .0 | dherm | 68 | 2 | 28.00 | 13.00 | .1556 | .1529 |
| 150 | nbar | . | .0 | nbar | 72 | 2 | 83.00 | 15.00 | .2392 | .1914 |
| 154 | gcono | . | .0 | gcono | 72 | 1 | 80.00 | 83.00 | .2616 | .2524 |

5 cases in original cdrsum1=0

| 158 | mgoum | . | 1.0 | mgoum | . | . | -23.00 | -40.00 | .0923 | .0751 |

| 1 | kobri | 1 | .0 | kobri | 64 | 2 | 112.00 | 115.00 | .2734 | .2615 |
| 31 | tcast | 1 | .0 | tcast | 74 | 1 | -4.00 | 12.00 | .1668 | .1780 |
| 56 | rmrya | 1 | .0 | rmrya | 73 | 2 | 115.00 | 117.00 | .2031 | .2114 |
| 59 | afitz | 1 | .0 | afitz | 66 | 2 | 43.00 | 9.00 | .2013 | .1752 |
| 103 | cbaker2 | 1 | .0 | cbaker2 | 82 | 1 | 76.00 | 76.00 | .2121 | .1712 |
| 111 | hreyn | 1 | .0 | hreyn | 73 | 2 | 97.00 | 69.00 | .2483 | .2162 |
| 112 | lward | 1 | .0 | lward | 69 | 1 | 177.00 | 131.00 | .3615 | .2719 |
| 122 | dgreg2 | 1 | .0 | dgreg2 | 74 | 2 | .00 | 76.00 | .1463 | .2187 |
| 136 | egroip | 1 | .0 | egroip | 68 | 2 | 119.00 | 105.00 | .2601 | .2408 |
| 140 | fmalo | 1 | .0 | fmalo | 74 | 2 | 76.00 | 76.00 | .2318 | .2397 |
| 141 | aswee | 1 | .0 | aswee | 79 | 2 | 76.00 | 76.00 | .2424 | .2397 |
| 142 | jstan | 1 | .0 | jstan | 73 | 1 | 152.00 | 72.00 | .2629 | .2417 |

12 cases in gold controls

| 9 | jmoyl | 2 | 1.0 | jmoyl | 68 | 1 | -34.00 | -45.00 | .1964 | .1767 |
| 54 | wwake | 2 | 1.0 | wwake | 80 | 1 | -20.00 | 21.00 | .1400 | .1700 |
| 101 | vher | 2 | 1.0 | vher | 86 | 2 | -3.00 | -13.00 | .1595 | .1701 |
| 151 | kcroc | 2 | 1.0 | kcroc | 73 | 2 | -2.00 | 9.00 | .1541 | .1261 |
| 78 | slo | 3 | 1.5 | slo | 75 | 1 | 4.00 | 2.00 | .1610 | .1610 |

Number of cases read:  23 Number of cases listed: 23

JONES 1st RFP - 1266

Tue, Mar 23, 2010   3:59 PM

```
----------
>From: "Marilyn Silagy Albert, PhD" <albert@psych.mgh.harvard.edu>
>To: kjj@ix.netcom.com
>Subject: Remeasuring Cases
>Date: Thu, Mar 15, 2001, 2:07 PM
>

> Dear Ken and Keith,
>
>  I just spoke with Ron about the 12 cases that you would like to have
> remeasured. We agreed that he would remeasure them and have Mark check the
> outlines to be sure he agrees with them. Ron thinks they can probably do
> this all in a day or two, so the sooner you send me the case numbers, the
> sooner the cases will be remeasured.
>
>  I look forward to seeing you next Wednesday. Many thanks for your help.
>
>       Marilyn
>
>
```

JONES 1st RFP - 1267

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *Ex.* *Rel.* KENNETH JAMES JONES | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION ) NO. 07-11481-WGY |
| BRIGHAM AND WOMEN'S HOSPITAL, MASSACHUSETTS GENERAL HOSPITAL, RONALD KILLIANY, MARILYN ALBERT, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## JURY VERDICT

1. Did Dr. Killiany knowingly falsify scientific data by exaggerating certain re-measurements of the EC to cause proof of a particular scientific hypothesis to emerge from the data?

_____✓_____ no     _____ yes

2. Were the statements made in the Grant application about having used blinded, reliable methods to produce the measurements both material and knowingly false?

_____✓_____ no     _____ yes

Foreman

Date: 4/9/13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action
No: 07-cv-11481-WGY

JONES et al
Plaintiff

v.

BRIGHAM & WOMEN'S HOSPITAL et al
Defendant

JUDGMENT

This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

IT IS ORDERED AND ADJUDGED JUDGMENT FOR THE DEFENDANTS.

         **Robert M. Farrell**
         **Acting Clerk**

**So Approved**

  **/s/ William G. Young**
**United States District Judge**

         **/s/ Jennifer Gaudet**
         **Deputy Clerk**

**May 31, 2013**

**To: All Counsel**

Add. 56

```
MIME-Version:1.0
From:ECFnotice@mad.uscourts.gov
To:CourtCopy@localhost.localdomain
Message-Id:5011013@mad.uscourts.gov
Subject:Activity in Case 1:07-cv-11481-WGY Jones et al v. Brigham and Women's Hospital et
al Order on Motion for New Trial
```
Content−Type: text/html

## United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 7/22/2013 at 11:52 AM EDT and filed on 7/22/2013

| | |
|---|---|
| **Case Name:** | Jones et al v. Brigham and Women's Hospital et al |
| **Case Number:** | 1:07−cv−11481−WGY |
| **Filer:** | |

**WARNING: CASE CLOSED on 05/31/2013**

**Document Number:** 261(No document attached)

**Docket Text:**
**Judge William G. Young: ELECTRONIC ORDER entered denying [246] Motion for New Trial; denying [246] Motion for Summary Judgment; denying [246] Motion for Judgment as a Matter of Law (Paine, Matthew)**

**1:07−cv−11481−WGY Notice has been electronically mailed to:**

David J. Apfel     dapfel@goodwinprocter.com, cleblanc@goodwinprocter.com

Alan D. Rose, Sr     adr@rose−law.net

Harvey Nosowitz     hnosowitz@andersonkreiger.com

David K. Colapinto     dc@kkc.com

William D. Hughes     whughes@hughesnunn.com, ALautanen@HughesNunn.com

Laura E. Rosenbaum     lrosenbaum@goodwinprocter.com

Michael D. Kohn     mk@kkc.com

Jeremy L. Friedman     jlfried@comcast.net

Brian D. Lipkin     bdl@rose−law.net

**1:07−cv−11481−WGY Notice will not be electronically mailed to:**

Laurie J. Weinstein
United States Attorney's Office

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *Ex.*<br>*Rel.* KENNETH JAMES JONES | Case No. 1:07-CV-11481-WGY |
|     Plaintiff | |
| vs. | |
| BRIGHAM AND WOMEN'S<br>HOSPITAL, MASSACHUSETTS<br>GENERAL HOSPITAL, MARILYN<br>ALBERT, RONALD J. KILLIANY,<br>and MARIE F. KIJEWSKI, | |
|     Defendants | |

## NOTICE OF APPEAL

Notice is hereby given that Kenneth James Jones, *qui tam* plaintiff in the above named case, hereby appeals to the United States Court of Appeals for the First Circuit from the Judgment for all defendants entered in this action on the 31st of May, 2013 (Docket No. 244), and the denial of relator's Motions for New Trial, Summary Judgment and Judgment as a Matter of Law entered on July 22, 2013 (Docket No. 261). (Relator's Motions were timely filed June 28, 2013, Docket No. 246.) This appeal includes all interlocutory orders issued in this case, including those that gave rise to the Judgment and denial of relators' motions, and all proceedings in this case, including the jury trial that concluded April 10, 2013.

Respectfully submitted,

Dated: July 31, 2013

Kohn, Kohn & Colapinto, LLP
Hughes & Nunn, LLP
Law Office of Jeremy L. Friedman

By: /s/Jeremy L. Friedman
Jeremy L. Friedman

Attorneys for *qui tam* plaintiff
Kenneth James Jones

Add. 58

## CERTIFICATE OF ELECTRONIC SERVICE

I hereby certify that this document was filed through the ECF system of this Court on the 31st of July, 2013. This pleadings will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants.

/s/Jeremy L. Friedman
Jeremy L. Friedman

Michael D. Kohn (*Pro Hac Vice*)
David K. Colapinto (BBO No. 551835)
KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax:     (202) 342-6984
Michael Kohn [mk@kkc.com]
David Colapinto [dc@kkc.com]

William D. Hughes (BBO No. 243860)
HUGHES & NUNN LLP
350 Tenth Ave., Ste. 960
San Diego, CA 92101
Phone: (619) 231-1661
Fax:     (619) 236-9271
William D. Hughes [whughes@HughesNunn.com]

Jeremy L. Friedman (*Pro Hac Vice*)
LAW OFFICE OF JEREMY L. FRIEDMAN
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
Jeremy L. Friedman [jlfried@comcast.net]

Attorneys for *qui tam* plaintiff and relator
Kenneth James Jones