CASE NO. 13-1973
_____

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

KENNETH JAMES JONES, ex rel. United States of America

Plaintiff-Appellant

PRISCILLA PITT JONES, Ed.D., ex rel. United States of America;
UNITED STATES, ex rel. Kenneth James Jones

Plaintiffs

v.

MASSACHUSETTS GENERAL HOSPITAL; MARILYN ALBERT, Ph.D.;
RONALD J. KILLIANY, Ph.D.; BRIGHAM & WOMEN'S HOSPITAL

Defendants-Appellees

HARVARD MEDICAL SCHOOL; HARVARD UNIVERSITY;
MARIE F. KIJEWSKI, Sc.D.

Defendants
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**APPELLEES' BRIEF**
_____

Alan D. Rose (CAB #29639)
Brian D. Lipkin (CAB #1159011)
ROSE, CHINITZ & ROSE
One Beacon Street, 23rd Floor
Boston, Massachusetts  02108
(617) 536-0040
_____

MAY 16, 2014

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Under Fed. R. App. P. 26.1, Brigham & Women's Hospital discloses that:

1.  Brigham and Women's HealthCare, Inc. is the sole member of and nonprofit parent corporation of The Brigham & Women's Hospital, Inc.

2.  Partners HealthCare System, Inc. is the sole member of and nonprofit parent corporation of Brigham and Women's HealthCare, Inc.

3.  The Brigham & Women's Hospital, Inc. is a nonprofit corporation with no stock.

Under Fed. R. App. P. 26.1, Massachusetts General Hospital discloses that:

1.  The official name of Massachusetts General Hospital is "The General Hospital  Corporation," which is a nonprofit corporation.

2.  The Massachusetts General Hospital is the sole member and nonprofit parent corporation of The General Hospital Corporation.

3.  Partners HealthCare System, Inc. is the sole member and nonprofit parent corporation of The Massachusetts General Hospital.

4.  The General Hospital Corporation is a nonprofit corporation with no stock.

i

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS                     i

TABLE OF AUTHORITIES                                 vi

SUMMARY OF ARGUMENT                                  1

BACKGROUND                                           2

    I.    Using MRI scans, Dr. Gomez-Isla and Dr. Killiany measured a region of the brain called the entorhinal cortex.                                    3

    II.   As Dr. Killiany learned more about the entorhinal cortex, he concluded some of his initial measurements had been too conservative.             5

    III.  In an attempt to capture the entorhinal cortex more accurately, Dr. Killiany re-measured certain participants' MRI scans.                             6

    IV.  Dr. Albert asked an appropriate reviewer, Dr. Mark Moss, to look into Dr. Jones' concerns       8

    V.   After Dr. Albert had addressed Dr. Jones' concerns, Dr. Jones continued working on the study.    9

    VI.  At trial, Dr. Jones argued Dr. Killiany was liable because he had made the re-measurements, and Dr. Albert was liable because she had submitted the Grant Application.                            12

    VII.  The parties presented conflicting evidence for the jury to weigh.                                     13

VIII.   The conflicting evidence was critical for the jury to
decide the factual issues framed by this Court.                16

IX.   The District Court instructed the jury as Dr. Jones
requested, in accordance with this Court's previous
opinion.                                                       19

STANDARDS OF REVIEW                                            22

I.   Motion for Judgment as a Matter of Law                    22

II.   Motion for New Trial                                     23

ARGUMENT                                                       24

I.   The District Court properly denied Dr. Jones'
motion for judgment a matter of law.                           24

A. Dr. Jones waived the arguments in his
motion for judgment as a matter of law,
because he did not file a timely motion on
any issue other than damages.                           24

B. Even if Dr. Jones had preserved this issue,
the District Court properly denied his motion
for judgment as a matter of law.                        27

1.   Falsity                                      28

2.   Knowledge                                    29

3.   Materiality                                  33

II.   The District Court properly denied Dr. Jones'
motion for new trial.                                          34

A. The weight of the evidence supported the
   jury's verdict.                                          35

B. The District Court did not err by retaining
   jurisdiction over the case on remand.                    37

C. Dr. Jones cannot demonstrate that the District
   Court abused its discretion in ruling on the
   admissibility of evidence.                               39

   1. The District Court properly admitted
      evidence regarding the accuracy of
      Dr.        Killiany's     measurements,
      because this evidence was relevant to
      a critical issue: the defendants'
      intent.                                               40

   2. The District Court properly excluded
      the appendix to Dr. Schuff's report.                  41

   3. The District Court properly admitted
      Dr. Albert's testimony authenticating
      Dr. Jones' signature.                                 43

   4. The District Court properly admitted
      impeachment evidence regarding
      Dr. Jones' credibility.                               45

   5. The District Court properly admitted
      "laudatory statements" about the
      defendants' research.                                 47

6.  The District Court properly admitted evidence that other scientists have replicated the results of the defendants' research.                48

D.  The District Court did not err in instructing the jury.                49

1.  The Court should ignore Dr. Jones' brief discussion of this issue, because it does not rise to the level of appellate argument.                49

2.  Dr. Jones also forfeited this claim at trial.                50

3.  The District Court properly instructed the jury.   52

CONCLUSION                57

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

<u>Ahern v. Scholz</u>, 85 F.3d 774 (1st Cir. 1996)                                    39

<u>Am. Farm Lines v. Black Ball Freight Serv.</u>, 397 U.S. 532 (1970)        38

<u>BC Tech. v. Ensil Int'l</u>, No. 02-CV-700, 2008 WL 163578
(D. Utah Jan. 17, 2008)                                                          42

<u>Cash Energy, Inc. v. Weiner</u>, 81 F.3d 147 (1st Cir. 1996) (unpublished)     42

<u>Connelly v. Hyundai Motor Co.</u>, 351 F.3d 535 (1st Cir. 2003)          50-52

<u>Correia v. Feeney</u>, 620 F.3d 9 (1st Cir. 2010)                             23

<u>Costa-Urena v. Segarra</u>, 590 F.3d 18 (1st Cir. 2009)                      25

<u>Crowe v. Marchand</u>, 506 F.3d 13 (1st Cir. 2007)                          35

<u>Davignon v. Clemmey</u>, 322 F.3d 1 (1st Cir. 2003)                      47, 48

<u>DiBenedetto v. Hall</u>, 272 F.3d 1 (1st Cir. 2001)                         45

<u>Estate of Berganzo-Colon ex rel. Berganzo v. Ambush</u>,
704 F.3d 33 (1st Cir. 2013)                                                      22

<u>Forward Commc'ns Corp. v. United States</u>, 608 F.2d 485 (Ct. Cl. 1979)     42

<u>Goulet v. New Penn Motor Express, Inc.</u>, 512 F.3d 34 (1st Cir. 2008)      35

<u>Granfield v. CSX Transp., Inc.</u>, 597 F.3d 474 (1st Cir. 2010)            26

<u>Gray v. Genlyte Group, Inc.</u>, 289 F.3d 128 (1st Cir. 2002)            50-51

<u>Hatch v. Trail King Indus., Inc.</u>, 656 F.3d 59 (1st Cir. 2011)           52

<u>Jennings v. Jones</u>, 587 F.3d 430 (1st Cir. 2009)                      23, 24

Kearns v. Keystone Shipping Co., 863 F.2d 177 (1st Cir. 1988)                  23

Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63 (1st Cir. 2001)              25

Malone v. Lockheed Martin Corp., 610 F.3d 16 (1st Cir. 2010)                 22

Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21 (1st Cir. 2012)            38

Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.,
552 F.3d 47 (1st Cir. 2009)                                           22-23, 27

Monteagudo v. Asociación de Empleados del Estado
Libre Asociado de Puerto Rico, 554 F.3d 164 (1st Cir. 2009)                   22

Muñoz v. Sociedad Española de Auxilio Mutuo
y Beneficiencia de Puerto Rico, 671 F.3d 49 (1st Cir. 2012)                   25

Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. West Lake Acad.,
548 F.3d 8 (1st Cir. 2008)                                                    45

O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001)                 39

Ortiz v. Jordan, 131 S. Ct. 884 (2011)                                       26

Rivera Castillo v. Autokirey, Inc., 379 F.3d 4 (1st Cir. 2004)               25

Santos v. Sunrise Med., Inc., 351 F.3d 587 (1st Cir. 2003)                   39

Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487 (1st Cir. 2011)   50, 57

Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925 (1st Cir. 1997)        23-24

United States ex rel. Ge v. Takeda Pharm. Co.,
737 F.3d 116 (1st Cir. 2013)                                                 52

United States ex rel. Jones, 678 F.3d 72 (1st Cir. 2012)                 passim

United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,
608 F.3d 871 (D.C. Cir. 2010)                                                45

United States ex rel. Sanders v. Allison Engine Co.,
No. 95-0970 (S.D. Ohio Feb. 14, 2005) (slip op.)
(order on relators' motion in limine), aff'd in part and rev'd
in part on other grounds, 471 F.3d 610 (6th Cir. 2006), rev'd
on other grounds, 553 U.S. 662 (2008)                                      45

United States v. Rodriguez, 735 F.3d 1 (1st Cir. 2013),
cert. denied, 134 S. Ct. 1539 (2014)                                       55

United States v. Winchenbach, 197 F.3d 548 (1st Cir. 1999)                 44

United States v. Zannino, 895 F.2d 1 (1st Cir. 1990)                     49-50

Uphoff Figueroa v. Alejandro, 597 F.3d 423 (1st Cir. 2010)                 57

Vincent v. Marx & Co., 874 F.2d 36 (1st Cir. 1989)                         39

## Rules

D. Mass. Local Rule 40.1(K)(2)                                             38

D. Mass. Local Rule 116.4(b)(2)                                            38

Fed. R. Civ. P. 50(a)                                                      25

Fed. R. Civ. P. 50(b)                                                    24, 25

Fed. R. Evid. 901                                                          44

Following remand, the jury carefully considered all the evidence in this case. During an 11-day trial, the jury heard from eight witnesses, received 211 exhibits, and raised 15 questions. The District Court then instructed the jury, and provided a verdict form, using language based precisely on the First Circuit's previous opinion, 678 F.3d 72, 96 (1st Cir. 2012). After deliberating for parts of two days, the jury returned a verdict for the defendants.

Dr. Jones' Brief raises issues concerning the sufficiency of the defendants' evidence, evidentiary rulings, and jury instructions. He seeks either judgment as a matter of law or a new trial. In doing so, Dr. Jones ignores the applicable standards, misapprehends this Court's previous opinion, and fails to consider the evidence that supported the verdict. The defendants respectfully request the Court to affirm the judgment below.

## SUMMARY OF ARGUMENT

Dr. Jones waived the arguments in his renewed motion for judgment as a matter of law because he failed to raise them at the close of the evidence. (Pages 24 to 26.) Even if Dr. Jones had preserved these arguments, the jury's verdict was based on its evaluation of all the evidence. At this stage, Dr. Jones is not permitted to reargue his summary judgment motion. This Court previously decided there were disputed questions of material fact. A properly instructed jury considered the facts, and found for the defendants. (Pages 27 to 34.)

1

The District Court also correctly denied Dr. Jones' motion for new trial. Dr. Jones cannot demonstrate that the Court abused its discretion by refusing to reweigh the evidence. (Pages 34 to 37.) The District Court was warranted in retaining jurisdiction over the case on remand. The Court was not required to make any findings on this issue, and in any event, there was no prejudice. (Pages 37 to 39.) The Court acted within its broad discretion to rule on the admissibility of evidence. (Pages 39 to 49.) At trial and on appeal, Dr. Jones failed to preserve his challenges to the jury instructions and special verdict form. (Pages 49 to 52.) These challenges also fail on their merits, because the District Court properly instructed the jury, and provided a special verdict form which was based on this Court's previous opinion and which was almost identical to what Dr. Jones had requested. (Pages 52 to 57.)

## **BACKGROUND**

This qui tam action involves a Grant Application that the defendants, Marilyn Albert and Massachusetts General Hospital, submitted to the National Institutes of Health (NIH) on October 1, 2001. See App. 102, 384. Defendant Marilyn Albert was the program director and a principal investigator of the study, "Age-related Changes of Cognition in Health and Disease."[1] See App. 102, 384,

---

[1] The study had been ongoing since 1980. (Trial Tr. vol. 2, 105, Mar. 20, 2013.) The Grant Application at issue here sought a five-year renewal of funding for the study. Id.

389.  Defendant Ronald Killiany measured regions of interest in the brain as shown on MRI scans.  App. 1085.  The remaining defendant-appellee is Brigham and Women's Hospital, which also worked on the study.[2]  App. 103.  The program project grant included five projects and four "cores," including a statistical core headed by the relator, Dr. Jones.  App. 103, 107.

I.    **Using MRI scans, Dr. Gomez-Isla and Dr. Killiany measured a region of the brain called the entorhinal cortex.**

In 1996, Teresa Gomez-Isla was studying the brains of people who had died of, or with, Alzheimer's disease.  App. 567-68.  She learned that even in the disease's earliest stages, neurons were lost in the entorhinal cortex.  Id.  Dr. Albert and Dr. Killiany—then a volunteer—decided to study whether they could measure this loss of neurons on MRI scans.  See App. 511-14, 1085-86.

The resulting study involved taking MRI scans of participants and following them for three years to see which participants remained healthy ("normals"), which ones were potentially developing dementia ("questionables"), and which ones developed Alzheimer's disease ("converters").  App. 106, 118.  The scientists then would measure regions of interest in the brain, including the entorhinal cortex, to

---

[2] Dr. Jones stipulated to dismissal of his claims against Harvard University and Harvard Medical School.  App. 3.  The District Court dismissed his claims against an additional defendant, Marie Kijewski, Sc.D.  App. 7.  Dr. Jones is not appealing that order.  Add. 58.

determine whether the measurements could be used to predict who would develop Alzheimer's disease.  App. 112, 511-12.

In 1997, Dr. Gomez-Isla and Dr. Killiany discussed a protocol for measuring the entorhinal cortex on MRI scans.  App. 569.  To make these measurements, Dr. Gomez-Isla and Dr. Killiany used a mouse to trace an outline of the entorhinal cortex on a computer screen.[3]  App. 575.  It was particularly challenging to measure the entorhinal cortex because it was only about one cubic centimeter in volume.  App. 576.  Dr. Killiany (and Dr. Jones' expert, Norbert Schuff) testified that its boundaries were not visible on MRI, and were vague in every direction. App. 672, 1088-89.

Computer editing of the tiny, thin measurements could produce anomalous results.  See App. 578, 1100.  Pixels could be entirely deleted, revealing "drawings" of the entorhinal cortex which were biologically impossible— entorhinal cortices in multiple parts.  App. 689-91, 1100, 1142; see App. 1522 (showing drawing of entorhinal cortex in multiple parts).  In light of these challenges, Dr. Killiany and Dr. Gomez-Isla agreed on a conservative approach for their measurements.[4]  App. 574; see also App. 1209.

---

[3] Dr. Killiany also measured 13 other brain regions on MRIs.  App. 535.
[4]  Their protocol started at the rhinal sulcus, and followed the subiculum, hippocampus, and inferior border of the brain, back to the starting point.  App. 1088-89, 1096-97, 1441.

Dr. Killiany and Dr. Gomez-Isla separately measured the entorhinal cortex on MRI scans for a randomly selected group of 25 participants. See App. 1151. Dr. Jones used these initial measurements to conduct an inter-rater reliability study. See App. 853, 1151. The goal of the inter-rater reliability study was to determine whether these two "operators" could trace the entorhinal cortex independently and arrive at approximately the same results. App. 985. Dr. Killiany "was told that the reliability study was good and that [he] could go on and continue measuring additional subjects." App. 1124.

## II.   As Dr. Killiany learned more about the entorhinal cortex, he concluded some of his initial measurements had been too conservative.

The inter-rater reliability study was Dr. Killiany's first attempt to measure the entorhinal cortex. App. 1114. At first his drawings were "very conservative." App. 1209. He wanted to be certain that he was capturing only the entorhinal cortex, and that he was not going beyond its boundaries. Id.

As Dr. Killiany gained experience and discovered anatomical variability in some participants, he realized that in his initial drawings he had made errors in applying the protocol. App. 1087-88. For example, he observed that in some participants, two spaces in the brain (the collateral sulcus and rhinal sulcus) appeared to merge together on the MRI scans. App. 1114. Dr. Killiany also learned that while one participant might have a shallow sulcus, another participant might have a very deep and long sulcus. Id. These discoveries, about the spaces

5

and structures surrounding the entorhinal cortex, were significant to Dr. Killiany because the entorhinal cortex "is a very difficult structure to identify," with "vague boundaries pretty much in every direction." App. 1088. In other words, since the entorhinal cortex did not appear clearly on MRI scans, it was defined (according to Dr. Killiany's and Dr. Gomez-Isla's protocol) by making reference to the boundaries of surrounding brain structures and spaces. App. 1088-89, 1441.

Dr. Killiany was "blinded"—he did not know the participants' belonged to groups (normal, questionable, or converter). App. 1133 (stating that Dr. Killiany "wasn't given any group information throughout the study"). He received the scans in random order, with no group identification. App. 582, 1111. Dr. Killiany testified, without contradiction, that he was not told anything about the statistical significance of his measurements. App. 1124.

## III.  In an attempt to capture the entorhinal cortex more accurately, Dr. Killiany re-measured certain participants' MRI scans.

Because Dr. Killiany discovered anatomical differences, he reviewed all of his entorhinal cortex measurements for accuracy, and re-measured the entorhinal cortex for 31 of the 140 participants. App. 1087-1088. Of the participants whose scans Dr. Killiany re-measured, four belonged to the reliability study, but only two of the four re-measurements of scans in the 25-participant reliability study were significant. See App. 960-61, 1557 (showing four re-measurements in bold). It did not surprise Dr. Gomez-Isla that Dr. Killiany re-measured, because the process

6

involved a learning curve.  App. 580.  Dr. Gomez-Isla testified that Dr. Killiany's initial measurements and his re-measurements followed the protocol they had created.  App. 587, 591-92.  Dr. Jones' expert, Norbert Schuff, acknowledged there was "remarkable consistency" between the measurements of Dr. Killiany and Dr. Gomez-Isla.  App. 719.

Dr. Killiany saved and labeled all his work, and all his drawings were available at trial.  App. 1107, 1167; see, e.g., App. 1449-1533 (saved drawings).  He sent all the data to the study's database manager, Mary Hyde, who worked in the statistical core with Dr. Jones.  App. 1107, 1182.  Dr. Killiany later shared all of his drawings with Dr. Keith Johnson, who was a scientist working on another aspect of the study.  App. 1107.  For each participant, Dr. Killiany provided both the original measurement and any re-measurement to Mary Hyde.   App. 1117, 1152, 1182.  He did not alter any measurements.  App. 1167.  Rather, where he thought he may have made an error in applying the protocol, he re-measured from scratch, following the protocol.  App. 1087-88.  He learned as he went along, and gave each re-measurement a separate version number.  App. 1103; see, e.g., App. 1450-51 (reflecting Dr. Killiany's labeling of each drawing).

As the chief statistician, Dr. Jones conducted the reliability study.  App. 595, 853.  In January 2000, he calculated a correlation of 0.96 between Dr. Killiany's and Dr. Gomez-Isla's initial measurements of the 25 participants whose MRIs

were used in the reliability study.  App. 776.  Dr. Jones did not suggest to Dr. Albert that a second reliability study was needed.  App. 1231; <u>see</u> App. 1348-49 (stating that Dr. Albert relied on Dr. Jones to tell her if a second reliability was needed, and he never suggested that it was).  Rather, in March 2001, he questioned whether the re-measurements "were correct."  App. 808.  His concern was whether the re-measurements were "accurate."  App. 766; <u>see also</u> App. 40 (alleging Dr. Jones "demanded that defendant Albert . . . investigate the accuracy of defendant Killiany's reports").

## IV.    Dr. Albert asked an appropriate reviewer, Dr. Mark Moss, to look into Dr. Jones' concerns.

After Dr. Albert learned Dr. Killiany had made re-measurements, her concern was also "whether or not the boundaries had been drawn accurately." App. 453.  This concern was consistent with Dr. Jones' focus on the accuracy of Dr. Killiany's data.  App. 40, 766.  Dr. Albert decided that Dr. Killiany's supervisor, Mark Moss, should review the measurements.  App. 463, 731, 1145. Dr. Moss, a "noted neuroanatomist," <u>United States ex rel. Jones</u>, 678 F.3d at 78, was an appropriate person for this task because he had reviewed almost all of Dr. Killiany's professional work, telling him when he got something wrong or right.  App. 1145-46.

Dr. Moss conducted his review, and asked Dr. Killiany to type his notes. App. 1146-47; <u>see</u> App. 1434-35 (typed notes).  Dr. Killiany sent the notes to

Dr. Jones and Dr. Johnson, with a copy to Dr. Albert and Dr. Moss.  App. 1433-35.

After a brief email exchange, see App. 791-92, 1147, 1232-33, Dr. Killiany heard

nothing further from Dr. Jones on this subject until he was served with the qui tam

complaint in December 2008.  App. 1147.

Dr. Albert believed Dr. Moss' review had addressed Dr. Jones' concerns.

App. 1231.  After Dr. Albert analyzed the data, she concluded it was clear that

"these changes were made in an effort to make them more accurate."  App. 1256.

After late July 2001, Dr. Jones said nothing else about the re-measurements to

Dr. Albert.  App. 1256-57.

Dr. Albert and Massachusetts General Hospital signed and submitted the

Grant Application on October 1, 2001.  App. 102.  The Application reported as a

"major finding" that MRI measurements of the entorhinal cortex (and other brain

regions) could be used, along with other markers, to predict who will get

Alzheimer's disease.  App. 106.  Dr. Albert believed that the major finding was

true, and that it was based on accurate data.  App. 1236.  Indeed, Dr. Jones did not

tell Dr. Albert that he disagreed with the major finding of the study.  Id.

## V.    After Dr. Albert had addressed Dr. Jones' concerns, Dr. Jones continued working on the study.

Dr. Jones participated in drafting and reviewing the Grant Application.  App.

854.  The major finding was based on his statistical analysis, and he never told Dr.

Albert that he disagreed with it.  App. 1236, 1257.  Dr. Jones had a chance to say

9

whatever he wanted to Dr. Albert about the statistical portion of the Application. App. 860.  The Application reported that for various brain regions (including the entorhinal cortex), the inter-rater reliability correlations ranged from 0.94 to 0.99. App. 136.  These figures were also based on Dr. Jones' calculations.  See App. 775-76 (stating that Dr. Jones had calculated inter-rater reliability correlation of 0.96 for entorhinal cortex).

The next month, in November 2001 (according to his trial testimony), Dr. Jones recalculated the reliability correlation for the entorhinal cortex.[5]  App. 776-77.  When Dr. Jones compared Dr. Killiany's re-measurements with Dr. Gomez-Isla's measurements, Dr. Jones claimed he had calculated a correlation of 0.54.[6]  App. 777-78.  But even assuming he made this calculation, there was no evidence he provided that number to Dr. Killiany or Dr. Albert.  App. 1124-25 (Dr. Killiany), 1227 (Dr. Albert).  There was also no evidence that Dr. Jones expressed concern about the reliability study or suggested a new study was needed. To the contrary, Dr. Albert testified that Dr. Jones did not raise concerns about the reliability study or suggest that a new reliability study should be done, only that all the scans should be re-measured.  See App. 524-25.  When Dr. Jones met with the

---

[5] The jury was free to disregard this testimony, which was not supported by any documentation.

[6] In the first two versions of Dr. Jones' complaint, he did not allege the defendants should have reported a reliability correlation of 0.54.  (See Docket Nos. 8-2, 41.)

grant reviewers at the NIH in March 2002, he did not mention Dr. Killiany's re-measurements or any concern he claimed to have had about them.  App. 936.

Other scientists have replicated the major finding of this study.  App. 1237.  Dr. Jones' expert, Dr. Schuff, acknowledged that a reduction of volume in the entorhinal cortex may be an early sign of Alzheimer's disease, which can be measured on MRI.  App. 687.

In 2002, Dr. Killiany drafted an article explaining the study's findings regarding the entorhinal cortex and other brain regions, which the Grant Application had reported.  See App. 1437-47 (article).  The article contained findings that were consistent with the Grant Application's statements, and therefore inconsistent with Dr. Jones' qui tam claims against the defendants.  Compare App. 102-44 (excerpts from Grant Application); with App. 1437-47 (article).  Dr. Jones agreed to coauthor the article.  App. 800, 1438.  On January 8, 2002, Dr. Jones signed an Authors' Concurrence Form, which affirmed that he "read and agree[d] with the content of the paper."  App. 1626; see App. 1625 (signed Author Disclosure Form); App. 1281 (authenticating Dr. Jones' signatures on these documents).

11

**VI. At trial, Dr. Jones argued Dr. Killiany was liable because he had made the re-measurements, and Dr. Albert was liable because she had submitted the Grant Application.**

In the Joint Pretrial Memorandum, Dr. Jones framed the "fact questions for the jury." See generally App. 185-215 (Joint Pretrial Memorandum). His theory was that Dr. Killiany had created false data:

> Whether defendant Killiany knowingly altered a portion of the MRI data, in departure from stated methodology, resulting in the false reporting of scientific results and false reporting of the existence of reliable methodologies.

App. 186. On the other hand, Dr. Jones focused on whether Dr. Albert had made false statements in the Grant Application:

> Whether defendant Albert knew of the false statements in the NIH grant application, or acted with reckless disregard for the truth.

Id.

The trial began on March 18, 2013. In his opening statement, Dr. Jones' attorney set out his theory of the case: that Dr. Killiany "decided to falsify his research data," and Dr. Albert "decided to lie on her research Application." (Trial Tr. vol. 1, 29, Mar. 18, 2013.) Dr. Jones' attorney stated that "Professor Albert applied for the grant on October 1, 2001." Id. at 30. He added that "Professor Albert submitted the Application knowing that the rules and regulations of the government required her to sign the first page of the grant to certify that the information she provided the government is true, complete, correct, and accurate."

12

Id. at 32.  Dr. Jones' attorneys often repeated their theme that Dr. Killiany had "altered" or "changed" the data, and that Dr. Albert had written, signed, and submitted "her grant proposal" knowing it contained false statements about the data. See, e.g., id. at 33-34, 38; App. 1371-72, 1381.

## VII.  The parties presented conflicting evidence for the jury to weigh.

Dr. Jones' credibility was a critical issue at trial.  He portrayed himself as a whistleblower, who told Dr. Albert that Dr. Killiany's re-measurements changed the measurement volumes from statistically insignificant to statistically significant. App. 751-53.  Dr. Jones also maintained that he continued to raise the issue until Dr. Albert ordered him to stop talking about it, and that as a result of his whistleblowing, he was "fired."   App. 786-87, 792-93, 796.   The defense highlighted inconsistencies in Dr. Jones' whistleblower story and also pointed out his bias and motive.  See, e.g., App. 940 (pointing out Dr. Jones' financial interest in outcome of case); App. 935-36 (pointing out that Government continued to fund Grant while Dr. Jones delayed in filing suit); App. 936 (pointing out that Dr. Jones said nothing about concerns when he attended meeting with "bigwig" from Government).

The evidence that Dr. Jones had coauthored Dr. Killiany's article was so harmful to Dr. Jones' case that he went out on a limb at trial and denied he had signed the authorship forms.  App. 801.  Dr. Albert, who knew Dr. Jones'

signature,[7] authenticated it on Authors' Concurrence Form and Author Disclosure Form. App. 1281. She testified about the meeting on January 8, 2002, where Dr. Jones and other co-authors had signed the forms. App. 1281-84. The defense also pointed out that Dr. Jones' conduct—including his documented eagerness to continue working on the project—was inconsistent with his claim of whistleblowing.[8] App. 854-56.

As to motive, the defense questioned Dr. Jones' long delay in bringing suit. Dr. Jones first raised issues in March 2001, and he stopped working on the study in 2003, but he did not file suit until 2006. App. 295-96, 933, 939-40. The defense argued this long delay was to Dr. Jones' potential financial advantage. App. 935-36, 1363. If he truly believed his claims and he truly had been concerned about protecting the federal fisc, he would have notified the NIH and the Department of Justice as early as possible. Id. By waiting to inform the Government, he permitted the NIH funds to be paid out to the hospitals, thereby ensuring that there would be a "pie" from which he could try to collect his "slice." Id. In his Brief at page 38, Dr. Jones labels as "devastating" this common sense explanation for his long delay in pursuing his qui tam claim.

---

[7] Dr. Jones testified that he had been working with Dr. Albert since the late 1970s or early 1980s. (Trial Tr. vol. 3, 69, Mar. 21, 2013.)

[8] Despite Dr. Jones' stated concern that Dr. Albert had defrauded the Government, his "hope was to be the project leader for the data management and statistics core for the period 2002 to 2007." See App. 856.

As to Dr. Jones' claim that he was fired for blowing the whistle, the defense established (from Dr. Jones' own testimony) that at an NIH meeting in March 2002, an NIH reviewer suggested that the team use an alternative statistical technique known as "survival analysis," which Dr. Jones had not employed.  App. 899-905.    Dr. Jones decided the reviewer's suggestion was "completely inappropriate," and told the reviewer so.    App. 900-01.    Because Dr. Jones persisted in what amounted to an attack on the NIH reviewer's judgment on the matter, the NIH ultimately concluded that Dr. Albert needed to hire a statistician with expertise in survival analysis.  App. 909-10.  The defense argued it was this requirement, and not Dr. Jones' claimed "whistleblowing," which ultimately caused him to be eased out of his statistician's role.  App. 1362.  The defense also established that Jerrold Rosenbaum of Massachusetts General Hospital informed Dr. Jones that he could keep his position at MGH by agreeing to perform just two to four hours of work per week at MGH.   App. 827-28, 1561 (email advising Dr. Jones of this option).  Dr. Jones admitted that he "did not follow up" on this invitation.  App. 828.

Refuting Dr. Jones' claim that Dr. Killiany was "unblinded" (meaning that Dr. Killiany knew the study participants' group status), the defense established that in a previous affidavit, Dr. Jones had sworn that Dr. Killiany was "blinded."  App. 850-51.  Since proving that Dr. Killiany was unblinded was of central importance

to Dr. Jones' theory of the case, and to the issues which this Court previously had identified for trial, the evidence that Dr. Jones had sworn Dr. Killiany <u>was</u> blinded severely undermined Dr. Jones' theory and his credibility.  <u>See</u> App. 1369 (arguing that Dr. Jones "cannot escape from those words" in his affidavit).

## VIII. The conflicting evidence was critical for the jury to decide the factual issues framed by this Court.

Throughout his Brief, Jones repeats his theme that certain evidence was "undisputed."  (<u>See, e.g.</u>, Jones Br. 15, 16, 28, 36.)  This characterization is wholly fallacious.  This Court's explanation of the issues for trial—which Dr. Jones never quotes in his Brief—established that a key issue for the jury was whether Dr. Killiany and Dr. Albert had acted knowingly.  <u>United States ex rel. Jones</u>, 678 F.3d at 96 (identifying factual questions to be tried); App. 1404-5 (confirming that District Court followed this Court's previous opinion in instructing jury).

Question 1 asked:  "Did Dr. Killiany knowingly falsify scientific data by exaggerating certain re-measurements of the EC to cause proof of a particular scientific hypothesis to emerge from the data?"  Add. 55.  Question 2 asked: "Were the statements made in the Grant application about having used blinded, reliable methods to produce the measurements both material and knowingly false?"  <u>Id.</u>

These questions necessarily implicated the mental states of Dr. Killiany and Dr. Albert.  Indeed, it would have been difficult for the jurors to answer the

questions without hearing testimony from these central witnesses.  Dr. Jones would have the Court believe that their testimony was not relevant.[9]  Notwithstanding Dr. Jones' arguments, the individual defendants were entitled to describe for the jurors why they acted as they had.  Dr. Killiany thus testified in great detail about his analysis of the MRI scans, the way in which he applied the protocol to the grainy scans, and his efforts to follow the protocol on every scan.  App. 1087-98, 1140-41, 1177-79. As Dr. Killiany's knowledge grew and he detected anatomical differences on the MRI scans, his confidence in his drawings increased, always motivated by his attempt to be "accurate"—by which he meant following the protocol to the best of his ability.  App. 1087-88, 1136, 1138, 1144.  He numbered, kept, and sent copies of all drawings to Dr. Johnson, and he sent all data for all measurements to Mary Hyde in the statistics core—acts which were fundamentally inconsistent with those of a scientist intent on fraud.  See App. 1107, 117, 1152, 1167, 1182.

The jury was entitled to find that Dr. Jones was not a believable witness—that his account at trial was exaggerated or fabricated, that he did not pursue the issue in 2001 with the same zeal as he purported at trial, that he was motivated by nothing more than greed, and that he perjured himself in front of the jury by denying his signature on the authorship disclosure form.  If the jury believed this

---

[9] Dr. Jones called Dr. Killiany and Dr. Albert as witnesses, contradicting his present assertion that their testimony was irrelevant.

evidence, it was warranted in deciding that Dr. Jones was a witness who would say anything to secure a verdict in his favor.

The jurors were also entitled to give little or no credit to Dr. Jones' three experts.[10] Indeed, some of his experts' testimony helped the defendants' case. Dr. Schuff admitted that: the entorhinal cortex is "a difficult structure in the brain and there's a learning curve," (Trial Tr. vol. 4, 65, Mar. 26, 2013); the entorhinal cortex is difficult to make out on MRI because it is "very small and some parts of its anatomical boundaries provide no contrast on MRI and therefore must be estimated using anatomical landmarks," App. 681-82; Dr. Killiany's original drawings were "too skinny" or "too short," warranting enlargements, App. 704, 706; Dr. Killiany's changes to the measurements in the reliability study were "small" as a "general proposition," App. 720; shrinkage of the entorhinal cortex was involved in Alzheimer's disease, App. 677, 722; and when Dr. Schuff had needed information as a practicing scientist, he had called Dr. Killiany looking for help, and Dr. Killiany helped him, App. 720-22.

The jury could conclude that opinions of Dr. Jones' expert statistician, Richard Goldstein, also were entitled to no weight because Dr. Goldstein had been given incomplete information.    (Trial Tr. vol. 8, 16-19, April 1, 2013.)

---

[10] This Court should pay no attention to the distraction of Dr. Saykin's testimony. The defense chose not to call him as a witness, Dr. Jones did not offer Dr. Saykin's deposition testimony, and the testimony was not part of the record which the jury considered.

Dr. Goldstein also admitted he had been operating from a standpoint of "ignorance" on particular issues.  Id. at 15.

Finally, the jurors were entitled to give no weight to the testimony of Dr. Davila-Garcia, since, among other things: she had falsified her own resume by concealing the fact that the NIH had removed her from one of its grants; Dr. Jones' lawyers had told her this "was a case of fraudulent data" when they retained her; and she knew nothing about the brain science at issue.  (Trial Tr. vol. 8, 93, 97-98, 116-21, Apr. 1, 2013.)

At the close of Dr. Jones' case and the close of all the evidence, the defendants moved for judgment as a matter of law.  See App. 28.  Dr. Jones' only motion for judgment as a matter of law concerned damages.  (Trial Tr. vol. 11, 85, Apr. 5, 2013.)  Dr. Jones also did not seek to renew the motion for summary judgment which he had filed in September 2010, before the first appeal in this case.  See id.

## IX.    The District Court instructed the jury as Dr. Jones requested, in accordance with this Court's previous opinion.

The District Court held a charge conference on April 5, 2013.  The Court earlier had given both sides a draft special verdict form with the two special questions, App. 1161, following the trial issues this Court had identified.  See 1056 (reflecting District Court's intent for verdict slip to contain "only the two questions that the First Circuit remanded to me").  The Court outlined at the charge

19

conference how it would instruct the jury on the elements of the claims.  See App. 1268-79.  The Court explained that Question 1 related to Dr. Killiany and Question 2 to Dr. Albert.  App. 1276.  This explanation was consistent with Dr. Jones' theories and presentation of evidence.

The Court instructed the jury on the essential elements under the False Claims Act: falsity, materiality, and knowledge.  App. 1400-01.  Immediately after the charge, the attorneys went to the bench.  See App. 1412-16.  Dr. Jones' attorney asserted the Court incorrectly had stated there were two experts.  App. 1413.  In fact there were three.  Id.  The Court agreed to tell the jury there had been three experts, and it did so.  App. 1413, 1416.  Dr. Jones' attorney also said that: "[O]n the issue of materiality, Judge.  It's a natural tendency for influence[,] not to make a difference[,] because that's a but for causation issue."  App. 1413.  In fact, the Court had not used the term "but for" in instructing the jury, but nonetheless the Court was immediately responsive, stating: "I'll add that, yes.  Natural tendency."  Id.  The Court agreed to make the change and did so, telling the jury that "materiality" meant the following: "A statement is material if it has a natural tendency to affect the thinking of the NIH.  Keep that in mind."  App. 1416.

Both sides questioned the Court's statement to the jury that: "For the purposes of this case a fact is the best available data, the most accurate data as the scientists involved reasonably thought they had." App. 1402.  Defense counsel

asserted the statement that the defendants had to "use the best available data"
created a "higher standard than is required."  App. 1415.  The Court overruled
defense counsel's objection.  Id.  But the Court agreed to reinstruct the jury on the
issue of "accuracy."  Id.  The Court then instructed the jury that:

> I talked about the most accurate data . . . .  [T]he better
> way to say that is the most reliable data.  If I slide off into
> accuracy you may get measuring pixels and voxels.
> That's not what we're talking about.  It's got to be the
> most reliable data and they have a duty to come forward
> with the most reliable data.

App. 1416.  The Court thus placed on the defendants a duty far higher than was
required.  The defendants were not simply required to have avoided making false
statements, but must have come forward with (meaning presented to the NIH) the
"most reliable data," see id., an obligation which the False Claims Act does not
impose.

The Court asked Dr. Jones' attorney, "Is the supplementary charge
satisfactory, Mr. Friedman?"  App. 1417.  He replied, "Yes, your Honor."  Id.  The
District Court gave the jury a special verdict form, which was almost identical to
the one that Dr. Jones had requested.  Compare Add. 55 (special verdict form),
with Docket No. 232 (Dr. Jones' memorandum requesting special verdict form).

21

On April 9, 2013, the jury returned its verdict, answering each question, "No." Add. 55. The Court then entered judgment for all defendants.[11] Add. 56. Dr. Jones moved for a new trial, which the Court denied on July 22, 2013. Add. 57. Dr. Jones timely appealed. See Add. 58.

## STANDARDS OF REVIEW

### I.    Motion for Judgment as a Matter of Law

Dr. Jones "faces an uphill battle" in appealing the denial of his "renewed" motion for judgment as a matter of law. Estate of Berganzo-Colon ex rel. Berganzo v. Ambush, 704 F.3d 33, 38 (1st Cir. 2013) (quotation omitted). The standard for granting judgment as a matter of law is "stringent." Malone v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010); Monteagudo v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 170 (1st Cir. 2009) (quotation omitted) ("[R]eview is weighted toward preservation of the jury verdict.")

"[A] jury's verdict and factual findings 'must be upheld unless the facts and inferences viewed in the light most favorable to the verdict point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict.'" Mass. Eye and Ear Infirmary v. QLT Phototherapeutics,

---

[11] The parties had stipulated that the individual defendants were working for the hospitals, and that if the individual defendants were liable, the hospital defendants were as well. App. 1400.

Inc., 552 F.3d 47, 57 (1st Cir. 2009) (quotation omitted).  In reviewing the denial

of a motion for judgment as a matter of law, the Court must construe the evidence

in the light most favorable to the non-moving parties (here, the defendants).

Ambush, 704 F.3d 38 (citation omitted).

## II.    Motion for New Trial

Under the abuse of discretion standard, the District Court's denial of

Dr. Jones' motion for new trial is reviewed with "much deference."  Correia v.

Feeney, 620 F.3d 9, 11 (1st Cir. 2010) (citing Jennings v. Jones, 587 F.3d 430, 437

(1st Cir. 2009)).  As this Court has explained:

> Appellate deference [regarding motions for new trial]
> makes sense.  Circuit judges, reading the dry pages of the
> record, do not experience the tenor of the testimony at
> trial.  The balance of proof is often close and may hinge
> on personal evaluations of witness demeanor.

Jennings, 587 F.3d at 437 (quotation omitted) (alteration in original).

"A district court should grant a motion for a new trial only if 'the outcome is

against the clear weight of the evidence such that upholding the verdict will result

in a miscarriage of justice.'"[12]  Ambush, 704 F.3d at 38 (quotation omitted); see

---

[12] Dr. Jones cites Kearns v. Keystone Shipping Co., 863 F.2d 177, 181 (1st Cir. 1988), for the proposition that a District Court should grant a new trial where one is needed to prevent injustice.  (Jones Br. 33.)  However, Dr. Jones seeks to minimize the heavy burden he faces, by omitting the following sentence: "Only with appropriate caution and to prevent a miscarriage of justice should a trial court set aside a jury verdict, and only on a finding of an abuse of discretion should a reviewing court set aside the trial court's determination."  863 F.2d at 181.

also Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997)

(quotation omitted) (applying "strict standard of review" to motion for new trial).

On a motion for new trial, evidence is not construed in any party's favor.

Jennings, 587 F.3d at 438.

## **ARGUMENT**

### I.    **The District Court properly denied Dr. Jones' motion for judgment as a matter of law.**

Dr. Jones claims he was entitled to judgment as a matter of law under Fed.

R. Civ. P. 50(b).  He failed to preserve this claim because at the close of the

evidence, his motion for judgment as a matter of law concerned only damages, and

did not raise any of the issues he now argues on appeal.  (See Trial Tr. vol. 11, 85,

Apr. 5, 2013.)  Dr. Jones' argument also fails on its merits.  There were many

disputed questions of material fact, as this Court identified in its previous opinion.

The jury was entitled to resolve these questions in the defendants' favor.

#### A.    **Dr. Jones waived the arguments in his motion for judgment as a matter of law, because he did not file a timely motion on any issue other than damages.**

Dr. Jones appeals from the denial of his renewed motion for judgment as a

matter of law under Rule 50(b).  His only motion under Rule 50(a), however,

concerned damages.  App. 1350.  Dr. Jones waived all the arguments in his

renewed motion by failing to raise them at the close of the evidence.

"Any argument omitted from the [Rule 50(a)] motion made at the close of

24

evidence is waived as a ground for judgment under Rule 50(b)." Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico, 671 F.3d 49, 58 (1st Cir. 2012) (quotation omitted) (alteration in original); Costa-Urena v. Segarra, 590 F.3d 18, 26 n.4 (1st Cir. 2009) (citation omitted) ("It is well-established that arguments not made in a motion for judgment as a matter of law under Rule 50(a) cannot then be advanced in a renewed motion for judgment as a matter of law under Rule 50(b)); Rivera Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004) (concluding that "failure to move for judgment as a matter of law at the close of evidence procedurally defaults this claim on appeal"); Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 71-72 (1st Cir. 2001) (quotation omitted) (alteration in original) ("The movant cannot use [a renewed motion for judgment as a matter of law] as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict.").

Here, Dr. Jones moved under Rule 50(a) on one limited issue: whether the jury should be permitted to decide the amount of damages.[13]  (Trial Tr. vol. 11, 85, Apr. 5, 2013.)  He did not base his Rule 50(a) motion on any other ground.  Id. Therefore, he waived all the arguments in his renewed motion for judgment as a matter of law.

In an attempt to avoid waiver, Dr. Jones argues he should be permitted to

---

[13] Dr. Jones does not press this point on appeal.  Damages are not at issue because the jury did not find the defendants liable.

"renew" his summary judgment motion.  (Jones Br. 31-32.)  The Supreme Court and this Court have concluded that a party in Dr. Jones' position cannot do this, because it is too late to "renew" a summary judgment motion after an adverse jury verdict.  Ortiz v. Jordan, 131 S. Ct. 884, 888-89 (2011) ("May a party . . . appeal an order denying summary judgment after a full trial on the merits?  Our answer is no."); Granfield v. CSX Transp., Inc., 597 F.3d 474, 481 n.8 (1st Cir. 2010) (quotation omitted) (declining to review summary judgment motion because it had "been overtaken by subsequent events, namely, a full-dress trial and an adverse jury verdict").

Dr. Jones cannot renew his summary judgment motion for an additional reason.  In its previous opinion, this Court concluded neither party was entitled to judgment as a matter of law, because there were disputed questions of material fact.  United States ex rel. Jones, 678 F.3d at 96 (remanding case for trial).  Thus, the Court already decided that Dr. Jones was not entitled to judgment as a matter of law.  See id. at 83 (quotation omitted) (stating that in its previous opinion, this Court considered cross-motions for summary judgment to decide whether any party was entitled to judgment as a matter of law).  Now that a jury has heard all the evidence and resolved these factual questions, Dr. Jones can no longer rely on the summary judgment record or his summary judgment motion.

**B.    Even if Dr. Jones had preserved this issue, the District Court properly denied his motion for judgment as a matter of law.**

Dr. Jones' motion also failed on its merits.  To prevail on his "renewed motion" for judgment as a matter of law, Dr. Jones would have needed to establish that the evidence "strongly" and "overwhelmingly" pointed in his favor.  Mass. Eye and Ear Infirmary, 552 F.3d at 57.  Because ample evidence supported the defense verdict, Dr. Jones cannot disturb this verdict on appeal.

Dr. Jones contends that as a matter of law, he proved each element of liability under the False Claims Act: falsity, knowledge, and materiality.  His Brief repeatedly misconstrues the questions which the First Circuit identified and remanded for trial.  The first question asked whether Dr. Killiany knowingly falsified scientific data by exaggerating the boundaries of the entorhinal cortex in order to prove a hypothesis.  Add. 55; see also United States ex rel. Jones, 678 F.3d at 96 (identifying this is a factual question for trial).  Dr. Killiany was in the best position to answer that question, and explained his thought process with respect to many of the re-measurements.  See App. 1089-1160 (explaining Dr. Killiany's re-measurements).  Additional evidence supported the jury's verdict for Dr. Killiany. For example: he saved (and carefully numbered) all the MRI scans and data, App. 1103, 1107, 1167; he did not act like someone who was trying to cover up what he had done, because he sent all the data to the database manager (Mary Hyde) and all the MRI scans to his colleague (Keith Johnson), App. 1107, 1182; and he did not

27

know whether his initial measurements had statistical significance, so he had no motive to falsify data. App. 1124; see generally App. 1356-58 (summarizing evidence that Dr. Killiany had not knowingly falsified scientific data). Finally, Dr. Killiany testified he was blinded to the participants' group status, App. 1133, and no evidence proved he became unblinded.

The second special verdict question asked whether the Grant Application made false statements about having used blinded, reliable methods to produce the measurements. Add. 55. Here, again, there was ample testimony that Dr. Albert— who signed the Grant Application—had taken steps to assure that Dr. Killiany would be blind to the group status of each participant, and that the study's methods were reliable. See, e.g., App. 463, 731, 1145. Notwithstanding Dr. Jones' oft-repeated argument that the evidence was "undisputed" and "without rebuttal," (see, e.g., Jones Br. 15, 16, 28, 36), the defendants did refute all of Dr. Jones' testimony and evidence.

### 1.    Falsity

Dr. Jones argues the issue of falsity was "undisputed" at trial. Id. at 28. He asserts that Dr. Schuff was "the only competent witness to review" the scans. Id. But Dr. Schuff admitted that he had not reviewed many of the relevant scans, even though he had asked for all of them. App. 708-11. Dr. Jones also overlooks Dr. Gomez-Isla's testimony rebutting Dr. Schuff's claim of falsity, and the fact that

she was competent to testify about the MRI scans.  <u>See</u> App. 541-45, 587-88, 592.

Finally, Dr. Jones does not address Dr. Killiany's testimony, which was given in

painstaking detail and subject to extensive cross-examination, about the reasons for

his re-measurements.  <u>See</u> App. 1089-1160.

Dr. Jones also highlights the claim of his statistical expert, Dr. Goldstein,

that Dr. Killiany's re-measurements caused the data to become statistically

significant.  (Jones Br. 28.)  But Dr. Jones glosses over Dr. Goldstein's admissions

that he did not "know what the protocol was," and that he did not "know why for

certain participants Dr. Killiany decided to make revised measurements."  (Trial

Tr. vol. 8, 15, Apr. 1, 2013.)  Without this information, Dr. Goldstein conceded, he

was "going from a place of ignorance . . . ." <u>Id.</u> at 15.

### 2.    Knowledge

Dr. Jones' second argument is that he proved as a matter of law that the

defendants acted knowingly in making false statements.  (Jones Br. 29.)  Dr. Jones

was required to base his motion for judgment as a matter of law on evidence which

the jury considered.   <u>Ambush</u>, 704 F.3d at 38.   Ignoring this limitation, he

emphasizes two things which were <u>not</u> evidence: the defendants' opening

statement and the deposition testimony of Andrew Saykin.[14]  (Jones Br. 29-31.)

Dr. Jones refers to Exhibits 198 and 199, which showed that certain participants belonged to group "6" or group "7."  Dr. Killiany testified, however, that those numbers had no meaning to him.  App. 1164-65.  That is because he did not have access to the "key" which matched the numerical codes to participant groups.  App. 1166.  The jury was permitted to believe his testimony that he remained blinded.

Dr. Jones also relies on a document called the "Relator's Table," which he created specifically for this case.  See Add. 52 (Relator's Table); see also App. 839 (stating that Dr. Jones created the document "before we went to trial").  The Table suggested that after Dr. Killiany had completed his re-measurements, some of the participants' entorhinal cortex measurements went from being among the smaller volumes to being among the larger volumes.  See Add. 52.  At trial, the parties presented much evidence and argument on the significance of the Relator's Table.[15]  The jury was entitled to discount the Table's significance because, as Dr. Moss explained, small changes to very small structures (like the entorhinal

---

[14] The defendants filed a motion to strike Dr. Saykin's deposition transcript, which the District Court denied as moot when it denied Jones' motion for a new trial. App. 30-31.  Dr. Saykin's deposition transcript was not read to the jury and was not marked as an exhibit.  It was not properly included by Dr. Jones in the appendix.  See App. 249-294.

[15] Dr. Jones used the Table extensively to examine witnesses, and he also displayed an enlarged version of the Table to the jury.  See, e.g., App. 829, 1332.

cortex) can cause large percentage changes:

> [I]f you think about a pea and a head of cabbage, right? If I asked you to take a little piece out of the pea and a little piece out of the cabbage, the piece you take out of the pea might be a hundred percent of the pea.  The piece you take out of the cabbage might be .001 percent.  So because you're dealing with very little, tiny objects the slightest change reflects a very large percentage change. The bigger the object, the smaller the percentage.  So these big numbers happen when you look at small objects.

App. 747-48.

Because Dr. Killiany did not learn the statistical significance of his measurements, App. 1124, he had no reason to re-measure in order to prove any particular hypothesis.  Indeed, the Relator's Table showed that Dr. Killiany made re-measurements which would have gone in the "wrong direction," if he had intended to prove that participants who get Alzheimer's disease have smaller entorhinal cortices.  App. 709-11.  Had Dr. Killiany been intent on fraud, his re-measurements for participants in the "converter" and "questionable" groups would have decreased, not increased.  See 1357-58.  Finally, the jury was warranted in disregarding the selective lines on the Table altogether and believing Dr. Killiany's explanation for his re-measurements: that as he learned about the anatomy of the brain's spaces and structures, he checked his earlier work and re-measured where he believed he had made mistakes.  App. 1087-88.

Dr. Jones argues that Dr. Albert also "meets the *scienter* requirements of the

31

Act as a matter of law." (Jones Br. 29.) Like Dr. Killiany's state of mind, Dr. Albert's state of mind was a fact question for the jury. United States ex rel. Jones, 678 F.3d at 96. The jury was entitled to credit Dr. Albert's testimony that she believed the Grant Application "was truthful," and that she "believe[s] the major finding today." App. 1236-37.

To the contrary, Dr. Albert testified that Dr. Jones did not raise concerns about the reliability study or suggest that a new reliability study should be done, only that all the scans should be re-measured. See. When Dr. Jones met with the grant reviewers at the NIH in March 2002, he did not mention Dr. Killiany's re-measurements or any concern he claimed to have had about them.

Dr. Jones also was not entitled to judgment as a matter of law under his alternative theory that the Grant Application erred by reporting an inter-rater reliability correlation of 0.96. The jury was free to disregard Dr. Jones' self-serving testimony that one month after Dr. Albert had submitted the Application, Dr. Jones calculated a new value of 0.54. See App. 777-78 (Dr. Jones' testimony on this issue). Even if this were true, Dr. Jones had participated in drafting the Grant Application of which he now complains, had agreed to coauthor an article which contained the value of 0.96, and until this case he had not told the NIH (or anyone else) of his claim that the value should have been 0.54. App. App. 524-25, App. 936, 1124-25, 1227. On the disputed evidence, the jury was warranted in

finding (as it did) that there were no knowing, false, material statements regarding the inter-rater reliability study.

In sum, this Court decided that Dr. Killiany's state of mind and Dr. Albert's state of mind were critical fact questions for the jury to decide at trial. United States ex rel. Jones, 678 F.3d at 96. Dr. Jones' experts were not competent to offer any evidence on this issue, since Dr. Killiany and Dr. Albert were the only witnesses who could offer direct insight into their own states of mind. The jury found for Dr. Killiany and Dr. Albert. Its verdict should not be disturbed.

### 3. Materiality

Dr. Jones' third argument is that he established materiality as a matter of law. (Jones Br. 28.) There was also a genuine dispute on this issue, however, which the jury was free to resolve in the defendants' favor. Dr. Jones did not call anyone from the NIH, which considered the Grant Application, to testify. Although Dr. Davila-Garcia did testify on materiality, the jury was free to disregard her testimony, particularly since she acknowledged the NIH had removed her from a grant, she had falsified this point on her resume, and she knew nothing about the brain science at issue. (Trial Tr. vol. 8, 93, 97-98, 116-21, Apr. 1, 2013.) The jury could also consider Dr. Killiany's and Dr. Albert's testimony that as they had advised the NIH, one of the major goals of the Grant Application was to develop automated measurements of regions of interest in the brain, moving the

MRI project away from hand drawings.  App. 1149 (Dr. Killiany), App. 1242-43 (Dr. Albert); <u>see also</u> App. 128 (advising NIH of disadvantages of hand-drawn measurements).  Finally, in view of evidence that only four of the re-measured participants were in the 25-participant inter-reliability study, and that only two of those changes were significant,[16] the jury could have found that Dr. Killiany's re-measurements were not material to the funding of the Grant Application.  <u>See</u> App. 1557 (showing these four changes, two of which were minor).

## II.    The District Court properly denied Dr. Jones' motion for new trial.

Dr. Jones makes four arguments in support of his claim that the District Court erred by denying his motion for new trial.  First, he contends that the jury verdict went against the weight of the evidence.  (Jones Br. 33.)  This claim is without merit because the jury was entitled to credit the testimony of Dr. Albert and Dr. Killiany and to discredit Dr. Jones' testimony.  Second, Dr. Jones argues the District Court erred in keeping jurisdiction over this case on remand.  <u>Id.</u> at 34. The District Court, however, was the best interpreter of its own local rules, and those rules control this question.  Third, Dr. Jones claims the District Court made

---

[16] Dr. Killiany's entorhinal cortex measurements and re-measurements for participants 31 and 59 changed by 4.5% and 25.5%, respectively.  <u>See</u> App. 1557. These changes were smaller than many of the differences that resulted when Dr. Gomez-Isla and Dr. Killiany measured scans for the same participant.  <u>See id.</u> (showing 27.3% difference between Dr. Gomez-Isla's and Dr. Killiany's initial measurements for participant 56, and 21.1% difference between their initial measurements for participant 72).

incorrect evidentiary rulings.  <u>Id.</u> at 35-39.  Because he did not make timely objections, Dr. Jones waived this argument.  He cannot establish that the Court abused its discretion by ruling on the admissibility of evidence.  His fourth argument is that the District Court erred in instructing the jury.  <u>Id.</u> at 40-41.  Dr. Jones failed to preserve this issue, and in any event, the District Court properly instructed the jury based on this Court's previous opinion.

### A.    The weight of the evidence supported the jury's verdict.

Dr. Jones argues that the District Court should have awarded him a new trial based on the weight of the evidence.  (Jones Br. 33.)  As in the case of his argument for judgment as a matter of law, Dr. Jones ignores the standard for deciding a motion for new trial based on the weight of the evidence. He also ignores the applicable standard of review.

This Court has cautioned that "a jury's verdict on the facts should only be overturned in the most compelling circumstances."  <u>Goulet v. New Penn Motor Express, Inc.</u>, 512 F.3d 34, 44 (1st Cir. 2008) (quotation omitted).  When a jury weighs conflicting evidence, its "credibility call" should be left "in place."  <u>Crowe v. Marchand</u>, 506 F.3d 13, 19 (1st Cir. 2007).

Dr. Jones misconstrues the effect of this Court's previous opinion, which considered cross-motions for summary judgment.  The issue was whether there was sufficient evidence which, <u>if believed</u>, warranted a verdict for Dr. Jones.  This

Court did not decide the outcome, but merely identified disputed questions of material fact, and concluded there must be a trial because <u>neither</u> party was entitled to judgment as a matter of law.   <u>United States ex rel. Jones</u>, 678 F.3d at 96. Dr. Jones repeatedly confuses this Court's remand for a trial with a decision on the merits of the case.   Since this Court concluded the cross-motions for summary judgment should have been denied, the case was for the jury to decide.   The jury did so.

Dr. Albert testified over five days.   She stood up to aggressive cross-examination from two of Dr. Jones' attorneys.   She came across as a careful scientist who did her best to address Dr. Jones' concerns.   Dr. Albert testified that she believed the statements in the Grant Application, in 2001 and at the time of trial. App. 1236-37.

The jury also observed Dr. Killiany's testimony.   Like Dr. Albert, he presented himself as a careful scientist who was concerned with trying to help people.   Contrary to Dr. Jones' claim that greed motivated Dr. Killiany to defraud the Government and that "[h]e was about to lose his job," (Trial Tr. vol. 1, 34, Mar. 18, 2013), Dr. Killiany testified that he began working on the grant as a volunteer, and that he later earned only $10,000 per year on the study.[17]   App.

---

[17] In 2002, when Dr. Killiany accepted more responsibilities as a project leader, there was a decrease in the amount of money he received from the Grant.   <u>See</u> App. 1086.

1085-86.  Dr. Killiany gave the jury a detailed explanation of his re-measurements. He also rebutted Dr. Jones' claim that he "altered" data, by testifying that he had saved and carefully labeled all of his work, including the original measurements and re-measurements—all of which he did from scratch.  App. 1103-07.  The jury was warranted in believing Dr. Killiany.

There was ample evidence from which the jury could disbelieve Dr. Jones' testimony.  The jury learned about Dr. Jones' financial motive for pursuing "the maximum amount" that was awardable to him under the False Claims Act.  App. 940.  The jury also learned that he was dissatisfied about being removed from the grant, at a time when he very much wanted to continue working on it.  See App. 874-75.  Finally, the jury observed firsthand Dr. Jones' attempt to disavow his own signature on the author disclosure form.  App. 801.  This testimony was contradicted, among other things, by the fact that Dr. Jones had cited the 2002 article on his resume.  App. 1589.

The weight of the evidence favored the defendants' position and the jury's verdict.  The Court should reject Dr. Jones' challenge to the manner in which the jury weighed the evidence.

### B.    The District Court did not err by retaining jurisdiction over the case on remand.

After this Court remanded the case for trial, the District Court retained jurisdiction. The District Court committed no error in doing so.

37

Dr. Jones relies on Local Rule 40.1(K)(2) of the United States District Court for the District of Massachusetts. "[A] district court's application of its own local rules" is entitled to "a special degree of deference—above and beyond the traditional standards of decisionmaking and appellate oversight." Markel Am. Ins. Co. v. Diaz-Santiago, 674 F.3d 21, 29 (1st Cir. 2012) (quotation omitted). When a party assigns error to a district court's deviation from its procedural rules, this claim is reviewable only "upon a showing of substantial prejudice to the complaining party." Am. Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 538 (1970) (quotation and citations omitted).

Here, since this Court did not direct that the case be reassigned on remand, the District Court judge was entitled to retain jurisdiction if he determined that by doing so there would "result a substantial saving in the time of the whole court and that there is no reason why, in the interest of justice, further proceedings should be conducted before another judge." D. Mass. Local Rule 40.1(K)(2). Although the local rule authorized the District Court judge to determine these issues, Dr. Jones does not cite any rule or case which required the judge to make specific findings. Cf. D. Mass. Local Rule 116.4(b)(2) (requiring "a finding that the preliminary transcript is accurate" before it may be used).

Even if Dr. Jones could show that the District Court erred, he concedes that he suffered no harm because the District Court retained jurisdiction. Dr. Jones

acknowledges that the trial was fair and even-handed, and that the District Court judge provided a "vibrant, comfortable and communicative courtroom for 11 days of testimony." (Jones Br. 35, n.24.) There was no error and no prejudice.

### C.    Dr. Jones cannot demonstrate that the District Court abused its discretion in ruling on the admissibility of evidence.

Dr. Jones next challenges certain evidentiary rulings. (Jones Br. 35-39.) He asserts that he preserved these claims by filing motions in limine. See id. That was insufficient, because "[a]n unsuccessful motion in limine does not preserve an evidentiary objection." O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001) (citation omitted). By failing to object to evidence, a party "has waived any claim that the evidence was inadmissible." Id.

Dr. Jones' evidentiary arguments also fail on their merits. The District Court had "considerable latitude" to rule on the admissibility of evidence. See Santos v. Sunrise Med., Inc., 351 F.3d 587, 592 (1st Cir. 2003) (quotation omitted). Under the abuse of discretion standard, this Court reverses evidentiary rulings "[o]nly rarely—and in extraordinarily compelling circumstances." Id. (quotation omitted). Relevant factors include the "centrality of the evidence, its prejudicial effect, whether it is cumulative, the use of the evidence by counsel, and the closeness of the case." Vincent v. Marx & Co., 874 F.2d 36, 41 (1st Cir. 1989). In reviewing evidentiary rulings, this Court examines "the record as a whole." Ahern v. Scholz, 85 F.3d 774, 791 (1st Cir. 1996) (citation omitted).

1.    **The District Court properly admitted evidence regarding the accuracy of Dr. Killiany's measurements, because this evidence was relevant to a critical issue: the defendants' intent.**

Dr. Jones argues the District Court erred in admitting testimony on the accuracy of Dr. Killiany's measurements.    This claim is inconsistent with Dr. Jones' Second Amended Complaint, in which he alleged he had informed Dr. Albert that he wanted her to "investigate the <u>accuracy</u> of defendant Killiany's reports."  App. 40 (emphasis added).

In addition, Dr. Jones waived his claim of evidentiary error by permitting Dr. Killiany to testify, without objection, to the accuracy of his measurements for seven participants.  App. 1105-06, 1116-17, 1124, 1136, 1137, 1141, 1154, 1158. Dr. Jones also did not object to (or move to strike) testimony that a concern for accuracy motivated Dr. Albert and Dr. Killiany.  App. 453, 1001-02, 1006, 1019, 1144.  In cross-examining Dr. Killiany, Dr. Jones' counsel even asked whether Mary Hyde "would get just [Dr. Killiany's] most accurate measurements," and posed two questions about the accuracy of automated measurements of the entorhinal cortex.  App. 1169, 1174, 1183.  Dr. Jones cannot now justly complain that it was error to admit testimony regarding accuracy.

Even if Dr. Jones had made timely objections, the District Court properly admitted evidence regarding accuracy, because this evidence was relevant to Dr. Killiany's state of mind.  A critical question for the jury was whether

Dr. Killiany intended to make false statements about the measurements. In the District Court's words, one of Dr. Killiany's defenses was that he "was doing this for an appropriate reason."[18] See App. 368.

Evidence regarding accuracy was also relevant to Dr. Albert's state of mind. After Dr. Jones told Dr. Albert about his concerns, she asked Dr. Moss to review the accuracy of Dr. Killiany's measurements. App. 463, 731, 1145. The Court did not abuse its discretion by permitting Dr. Albert to testify that after Dr. Moss had addressed her concerns regarding accuracy, she believed the statements in the Grant Application were truthful. App. 1231, 1236-37.

### 2.    The District Court properly excluded the appendix to Dr. Schuff's report.

Dr. Jones' next argument concerns an appendix to the report of his expert witness, Dr. Norbert Schuff. See App. 153-58 (appendix to Dr. Schuff's expert report). In the appendix, Dr. Schuff commented on some of Dr. Killiany's measurements of the entorhinal cortex. See id. After Dr. Schuff had testified and left the courtroom, the District Court addressed a juror's question, which asked to see the appendix. App. 1188. The District Court properly excluded the appendix

---

[18] In his Brief, Dr. Jones misinterprets this Court's statement, in its previous opinion, that accuracy was "not at issue." (Jones Br. 36.) Properly read, this statement meant that the jury was not to make a scientific or mathematic judgment about whether Dr. Killiany's initial measurements or re-measurements were better. At Dr. Jones' request, the District Court instructed the jury to that effect. App. 1416.

because it was a prior consistent statement of the witness, and therefore, hearsay. App. 1194; see Cash Energy, Inc. v. Weiner, 81 F.3d 147, at *3 n.7 (1st Cir. 1996) (unpublished) (holding that at summary judgment stage, expert report "is inadmissible hearsay").

Contrary to Dr. Jones' claim on appeal, the appendix was not admissible as part of Dr. Schuff's testimony. (Jones Br. 37.) In support of his argument, Dr. Jones cites two cases from other jurisdictions. These cases, however, do not help his position. See Forward Commc'ns Corp. v. United States, 608 F.2d 485, 511 (Ct. Cl. 1979) (concluding that expert report was inadmissible, but that expert could testify to his opinions); BC Tech. v. Ensil Int'l, No. 02-CV-700, 2008 WL 163578, at *2 (D. Utah Jan. 17, 2008) (order on motions in limine) (concluding that expert witnesses could explain their live testimony using the charts, exhibits, and summaries attached to their reports).

Dr. Jones next complains that the District Court failed to read his memorandum on this issue. (Jones Br. 37.) Dr. Jones is mistaken about the record, however, which confirms that the District Court had not read the defendants' memorandum. App. 1194.

Finally, Dr. Jones argues the District Court should have admitted the appendix because there was a lack of evidence against it, and because this case involved "technical" issues. (Jones Br. 37.) Even if Dr. Jones had advanced these

arguments at trial—which he did not, App. 1194—they would not justify the admission of the hearsay appendix to Dr. Schuff's report.  In any event, Dr. Killiany provided ample evidence to contradict the opinions in Dr. Schuff's appendix, and helped the jury to understand the technical issues in the case, when he explained his measurements at length.  See App. 1089-1160.

### 3.    The District Court properly admitted Dr. Albert's testimony authenticating Dr. Jones' signature.

Dr. Jones argues the defendants should not have been permitted to impeach him with the fact that he signed the author disclosure form for Dr. Killiany's 2002 article.  The article, which identified Dr. Jones as a coauthor, reported an inter-rater reliability coefficient of 0.96 for Dr. Killiany's and Dr. Gomez-Isla's measurements of the entorhinal cortex.  App. 1440.  The article also stated that there was "substantial involvement of the entorhinal cortex in the preclinical phase of AD," and that this finding was "measurable on MRI."  App. 1438.   These statements were (1) consistent with statements in the Grant Application, and (2) directly inconsistent with Dr. Jones' contentions at trial.

In view of this evidence which was highly damaging to Dr. Jones' claims, he tried to distance himself from the 2002 article. He did so by—among other things—testifying on direct examination that the signatures on the authorship forms, bearing his name, were not his signatures.  App. 801.

43

Because Dr. Albert had worked with Dr. Jones for decades, she knew his handwriting and signature. App. 1263-64; (Trial Tr. vol. 3, 69, Mar. 21, 2013.) Under Fed. R. Evid. 901, therefore, Dr. Albert was competent to authenticate Dr. Jones' signatures on the authorship forms. See App. 1625-26. The District Court did not abuse its discretion by admitting this evidence on the issues of falsity and knowledge. The evidence was also admissible to impeach Dr. Jones. See United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999) (concluding that evidence may be admitted for impeachment "when two statements, one made at trial and one made previously, are irreconcilably at odds").

Contrary to Dr. Jones' contentions in his Brief, Dr. Albert's testimony did not result in a mini-trial on a collateral matter. Her testimony on this point took fewer than three pages of the transcript. App. 1263-65. The issue of whether Dr. Jones signed the authorship documents was so important that his attorney first raised on direct examination whether the signatures belonged to Dr. Jones. See App. 800-01.

The District Court did not err by permitting Dr. Albert to authenticate Dr. Jones' signature.

**4.    The District Court properly admitted impeachment evidence regarding Dr. Jones' credibility.**

Dr. Jones asserts that the District Court erred in admitting evidence on his financial motive for pursuing this case.[19]  (Jones Br. 38.)  This position is contrary to established case law in the First Circuit and other federal courts.  This Court has explained that "[b]ias is always relevant as discrediting the witness and affecting the weight of his testimony."  See, e.g., DiBenedetto v. Hall, 272 F.3d 1, 10 (1st Cir. 2001) (quotation omitted).  In the context of False Claims Act cases, federal courts have concluded that cross-examination regarding a relator's financial interest is "a perfectly acceptable point for counsel to make," and that relators "may be cross-examined with regard to their financial interest in the outcome of the case."  United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 608 F.3d 871, 898 (D.C. Cir. 2010) (citations omitted); United States ex rel. Sanders v. Allison Engine Co., No. 95-0970, slip op. at 2 (S.D. Ohio Feb. 14, 2005) (order on relators' motion in limine), aff'd in part and rev'd in part on other grounds, 471 F.3d 610 (6th Cir. 2006), rev'd on other grounds, 553 U.S. 662 (2008).

---

[19] Dr. Jones also complains about the defendants' closing argument on this point. (Jones Br. 38.)  Because he did not object, he failed to preserve any claim of error. See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. West Lake Acad., 548 F.3d 8, 22 (1st Cir. 2008) (citations omitted) (requiring timely objection to preserve claim that closing argument was improper).  Defense counsel's closing argument was plainly warranted on the evidence presented.

In this case, evidence regarding Dr. Jones' financial motive was relevant for the jury to consider in evaluating his testimony. By waiting to file suit, Dr. Jones permitted the Government to pay the claim which he now contends was false. App. 935-36, 1363. Dr. Jones' inaction produced a large sum from which he could recover, if he could persuade the Government or a jury that the defendants had violated the False Claims Act. See id.

Although Dr. Jones' attorneys complained at trial that delay was somehow necessary under the False Claims Act's seal requirements, see App. 937-38, it was not. The seal requirement was simply that once the Government was notified of the case's filing, Dr. Jones could not disclose its existence. Nothing in the statute prevented Dr. Jones from filing his case as early as he wanted. He might have filed suit even before the Grant Application was approved. If the defense's evidence and argument on these points were "devastating," as Dr. Jones contends (Jones Br. 38), this was only because they proved powerfully that (1) Dr. Jones had been motivated by financial gain, for himself, for many years, and (2) if he had truly cared about the federal fisc he would have acted to protect it at the earliest possible opportunity, at a time when the Government had not yet paid the defendants. The defense was also entitled to show that Dr. Jones was eager to continue working on the grant, as this evidence cast serious doubt on his claim that he was working with people intent on fraud.

**5.    The District Court properly admitted "laudatory statements" about the defendants' research.**

Dr. Jones asserts that the District Court should have excluded so-called "laudatory statements" about the defendants' research.  (Jones Br. 39.)  Once again, Dr. Jones did not preserve this issue.  Although he argues that he filed a motion in limine seeking to preclude this evidence, his failure to make timely objections during the trial means that his challenge is reviewable only for plain error.  See Davignon v. Clemmey, 322 F.3d 1, 8 (1st Cir. 2003) (citation omitted) (stating "that objection asserted by motion in limine does not preserve evidentiary challenge absent contemporaneous objection at trial").

If the Court reaches the merits of Dr. Jones' claim, it was appropriate for the defendants to introduce evidence which placed the structure, methods, and goals of the program project grant in context.  In addition to Dr. Killiany's work with MRI scans, the Grant Application explained the defendants' work with neuropsychological testing, genetics, and fMRI and SPECT imaging.  App. 107.  Many scientists, leaders in their fields, collaborated on the grant.  App. 1215-19.  Evidence about the grant was relevant to the issue of materiality, because it explained that Dr. Killiany's work with MRI scans of the entorhinal cortex was a small part of a much larger study.  The defendants were also entitled to introduce this evidence to rebut Dr. Jones' claim that they were "bad apples."  See App. 370.

**6.    The District Court properly admitted evidence that other scientists have replicated the results of the defendants' research.**

Dr. Jones argues the District Court should have excluded evidence that other scientists replicated the defendants' finding.  (Jones Br. 39.)  Dr. Jones failed to preserve this issue because he did not object to Dr. Schuff's and Dr. Gomez-Isla's testimony on replication.   App. 568, 676-677; see Davignon, 322 F.3d at 8 (concluding that filing of motion in limine was insufficient to preserve evidentiary ruling for appellate review).

Dr. Jones contends that "the district court permitted Albert to testify and defense counsel to argue falsely that the MRI results reported in the Application on predictability of AD had been duplicated by other scientists."  (Jones Br. 39.)  He does not cite any evidence to support his bare assertion that this testimony and argument were false.  Dr. Jones also overlooks the opinion of his own expert, Dr. Schuff, who confirmed Dr. Albert's finding that "the normals have larger volumes than Alzheimer's patients."  App. 674.  Replication evidence was relevant to the elements of falsity and knowledge.

Replication evidence also rebutted Dr. Goldstein's claim, which was based solely on his statistical analysis, that it was unlikely Dr. Killiany had been blinded.  (Jones Br. 19.)   Other scientists have concluded that Alzheimer's disease is associated with shrinkage in the entorhinal cortex.   See App. 674.   It was

unsurprising, then, that as Dr. Killiany learned more about the anatomy of the brain and his re-measurements became more accurate, the data led him toward the truth: that participants in the "normal" group (who were unaffected by Alzheimer's disease) had larger entorhinal cortices than participants in the "converter" and "questionable" groups (who were beginning to be affected by Alzheimer's disease).

### D. The District Court did not err in instructing the jury.

#### 1. The Court should ignore Dr. Jones' brief discussion of this issue, because it does not rise to the level of appellate argument.

In a scant two pages of undeveloped argument, Dr. Jones contends that a new trial is warranted because of claimed errors in failing to give certain of his proposed jury instructions. (Jones Br. 40-41.) He also argues, scattershot, that the District Court erred in instructing the jury on intent, falsity, knowledge, deliberate ignorance, reckless disregard, "most accurate" data, materiality, and accuracy. Finally, Dr. Jones levels a general complaint against the special verdict form itself.

This section of Dr. Jones' Brief cites but two cases for general principles regarding jury instructions. This Court should decline to consider Dr. Jones' arguments about the jury instructions and special verdict form as not meeting the required standards for developed argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (citations omitted) (stating "the settled appellate rule that

49

issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

### 2.    Dr. Jones also forfeited this claim at trial.

At trial, Dr. Jones forfeited his claim that the District Court erred in instructing the jury.  "When an objection to a jury instruction is forfeited, we apply the plain error standard."  <u>Connelly v. Hyundai Motor Co.</u>, 351 F.3d 535, 545 (1st Cir. 2003) (citation omitted).

This Court has explained its "quite strict" requirement that a party must object to a challenged jury instruction before the jury retires:

> [A] party wishing to object to an instruction must raise the objection 'before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.' . . . It is well-settled in this Circuit that '[e]ven if the initial request for an instruction is made in detail, the requesting party must object again after the instructions are given but before the jury retires for deliberations.'

<u>Id.</u> at 544 (quotations and citations omitted) (alteration in original); <u>see also Sony BMG Music Entm't v. Tenenbaum</u>, 660 F.3d 487, 506 n.20 (1st Cir. 2011) (quotation omitted) (requiring that even if a party previously requested a jury instruction, the party "must object *again* after the instructions are given but before the jury retires for deliberations"); <u>Gray v. Genlyte Group, Inc.</u>, 289 F.3d 128, 133-34 (1st Cir. 2002) ("[A] party cannot assign as error the giving of or failure to give an instruction 'unless that party objects thereto before the jury retires to consider

50

its verdict, stating *distinctly* the matter objected to and the grounds of the objection.'").

Mindful of this Court's "quite strict" rule, Connelly, 351 F.3d at 544, the trial judge reminded the parties to make specific objections to the jury instructions when they were given. App. 1274. After the jury was charged, Dr. Jones' attorney came to the bench and made four comments about the instructions. App. 1413. These comments concerned the number of expert witnesses (three, not two), the definition of materiality, the application of the materiality concept to Question 1, and a question about "accuracy." Id. At that time, Dr. Jones' attorney said nothing about the Court's limitation of Question 2 to Dr. Albert. See id. The Court then gave its supplementary charge, stating that there were three experts, not two, and modifying the definition of "materiality" as Dr. Jones' attorney requested. App. 1416. The Court essentially stated that it disagreed with Dr. Jones' inaccurate observations on the application of the materiality concept to Question 1 and the comment about "accuracy," which the Court correctly had covered in its Charge (when it said, "you're not asked yourselves to determine accuracy or to determine the borders of the entorhinal cortex," App. 1402). After the Court gave its supplementary charge, the Court asked, "Is the supplementary charge satisfactory, Mr. Friedman?" App. 1417. Counsel replied, "Yes, your Honor." Id. Having failed to object when given the chance, and having answered

51

"Yes" to the question whether the supplementary charge was "satisfactory," Dr. Jones can have no further basis for appeal from the instructions or special verdict form.

### 3.    The District Court properly instructed the jury.

Dr. Jones does not argue and cannot establish that the District Court committed plain error in instructing the jury. "Plain error is reserved for only 'the most egregious circumstances.'" Connelly, 351 F.3d at 545 (quotation omitted). To meet this standard, Dr. Jones would need to show "(1) an error, (2) that is plain (i.e., obvious and clear under current law) (3) that is likely to alter the outcome, and (4) that is sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial process." Id. (citation omitted).

The jury instructions must be viewed as a whole. Hatch v. Trail King Indus., Inc., 656 F.3d 59, 64 (1st Cir. 2011) (citation omitted). The District Court properly instructed the jury on intent by telling the jury that it must find the defendants made a "knowing misstatement of a material fact," App. 1401-1402. This instruction comported with established case law. See, e.g., United States ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 120 (1st Cir. 2013) (citing 31 U.S.C. § 3729(a)(1)(A)) (stating that False Claims Act "imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," where the false statement is material).

The District Court also accurately instructed the jury on falsity, but did so in a way that was unfavorable to the defendants. Instead of stressing falsity, the Court instructed the jurors that the defendants had to use the "best available data," the "most accurate data." The defense objected to the Court's references as placing on the defense a "higher standard than is required," but the Court refused to modify the language. App. 1415. The Court also accurately instructed on "deliberate disregard." App. 1404. The Court properly declined to say that the defendants must have had a specific intent to defraud.

As to materiality, the Court also properly instructed the jury. The Court correctly explained that for a fact to be "material," it would need to be "a fact of sufficient consequence to make a difference to the NIH." App. 1403. The Court referred to hypothetical facts that would not be material, and then said: "It's got to be something that rises to the go/no go level. Something that would factor into the scores that you've heard testimony about. Something that the NIH reviewers would have thought made a difference. A consequential difference." App. 1403-04. The "scores" to which the Court referred were the scores reflected on the Pink Sheets given to each Project in the Grant Application. See App. 1591-1603 (Pink Sheets). In light of the fact that the scores the jury saw in the Pink Sheets ranged from a low (good score) of 53 to a high (poor score) of 249, the jury was led to believe that any fact that might have influenced the scores in the slightest degree

would have been material.  See id.  If anything, this instruction made the defendants' task more difficult.

Despite the light burden that the District Court's definition of materiality placed on Dr. Jones, his counsel objected to omission of the words "natural tendency for influence not to make a difference because that's a but for causation issue." App. 1413. The Court immediately said, "I'll add that, yes. Natural tendency." Id. Dr. Jones' counsel's reference to "but for causation" was a red herring, since the Court did not use the words "but for" or "but for causation." In its supplemental charge, the Court instructed the jury: "I defined it (materiality) accurately, I should add this phrase. A statement is material if it has a natural tendency to affect the thinking of the NIH." App. 1416.

One moment later, the Court asked counsel whether the supplementary charge was "satisfactory," and Dr. Jones' attorney replied, "Yes, your Honor." App. 1417.  The supplemental charge bent heavily in Dr. Jones' favor, since it dropped the notion of "influence" and substituted the words "affect the thinking of the NIH."  Since virtually any fact could "affect the thinking of the NIH," the definition of materiality was favorable to Jones.  This is no ground for appeal.  In any event, the Court gave Dr. Jones' attorney every chance to voice his displeasure.  Dr. Jones' attorney pronounced himself satisfied, as undoubtedly he should have been at that stage.

54

Dr. Jones' final complaint concerns the special verdict form. Dr. Jones apparently claims he objected to the Court's refusal to permit a yes answer for Dr. Albert on Question No. 1. (Jones Br. 41.) He did not. During the charge conference, Dr. Jones did not seek an instruction that Question No. 1 applied to Dr. Albert, as well as Dr. Killiany. See United States v. Rodriguez, 735 F.3d 1, 11 (1st Cir. 2013), cert. denied, 134 S. Ct. 1539 (2014) (citation omitted) (stating that question on appeal is whether verdict form and jury instructions, taken as a whole, fairly presented issues to jury). Indeed, given how this Court formulated the jury questions in its previous opinion, it is impossible to see how Dr. Albert—who had nothing to do with measuring brain regions on MRI scans—could have been found liable, or not liable, for Dr. Killiany's alleged intentional exaggerations of the boundaries of the entorhinal cortex. See United States ex rel. Jones, 678 F.3d at 96 (stating that "the essential dispute is whether Killiany falsified scientific data" (emphasis added)). Furthermore, Dr. Jones' attorneys approved the wording of Question No. 1, which referred only to Dr. Killiany—consistently with this Court's identification of the remaining issues for trial. (Docket No. 232 at 2.)

Dr. Jones argues the District Court "believed erroneously that . . . Killiany is not liable if there were false statements about methodology, but no finding of intentional falsification of data." (Jones Br. 41.) Dr. Jones fails to explain how the jury could have found Dr. Killiany not liable under Question No. 1, yet somehow

found him liable under Question 2.  In view of the evidence and argument that were presented throughout the trial, such a verdict would not have made sense.

Even more fundamentally, Dr. Jones' theory at trial and the evidence he offered were wholly consistent with the District Court's conclusion that Question No. 1 related to Dr. Killiany and Question No. 2 related to Dr. Albert.  In the Joint Pretrial Memorandum, Dr. Jones argued that Dr. Killiany's liability depended on whether he had created false data, and Dr. Albert's liability depended on whether she had made false statements in the Grant Application.  App. 186.  In his opening statement, Dr. Jones' attorney said that Dr. Killiany intentionally had exaggerated the entorhinal cortex boundaries of the normal participants, and Dr. Jones' attorney then referred to the Grant Application as "her" (Dr. Albert's) Application.  (Trial Tr. vol. 1, 29, 30-32, Mar. 18, 2013.)  Throughout the trial, Dr. Jones' attorneys repeated their theme that Dr. Killiany had "plumped out" selected measurements of the entorhinal cortex, and that Dr. Albert knew statements in the Grant Application were false.

During the charge conference, when the Court explained that Question 1 related to Dr. Killiany and Question 2 related to Dr. Albert, App. 1273, Dr. Jones' attorney said that "Dr. Killiany was the author as well on those statements."  App. 1276.  He then argued that Killiany's "name is on every page of the Project 3."  Id.  The Court responded, "Not, not enough," and when

Dr. Jones' counsel replied, "okay," the District Court further explained, "Not enough.  I mean, it's a matter of sufficiency of the evidence.  Ms. Albert was the head person."  Id.  Dr. Jones' attorney thus acquiesced in the Court's proposed instruction that Question 2 related to Dr. Albert.  See id.

Given the evidence, Dr. Jones' theories before and at trial, and the opening statement of Dr. Jones' attorney, it is difficult to see how the Court could have permitted Dr. Killiany to be found liable on Question 2 without confusing the jury.  The District Court appropriately exercised its discretion to charge the jury and frame the issues in the manner in which the parties had tried the case.  See Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 503 n.17 (1st Cir. 2011) (quotation omitted) ("District courts have 'considerable discretion about the formulation, nature, and scope of the issues' on a special verdict form."); see also Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010) (quotation omitted) (stating that special verdict form should present case "fairly and accurately").  Put another way, the District Court was under no duty to charge the jury in an illogical manner.

## CONCLUSION

The defendants respectfully request the Court to affirm the judgment below.

BRIGHAM AND WOMEN'S HOSPITAL,
MASSACHUSETTS GENERAL
HOSPITAL,
MARILYN S. ALBERT, AND
RONALD J. KILLIANY,

By their attorneys,


/s/ Alan D. Rose
Alan D. Rose (CAB # 29639)
Brian D. Lipkin CAB # 1159011)
Rose, Chinitz & Rose
One Beacon Street
Boston, MA  02108
(617) 536-0040
Fax: (617) 536-4400
adr@rose-law.net
bdl@rose-law.net

Date:  May 16, 2014

## CERTIFICATE OF COMPLIANCE WITH
## FED. R. APP. P. 32(a)(7)(B)(i)

Under Fed. R. App. P. 32(a)(7)(B)(i), I certify that this brief contains 14,000

words.

/s/ Brian D. Lipkin

## <u>CERTIFICATE OF SERVICE</u>

On May 16, 2014, I e-filed this brief through the ECF system, in which the

following attorneys are registered participants:

      Jeremy L. Friedman
      Law Office of Jeremy L. Friedman
      2801 Sylhowe Road
      Oakland, California  94602
      jlfried@comcast.net

      William D. Hughes
      Hughes & Nunn, LLP
      350 10th Avenue, Suite 960
      San Diego, California  92101
      whughes@hughesnunn.com

      Michael D. Kohn
      David K. Colapinto
      Kohn, Kohn & Colapinto, LLP
      3233 P Street NW
      Washington, DC  20007
      mk@kkc.com
      dc@kkc.com

      Laurie J. Weinstein
      U.S. Attorney's Office
      Judiciary Center Building
      555 4th Street, NW, E4820
      Washington, DC  20001

                   /s/ Brian D. Lipkin