# NO. 14-1088

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

---

### UNITED STATES OF AMERICA,
*Appellee,*

**v.**

### FRANK PEAKE
*Defendants/Appellants.*

---

**On Appeal from the United States District Court
for the District of Puerto Rico
District Court Case Number 11-CR-512 (DRD)**

---

### REPLY BRIEF OF APPELLANT FRANK PEAKE

---

**DAVID OSCAR MARKUS**
**MONA E. MARKUS**
**A. MARGOT MOSS**
**MARKUS & MARKUS, PLLC**
**Attorneys for Appellant**
**40 N.W. 3rd Street, Penthouse One**
**Miami, Florida 33128**
**Telephone No. (305) 379-6667**
**Facsimile No. (305) 379-6668**

# TABLE OF CONTENTS

TABLE OF CITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

REPLY ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . 1

   I.     PEAKE SHOULD BE GRANTED A NEW TRIAL BECAUSE OF
        THE GOVERNMENT'S FOCUS ON UNDULY PREJUDICIAL
        AND IRRELEVANT ARGUMENTS DESIGNED TO APPEAL
        TO JURY BIAS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   II.    PEAKE SHOULD BE GRANTED A NEW TRIAL DUE TO THE
        GOVERNMENT'S USE OF DOCUMENTS OBTAINED FROM
        THE ILLEGAL SEARCH AND SEIZURE OF PEAKE'S
        PERSONAL ELECTRONICS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

   III.   PEAKE IS ENTITLED TO A NEW TRIAL BECAUSE HE
        WAS IMPROPERLY DENIED HIS THEORY OF
        DEFENSE INSTRUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   IV.   PEAKE SHOULD BE GRANTED A NEW TRIAL DUE TO
        ERRORS DURING JURY DELIBERATIONS . . . . . . . . . . . . . . . . 23

   V.    PEAKE'S CONVICTION SHOULD BE REVERSED AND THE
        CASE DISMISSED FOR LACK OF JURISDICTION DUE TO
        THE FACT THAT PUERTO RICO IS NOT A STATE  . . . . . . . . 25

   VI.   IF PEAKE'S CONVICTION IS NOT OVERTURNED, HE
        SHOULD BE RESENTENCED DUE TO ERROR IN
        THE APPLICATION OF THE VOLUME OF
        COMMERCE GUIDELINE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

i

# TABLE OF CITATIONS

*Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*
    398 F.3d 56 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Califano v. Torres*
    435 U.S. 1 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank*
    649 F.2d 36 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Harris v. Rosario*
    446 U.S. 651 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Igartua v. United States*
    32 F.3d 8 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Igartua v. United States*
    229 F.3d 80 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Igartua v. United States*
    417 F.3d 145 (1st Cir. 2005) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Igartua v. United States*
    626 F.3d 592 (1st Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*People of Puerto Rico v. Shell*
    302 U.S. 253 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 28

*United States v. Allen*
    670 F.3d 12 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Angiulo*
    485 F.2d 37 (1st Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Brunette*
    256 F.3d 14 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Ferreras*
    192 F.3d 5 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*United States v. Figueroa-Encarnacion*
    343 F.3d 23 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Fuccillo*
    808 F.2d 173 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Gamache*
    156 F.3d 1 (1st Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Ganias*
    755 F.3d 125 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. George*
    676 F.3d 249 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*United States v. Hernandez-Albino*
    177 F.3d 33 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Isaacson,*
    752 F.3d 1305 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Leon*
    468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Manning*
    79 F.3d 212 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Peter*
    310 F.3d 709 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Powers*
    702 F.3d 1 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Richards*
    659 F.3d 527 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Rosa-Ortiz*
    348 F.3d 33 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Tomeny*
    144 F.3d 749 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Wurie*
    728 F.3d 1 (1st Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATUTORY AND OTHER AUTHORITY:

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

15 U.S.C. §3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

48 U.S.C § 734 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

U.S.S.G. § 6A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## ARGUMENT

**I.     PEAKE SHOULD BE GRANTED A NEW TRIAL BECAUSE OF THE GOVERNMENT'S FOCUS ON UNDULY PREJUDICIAL AND IRRELEVANT ARGUMENTS DESIGNED TO APPEAL TO JURY BIAS.**

The Government seeks to defend the overwhelming number of improper and prejudicial questions and remarks it made during the trial by simply ignoring that they occurred.  Rather than addressing the testimony head on, the Government sticks its head in the sand.  The Government offers a series of denials that are impossible to square with the record.  That each of these contentions is categorically false is amply demonstrated by the record:

**Contention 1:  The Government "never argued that the jurors or their families were victims of the conspiracy, and no witnesses testified that the conspiracy affected the prices paid by anyone other than companies purchasing freight services from the conspiring carriers."  GB25.**

**Contention 2: The Government "did not infer that those higher prices were passed onto the victim's customers, the general populace of Puerto Rico, in a secondary manner, nor did the government argue that hamburgers and paperclips cost more or that school children paid higher milk prices or went without milk as a result of the conspiracy."  GB35 (internal quotations omitted).**

**Facts:** The Government did, indeed, both "infer" and directly argue that all Puerto Ricans were victims.  Each of the following excerpts are direct quotes from the Government:

1

- "Ladies and Gentlemen, shipping is very important in Puerto Rico. . . . *Most consumer goods* travel to Puerto Rico from the [United States]. *Food for Pueblo supermarkets, medicine at Walgreens, most things at Walmart*." Appx 70.

- "It was so significant that it affected billions of dollars of freight to and from Puerto Rico. . . . This case is about Puerto Rico because *the conspiracy affected so much of what is sold here* . . . " Appx 72. (The Government's use of the word "sold," instead of "purchased," completely debunks its claim that it did not infer that higher prices were passed on to consumers).

- "Congress passed the Sherman Act because it was so concerned that *consumers need to buy things to feed and clothe their families. ...* They *[consumers] try to get the best price for what they buy*, especially in times when money is tight." Appx 72. (With this statement, the Government told the jury that the entire purpose of the crime is for the benefit of the consumer, not the retailer).

- "Businesses like Burger King, Office Max and Walgreens, *businesses that have stores all over Puerto Rico*, they were all paying more than they should have. . . ." Appx 73.

- A witness " who owns all the Burger Kings in Puerto Rico" will tell you that *"the shipping costs are factored into the costs of the whoppers sold at Burger King*." Appx 77.[1]

---

[1] This is the only record citation the Government takes on directly. Its explanation makes no sense. The Government states that the quote is "without a basis in argument or evidence," GB35, but it is a direct quote straight from the Government's mouth. Then the Government argues that "the sentence states only that the restaurateur factored the shipping cost into his costs, not that he passed them along in the price of hamburgers." GB35-36. But anyone hearing that shipping costs are "factored into the cost of a Whopper sold at Burger King" would understand that to mean the shipping cost affects the price at which Burger King is selling the Whopper. In any event, there simply is no appropriate reason for the Government to be referencing the cost of Whoppers at all. The statement obviously *was* "intended to inflame the jury." Gov't Brief at 36. It had no other purpose.

2

- "You will hear the victims like Burger King and Office Max, those big price increases, one of the options was *they passed that pricing on.* That hurt their ability to compete by offering lower prices for their products." Appx 78.

- "[T]here will be evidence that the government used the shipping companies to ship food for the school lunch program. . . . You will hear . . . that *paying more for shipping meant that the government had less money in the school lunch program to buy food for school children.*" Appx 78.

(Emphasis added). These are clear arguments that the jurors and their families were victims of the conspiracies.


**Contention 3: The Government's "witnesses said nothing about the conspiracy's effect on prices . . . for school lunches."[2] GB30.**

**Contention 4: The FDA witness "never testified that any school children had less for lunch or paid more for it as a result of the conspiracy." GB31.**

**Facts:** The FDA witness, who did not know anything about Peake, was asked a number of questions to highlight (entirely irrelevantly) that the FDA imported everyday food items for the school lunch program and for low income food assistance. The Government elicited unnecessarily that the U.S.D.A. transports "[c]anned vegetables, canned fruit, frozen ground beef, frozen poultry, chilled cheeses, foods of that nature." Appx 881-3. After questioning about the shipping

---

[2] The testimony of the FDA witness and the Burger King witness came in over repeated objection.

3

process and how prices were set, the Government then reminded the jury that the

point of all this was the effect on school lunches:

> Q.     [O]ne of those programs you mentioned was the school lunch program?
>
> A.     Yes, sir.
>
> ***
>
> MR. LEE     I am merely going to ask what is a school lunch program.
>
> ***
>
> A.     The school lunch program is a program by which nutritious and economical meals can be provided to public school children. . . .
>
> Q.     Does the U.S.D.A. purchase food for the school luncheon program?
>
> A.     Yes.
>
> ***
>
> Q.     Does the U.S.D.A. receive funds to purchase food for the school lunch program?
>
> A.     Yes, it does.
>
> Q.     Does the U.S.D.A. ever receive separate funding to arrange for the transportation of that program?
>
> A.     No, that is included in the funding purchase of the product.
>
> ***
>
> Q.     Were there other programs that the U.S.D.A. purchased food for?
>
> A.     Yes, there is also the food assistance to low income families, which is administered by the Puerto Rican Department of the Family.
>
> Q.     And did the U.S.D.A. arrange for transportation of food for that program from Jacksonville to Puerto Rico?
>
> A.     Yes, it did.

> Q.    Did food for that program, was it transported on ships operated by Sea Star and Horizon?
>
> A.    Yes, it was.
>
> MR. LEE:    No more questions, Your Honor.

Appx 889–93.  The Government's claim that "none of the questions were about the effect on school lunch prices" is demonstrably untrue.  GB36.  *All* of these questions, which immediately followed lengthy examination on how the conspiracy affected prices, were about the effect on school lunch prices.  If these questions were not about the effect on school lunch prices, then what was the purpose of referencing school lunches at all?

And contrary to the Government's suggestion that it repeated school lunch questions only after objections, in fact the Government offered numerous minor variations on the same question in order to emphasize repeatedly the school lunch program.  Not counting questions repeated after objections, the Government referenced the school lunch program at least 9 times (not counting questions regarding food for the poor). Appx 881, 889-93.

**Contention 5**: The Government's "witnesses said nothing about the conspiracy's effect on prices at Burger King..." GB30.

**Contention 6**: The Burger King supplier "was not asked any questions – nor did he give any answers – about the prices paid by Burger King customers." GB31.

**Facts:** The Burger King supplier, who had no knowledge about Peake's involvement in the conspiracy, worked for a company named Caribbean Restaurants. Though irrelevant to the prices Caribbean paid for shipping, the Government's first main examination topic was Burger King:

> Q.    What is Caribbean Restaurants?
>
> A.    Caribbean Restaurants here in Puerto Rico own and operate 180 Burger Kings in Puerto Rico.
>
> Q.    How many people to do the Burger King restaurants employ?
>
> A.    Approximately about 6,500 employees.
>
> Q.    Do you know if the Burger King restaurants in Puerto Rico are popular?
>
> A.    Yes, they are very popular.  Thankfully, yes.

Appx 528.  These questions plainly sought to bring home to the jurors that Burger King's 6,500 employees and its many customers were affected by the conspiracy. The questions were irrelevant to any matter at issue in the trial.

The Government then turned to Burger King's menu items and how the Whopper, specifically, was impacted by the conspiracy:

6

Q.     What is the most popular menu item at Burger King?

A.     We are known as Home of the Whopper.

Q.     Are you familiar with . . . the ingredients that go into the whopper?

A.     Yes, sir.

\*\*\*

Q.     What are some of the items that come from the States?

A.     The beef, the produce, the paper cups.

\*\*\*

Q.     How about the fixtures that go into Burger King restaurant, where do they come from?

A.     Most of them come from the U.S. also, yes.

\*\*\*

Q.     Are the meat, the cheese, the catsup, the mayonnaises, are those transported to Puerto Rico in shipping containers?

Appx 529-33.  After setting this foundation of the direct relationship between the shipping process and the "most popular" menu items at the "popular" Burger King stores, the Government then used the witness to explain how the conspiracy had the effect of increasing prices.  Appx. 533-51.  The *entire point* of the Government's examination of this witness was that consumers paid more for Burger King menu items.

The Government's statements regarding the record are, therefore, simply false. The Government itself expressly stated that a witness would testify that "shipping costs are factored into the costs of the whoppers sold at Burger King," Appx 77; that

7

another would testify that "paying more for shipping meant that the government had less money in the school lunch program to buy food for school children," Appx. 78; and that the jurors would hear that Sea Star customers like Burger King and Office Max "passed that pricing on," which "hurt their ability to compete by offering lower prices for their products." Appx 78.  It is thus inexplicable that the Government would tell this Court that it "never argued that the jurors or their families were victims of the conspiracy, and no witnesses testified that the conspiracy affected the prices paid by anyone other than companies purchasing freight services from the conspiring carriers."  GB25.

After fundamentally misrepresenting its own arguments and the testimony below, the Government then cobbles together pieces of sentences to substantially misquote Peake's Initial Brief:

> Peake nonetheless contends that all 'evidence (and the Government's accompanying argument)' regarding the conspiracy's existence and its nexus to interstate commerce 'had *no relevance whatsoever* to the case against Peake, which turned - solely – on the question of whether Peake was a member of the conspiracy,' and thus 'should have been excluded pursuant to Federal Rules of Evidence 402 and 403.'

GB32, quoting Initial Brief at 35-36. This is simply not what Peake argued.  The correct quote, in its entirety, is:

> Even if venue in Puerto Rico was appropriate, these over-the-top inappropriate appeals to sympathy and bias should never have occurred in any venue.  They

8

had *no relevance whatsoever* to the case against Peake, which turned – solely
– on the question of whether Peake was a member of the conspiracy that
unquestionably existed among others.  This evidence (and the Government's
accompanying argument) should have been excluded pursuant to Federal Rules
of Evidence 402 and 403.

Initial Brief at 35-36.  Peake did not argue that evidence and argument "regarding the

conspiracy's existence and its nexus to interstate commerce" were irrelevant.  He

argued that the "over-the-top inappropriate appeals to sympathy and bias" were

irrelevant.  And they were.

Peake has never contested the Government's right to "present evidence of the

price-fixing conspiracy's connection to, and effect on, interstate commerce."  GB32.

But these witnesses were not called for that purpose, and most of their testimony had

nothing to do with interstate commerce at all.  To the extent that these witnesses had

testimony to offer on that subject, their testimony should have been limited solely to

it.

Peake does not complain that the Government was permitted to "discuss the

prices within the shipping market, Sea Star's pricing and how Sea Star made its

pricing decisions," GB33, in order to prove that the conspiracy existed.  Rather, the

objection is that the Government went an unnecessary step further and argued that

those prices were unreasonable and unfair.  This latter argument exceeded what is

relevant  to  the  charge's  elements,  and  was  especially  harmful  because  the

9

Government successfully moved *in limine* to prohibit Peake from referencing in any way the converse (i.e., that prices were reasonable, fair, or competitive). D.E.103. This dichotomy was improper.

The Government also argues that its repeated references to big consumer companies which make everyday products were relevant. The names of these companies were *not* relevant, and the references were more prejudicial than probative. They therefore should have been excluded pursuant to Federal Rule of Evidence 403. There were countless other Sea Star customers that the Government claims had "individually rigged" bids. GB37. The Government does not explain why, *given the concern about prejudice that was significant enough to justify a precautionary instruction from the judge*, it should have been permitted to choose customers that had direct personal connection to the jurors. The defendant's interest in the jurors not perceiving a personal financial interest in the alleged crime far outweighed the Government's interest in "tell[ing] a colorful story with descriptive richness . . . not just to prove a fact but to establish its human significance." Gov't Brief at 38 (quotation omitted). When the "human significance" is direct personal harm to the jurors, descriptive richness must take a back seat to the defendant's right to an impartial jury.

10

The Government seeks to minimize the effect of the harm it created by comparing to cases in which a prosecutor asked the jurors to imagine getting knifed (and similar horrors). Referencing the price of a Whopper will never be as prejudicial, in the objective sense, as referencing gruesome facts in a murder case. That said, the prejudice inflicted by the Government was just about as inflammatory and personal to the jury as it could be in an antitrust case about international shipping rates.

It is true that the Government "never exhorted the jurors to put themselves in the victim's shoes." GB41. Instead, the Government told the jury, over and over again, that it already was wearing those shoes. This was improper, and necessitates a new trial.

## II.  PEAKE SHOULD BE GRANTED A NEW TRIAL DUE TO THE GOVERNMENT'S USE OF DOCUMENTS OBTAINED FROM THE ILLEGAL SEARCH AND SEIZURE OF PEAKE'S PERSONAL ELECTRONICS.

The following facts are undisputed regarding the scope of the search warrant pursuant to which the Government seized and utilized documents taken from Frank Peake's personal electronics:

- The draft warrant provided by the Government to the Florida Magistrate stated that "the search will include the . . . laptop computers, hand-held computers, cell phones, Blackberries, . . . in the possession of, or readily identifiable as belonging to . . . FRANK PEAKE." Appx-S 191.

11

- The Magistrate drew in a large X across that paragraph, and initialled the X in four different places.  Appx-S 191.

Seeking to buck the common understanding that crossing out a paragraph signals disapproval of the material contained therein, the Government now argues that in crossing out the paragraph, the Magistrate in fact was trying to *authorize* exactly what he crossed out and was signalling his desire to "*expand*" the search.  GB19 (emphasis in original).

Nothing about the Magistrate's revisions to the relevant page supports this conclusion:



Case 3:11-cr-00512-DRD   Document 85-2   Filed 08/02/12   Page 83 of 160

A total of five (5) doors provide ingress and egress to the building.  SEA STAR's main entrance is two glass doors on the front, east side of the building, one to either side of the large column under the awning.  The right side door is the publicly-accessible entrance, while the door to the left of the column is an employee entrance with an electronic keypad.  There are also doors for other businesses and tenants to enter the building.  Two are located at the back, west side: one in the center of the building and one on the southwest corner of the building.  The remaining door is on the southeast side in an area reserved for smoking.

In order to minimize the prospect of the removal and subsequent destruction of any of the documents and records identified in Exhibit B to the Search Warrant, the search will include the briefcases, laptop computers, hand-held computers, cell phones, Blackberries, and other movable document containers found on the premises described above, and in the possession of, or readily identifiable as belonging to SEA STAR management, pricing, and sales personnel including, but not limited to, FRANK PEAKE, PETER A. BACI, CARL FOX, NED LAGOY, NEIL PERLMUTTER, ALEX CHISHOLM, MIKE NICHOLSON, EDWARD PRETRE, and WILLIAM BYRNES.  Photographs of the premises are incorporated below:

Appx-S 194.

12

Indeed, nothing about *any* of the Magistrate's revisions should have given the Government the impression that the Magistrate sought to expand the warrant's intended scope. The Magistrate made no fewer than 17 handwritten edits to the Search Warrant with Attachments A and B, and *not one* of these edits appears designed to provide for a more expansive search. To the contrary, the edits all clearly seek to restrict the scope of the search. *See, e.g.,* Appx-S 189 (adding two provisions limiting the amount of time the Government had to conduct off-site analysis); Appx-S 193 (adding narrowing language regarding the permissible subject matter of material to be seized); Appx-S 194 (deleting "but not limited to" following the word including, and deleting "other indicia of notation of messages...").

The Magistrate also revised the definition of "documents and records" to expressly *exclude* those stored on "personal digital assistants such as Palm Pilot hand-held computers." Appx-S 194-95. In its brief, the Government misleadingly quotes the expansive portion of the "documents and records" definition without mentioning the Magistrate's intentional limitations. GB19. But the revisions expressly served to exclude Peake's "personal digital assistant," i.e., his Blackberry.[3] Contrary to the Government's suggestion, the Magistrate did *not* use "unequivocal language," and

_____

[3] Neither is the Government aided by the passage authorizing seizure of "address books" from Peake's Blackberry. GB19, quoting Appx-S 194. The documents were not from Peake's address books.

13

expressly excluded personal electronics from the list of included sources of documents and records. *Id.*

The Government also contends that by writing on the cover page that the Government had only 30 days to complete examination of seized computer equipment and electronic devices, the Magistrate intended to alter the scope of which items could be seized. GB20, quoting Appx-S 189. This conclusion does not follow. The fact that the Magistrate imposed limitations on the time for searching those electronics that *were* permitted to be seized (such as, for example, Sea Star's business computers) does not suggest that the Magistrate "clearly intended" to expand which electronics were within the scope of the warrant.

Thus the search warrant, as executed by the Magistrate, plainly disallowed (in multiple locations) the search and seizure of Peake's personal electronics. This is confirmed by the plain language of the final document, and the common sense understanding of the Magistrate's action in striking (in two places) language authorizing the search of Peake's personal items. This Court should reject the Government's suggestion that in striking items from the list of what was to be searched, the Magistrate intended to include the very items he struck.

Of course, before trial the Government itself signaled its own doubt in the interpretation it now seeks to foist upon this Court. Though it now professes

14

confidence both that the initial warrant permitted the search and seizure of Peake's

personal electronics, and that the warrant did not impose a time limit on the search

of the images (GB22), the Government obviously did not believe this to be the case

when it surreptitiously[4] sought a second warrant from a judge in an unrelated district.

The Government's actions clearly demonstrate its own belief that the initial warrant

did not authorize the search.[5]

For a similar reason, the Government's attempt to rely on the good-faith

exception to the exclusionary rule must fail. As the Government acknowledged, the

good-faith exception applies "where an objectively reasonable law enforcement

---

[4] The Government states in its Response that it "informed the district court in Puerto Rico of its actions and provided all relevant papers." GB21-22. From the placement of this sentence between two sentences discussing the D.C. proceedings, the Government suggests that it informed the Puerto Rico district judge at the time it was seeking the second warrant in D.C, rather than after the fact. This contention is not supported by any citation, and is not consistent with the record and proceedings below.

[5] In its brief, the Government properly avoids contending that its search was permissible because of the second warrant, arguing only that there was "no violation to cure" and effectively conceding that an impermissible search could not have been cured by the second warrant. *See United States v. Ganias*, 755 F.3d 125, 137 (2d Cir. 2014). The district court also rejected the idea that the search was permissible pursuant to the second warrant, stating that it "goes without saying that the Government cannot obtain a search warrant after a search has been executed to justify and constitutional[ly] insulate that search and seizure," for "[a]s sure as the sun will rise in the East, a warrant after an illegal search fails to cure a defendant's Fourth Amendment violation." Add. 80-81.

officer relied in good faith on a defective warrant." GB23, *citing United States v. Brunette*, 256 F.3d 14, 19 (1st Cir. 2001); *United States v. Leon*, 468 U.S. 897, 920-21 (1984). Here, however, the issue is not that the warrant was defective. It is that the warrant expressly disallowed a search of the items in question. The good faith exception "will not be applied unless the officers executing search warrants, at the very minimum, act within the scope of the warrants and abide by their terms." *United States v. Fuccillo*, 808 F.2d 173, 177 (1st Cir. 1987). It "assumes, of course, that the officers properly executed the warrant and searched only those places and for those objects that it was reasonable to believe were covered by the warrant." *Id.* at 178 (quotation omitted).

This is not the case here. The Government drafted express language that discussed with specificity the Government's ability to search and seize Peake's personal electronics, and the Magistrate crossed out that language. There thus was no basis by which the government agents could have "reasonably believed" that the search and seizure of Peake's laptop and Blackberry was authorized.

If the good-faith exception can be applied to permit the seizure of items expressly disallowed by the judicial officer who issued the warrant, then the good-faith exception would apply to insulate *every* search exceeding the scope of a warrant. Such an exception would decimate the warrant requirement entirely. *See United*

*States v. Ferreras*, 192 F.3d 5, 10 (1st Cir. 1999) ("When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms, and the warrant limitation becomes a practical nullity.").

Moreover, in any event, the good faith exception is not available to the Government because it was not argued below. *See United States v. Wurie*, 728 F.3d 1, 14 (1st Cir. 2013). The Government cites *United States v. Richards*, 659 F.3d 527, 559 n.11 (6th Cir. 2011),[6] for the proposition that its failure to raise the good faith exception below is not fatal, but its argument rings hollow. GB24 n. 4. *Richards* was based on whether there were deficiencies in the affidavit supporting the warrant, and "not on the underlying facts." This is not the case here.

## III. PEAKE IS ENTITLED TO A NEW TRIAL BECAUSE HE WAS IMPROPERLY DENIED HIS THEORY OF DEFENSE INSTRUCTION.

The Government emphatically asserts that the "court repeatedly and correctly instructed the jurors that to convict they must find that the evidence established beyond a reasonable doubt the offense's second element: Peake knowingly and intentionally became a member of the conspiracy." GB46-47. That statement implies

---

[6] Although not so indicated, the Government quotes from the *Richards* concurrence, not the majority opinion.

that the district court's instructions identified or highlighted the second element as of particular relevance. This is not the case.

While the district court referenced generally all the elements and described briefly the meaning of each, it never instructed the jury that there was only one element at issue. As a result, the instructions did *not* encompass the theory of defense set forth in Peake's proposed instruction.

Peake's theory of defense focused solely on the second element – his knowing and intentional joining of the conspiracy.[7] Although the Government suggests that the jury was instructed about Peake's theory of defense in other instructions, none of the citations provided by the Government support this premise:

- GB48, citing Appx 61-63. This is the preliminary instructions given on burden of proof before opening statements, with one sentence the court offered on each element. Nowhere did the instruction provide any hint as to which element was at issue, nor advise the jury that the existence of a conspiracy was not contested.

- GB49, citing Appx 1359-60, 1367-76, 132, and 1267 (sic)-1375. The Government cites the general instruction on burden of proof and presumption of innocence (1359-60). It then cites a range of pages (1367-76) in which the court listed all the elements, without emphasis on any in particular, and a page that has nothing to do with the elements at all (1382). And it closes the paragraph with citation to a passage in which the district judge outlined all three elements, did not indicate that the defense theory contested only element

---

[7] The district court's condemnation of Peake's proposed theory of defense instruction as "merely his theory of the case" is inexplicable. Appx 1493. What else should a theory of defense instruction be other than the defense's theory of the case?

two, and gave significantly more attention to element one than element two, without explaining that the existence of a conspiracy was not at issue. (cited as 1267-1375).

• <u>GB49-50, citing Appx 1374-75, 1369-70, 1375-76</u>. After citing the same passage in which the district court outlined all three elements, the Government then cites language that related generally to both elements one and two, and again did not explain the relevant point – that Peake did not deny the existence of a conspiracy, only his role in it.

Given that "[i]t is a basic tenet of criminal law that a defendant is entitled to an instruction on his theory of defense," *United States v. Powers*, 702 F.3d 1 (1st Cir. 2012), this record provides no basis for denying Peake his instruction. The district judge's determination that "Peake's defense theory that he was not involved in the conspiracy is a legitimate defense, but inappropriate as a jury instruction" is an incorrect statement of the law. Appx. 1494. If Peake's theory is legitimate (i.e. valid), then it should have been given. *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998).

Peake's instruction was particularly important in light of the Government's heavy emphasis on evidence that had nothing to do with the contested issue (Peake's involvement). Even though Peake did not contest that other individuals engaged in an antitrust conspiracy,[8] the Government made proving that uncontested point a

---

[8] The significant error discussed in Section I above (namely, the Government's repeated and improper reference to the jurors as victims), also plays into this issue regarding the theory of defense instruction. Because the effect of the conspiracy on

highlight of its presentation, even calling over objection two witnesses (out of a total of six, i.e., one third of its witnesses) who had no knowledge of Peake's involvement at all. *See* Appx. 893; Appx. 551-552. The clear impression left with the jury was that the existence of a conspiracy was at issue. For if Peake admitted the existence of the conspiracy and the harms ensuing therefrom, why would the Government have spent so much time discussing them? Peake's effort to focus only on his involvement (or lack thereof) was heavily overshadowed by the uncontested issue.

This was just the type of situation acknowledged by the Government, in which "'a court ought to focus the jury's attention on just what the defendant disputes – whether it is an affirmative defense *or merely a specification of just what element of the government's case is controverted.'*" GB51 (emphasis added), *quoting United States v. Allen*, 670 F.3d 12, 17 (1st Cir. 2012). In this case the instruction was, indeed, "mandatory" because there was risk that the theory of defense would be "obscure[d]" by the course of the trial. *Allen*, 670 F.3d at 17. Peake sought exactly what *Allen* discussed – for the court to "focus" the jury's attention on just what he disputed.

---

the citizens of Puerto Rico was the Government's dominant theme, it was particularly important that the jury be instructed that this was not a point that Peake contested, so that the jury did not perceive Peake as adverse to them.

The Government seeks to gloss over the significance of this issue by pointing out that Peake argued his theory of defense in closing. GB46-48, 52. This argument, in essence, seeks to eliminate the right to a theory of defense instruction, as it is *always* the case that a defendant argues his theory of defense in closing. Moreover, especially in the particular circumstance of this case, Peake's brief closing argument could never have supplied an adequate counterweight to the Government's weeks-long banging of the conspiracy drum.

The Government also seeks to gloss over as "beside the point" the actual ruling it seeks to defend. As Peake's Initial Brief explained, the district court stated that it was denying the theory of defense instruction because Peake did not testify. Initial Brief at 51-52. In response, the Government asserts, without any record citation, that this was not the basis of the court's decision, and it argues without a record citation that the district court relied on a different theory, using a quote from a Sixth Circuit case not even cited by the district court. GB52-53.

Once again, the Government's conclusory assertions regarding what happened below are squarely contradicted by the record. Not only was Peake's failure to testify the basis for the district court's denial of the theory of defense instruction, but *this was the very objection raised by the Government*:

21

MR. SNYDER: The United States opposes the theory of defense instruction, *on the grounds that it really is a surrogate for testimony by the defendant*, it's not necessary. The jury is provided with instruction on the law, not instruction on the arguments of the parties. There's not a theory of prosecution.

MR. MARKUS: Your Honor, I believe the law in the First Circuit is that as long as the theory of defense is an accurate statement of the law and is supported by evidence in the record, it should be given, and, therefore, we request a theory of defense instruction.

THE COURT: *[T]he Court understands that the instruction produced is an invitation to hearsay and to put into evidence the statement of your client, without sitting your client. So, the Court did not, on this occasion, accept the rule of the defense.*

MR. SNYDER: **And that accurately summarizes the objection of the Government**.

Appx 1390 (emphasis added). The simple fact is that Peake was denied his theory of defense instruction because he did not testify. This was plain error.

Finally, the Government suggests that Peake's theory sought to have the court "'recount[] the facts as seen through the rose-colored glasses of the defense.'" GB51 (quotation omitted). This critique is invalid in this case because the proposed instruction did not recite as true facts that were in contention. In any event, if the district court believed that the particular language proposed by Peake was improper, it should have given a modified version that addressed the drafting flaw. But the

22

court never even contemplated the instruction's language, because it improperly rejected the instruction out-of-hand because Peake did not testify.  Appx 1390.

## IV.    PEAKE SHOULD BE GRANTED A NEW TRIAL DUE TO ERRORS DURING JURY DELIBERATIONS.

This dispute comes down to the following: when a jury has indicated that it has reached a final non-unanimous verdict, and a district court instructs that jury to continue deliberating, is the district court required to offer the guidance set forth in *United States v. Angiulo*, 485 F.2d 37, 39-40 (1st Cir. 1973)?  Or is *Angiulo* guidance required only when the district court is giving a full *Allen* charge?

The Government and the district court rely on *United States v. Figueroa-Encarnacion*, 343 F.3d 23, 32 (1st Cir. 2003), for the proposition that "such counteractive language is only deemed necessary where a dynamite charge is delivered to a deadlocked jury." Gov't Brief at 53; Appx. 1489.  But that holding was based on the conclusion in that particular case that the jury "[was] not deadlocked in the first instance." 343 F.3d at 32.  Here, Peake's jury sent two notes, and the second one unequivocally indicated that the jury had reached a "final" verdict.  As such, *Figueroa-Encarnacion* is not applicable.

To the extent that *Figueroa-Encarnacion* suggests that the *Angiulo* guidance need not be included unless a full *Allen* charge is given (even if the jury is

deadlocked), that proposition is squarely contradicted by *Angiulo* itself, which held

unequivocally that "*whenever* a jury first informed the court that it is deadlocked, *any*

supplemental instruction which urges the jury to return to its deliberations *must*

include the three balancing elements." *Anguilo*, 485 F.2d at 40 (emphasis added).

The applicability of *Anguilo* in cases not involving an *Allen* charge was

demonstrated in *United States v. Manning,* 79 F.3d 212 (1st Cir. 1996). In *Manning*,

this Court reversed a conviction after the jury was not instructed with the three

required elements, **even though the jury had not been given any form of an *Allen***

**charge**. *Id.* at 222-23. The *Manning* judge did not even instruct the deadlocked jury

to continue deliberating at all – it merely asked the jury whether "reading any portion

of the testimony to [them] would assist [them] in reaching a decision." *Id.* The First

Circuit held that from this response "a rational lay jury could reasonably have inferred

that the court wanted it to reach a verdict, regardless of whether it could do so in good

conscience." *Id.* at 223.

The same is true here, but with more force. The jury sent two notes

"inform[ing] the court that it [was] deadlocked," and the district court provided a

"supplemental instruction which urge[d] the jury to return to its deliberations," but

did *not* "include the three balancing elements." *Angiulo*, 485 F.2d at 40. As a result,

the previously-hung jury returned a verdict which, as in *Manning*, it "inferred that the

24

court wanted it to reach." *Manning*, 79 F.2d at 223. The district judge's failure to grant a mistrial was an abuse of discretion, and the given instruction was a plain error that affected Peake's substantial rights and the fairness and integrity of the proceedings against him. *United States v. Hernandez-Albino*, 177 F.3d 33, 37-38 (1st Cir. 1999).

## V.    PEAKE'S CONVICTION SHOULD BE REVERSED AND THE CASE DISMISSED FOR LACK OF JURISDICTION DUE TO THE FACT THAT PUERTO RICO IS NOT A STATE.

Having consistently argued to this Court that Puerto Rico is neither a State nor the functional equivalent of a State, the United States now urges the opposite. Its arguments in support thereof are not reconcilable with its prior positions and are entirely off the mark.[9]

---

[9] The Government misunderstands why this issue can be first raised on appeal. Peake does not contend that the district court lacked traditional subject matter jurisdiction; Peake's point is that what he is alleged to have done, even if true, is simply not a crime under Section 1, and therefore the district court was without power to hear the case. *See United States v. Rosa-Ortiz*, 348 F.3d 33, 36 (1st Cir. 2003) (providing that "[b]ecause jurisdictional challenges to an indictment may be raised at any time, . . . [the defendant's] guilty plea did not waive his right to argue that he has been imprisoned for conduct that Congress did not proscribe in the crime charged."); *United States v. Peter*, 310 F.3d 709, 713 (11th Cir. 2002) (providing that "a district court is without jurisdiction to accept a guilty plea to a 'non-offense.'"); *United States v. Tomeny*, 144 F.3d 749, 751 (11th Cir. 1998) (providing that where claim can be resolved by examining the face of the indictment, the claim is jurisdictional and unwaivable). The use of the term "jurisdiction" to describe this doctrine may be an "awkward locution," but the point is that Puerto Rico's lack of Statehood creates a non-waivable defect in the Indictment. *See United States v.*

Pursuant to an unequivocal controlling *en banc* holding of this Court (which the Government, rather unbelievably, does not even cite), Puerto Rico is not a State. *See Igartua v. United States*, 417 F.3d 145, 147 (1st Cir. 2005) (en banc). In *Igartua*, the *en banc* Court reasoned that only the United States Congress can confer Statehood upon Puerto Rico, and that because Congress has not done so, Puerto Rico simply is not a State. *Id.* In multiple *Igartua* opinions, this Court repeatedly reiterated that Puerto Rico is not a State. *See, e.g., Igartua v. United States*, 626 F.3d 592, 599 (1st Cir. 2010); *Igartua v. United State*s, 417 F.3d 145, 148 (1st Cir. 2005) (*en banc*); *Igartua v. United States*, 229 F.3d 80 (1st Cir. 2000); *Igartua v. United States*, 32 F.3d 8 (1st Cir. 1994).

The *Igartua* opinions did not break new ground. The Supreme Court long ago determined that Puerto Rico is a Territory and not a State. *People of Puerto Rico v. Shell*, 302 U.S. 253, 259 (1937). Since that time, the Supreme Court has consistently renewed this holding. *See, e.g., Harris v. Rosario*, 446 U.S. 651, 651-52 (1980); *Califano v. Torres*, 435 U.S. 1 (1978). In *Shell*, the Supreme Court held that Puerto Rico's constitutional legal status dictates its statutory status under the Sherman Act. Thus, if Puerto Rico is not a State for constitutional purposes (which it currently is

---

*George*, 676 F.3d 249, 260 (1st Cir. 2012). In any event, <u>even under the plain error standard,</u> Peake's conviction must be overturned given that Puerto Rico simply is not a State and therefore Peake cannot be guilty of a Section One violation.

not), Congress did not make it one for Sherman Act purposes.  If and when Puerto

Rico becomes a State, Sections 1 and 2 of the Sherman Act would apply.  Until then,

it is Section 3 – and only Section 3 – that applies.[10]  *Shell*, 302 U.S. at 258-59.

*Igartua* also rejected the contention that Puerto Rico at some point became the

"functional equivalent of" or a "de facto" State.[11] 626 F.3d at 601. In so doing, it

disapproved the cases relied on by the Government, *Arroyo-Melecio v. Puerto Rican*

*Am. Ins. Co.*, 398 F.3d 56, 66 (1st Cir. 2005) and *Cordova & Simonpietri Ins. Agency*

*Inc. v. Chase Manhattan Bank,* 649 F.2d 36 (1st Cir. 1981), which contend that

Puerto Rico became sufficiently State-like after the *Shell* decision to become a

"commonwealth."[12] (This conclusion is unwarranted, additionally, because Congress

---

[10] Indeed, the language of 15 U.S.C. §3(a) (prohibiting conspiracy in restraint of trade "between" a Territory and "any State or States") is nearly identical to the language in the very first paragraph of the Indictment (alleging that the freight was transported "between" Puerto Rico and "the continental United States.").

[11] The Government, too, rejected that contention in *Igartua*, though it has taken an about-face in this case.  In 2012, the United States Solicitor General expressly endorsed *Igartua*, stating that "[t]he Framers did not anticipate that the federal courts would decide, under any rubric of *de facto* or functional statehood . . . The Constitution commits that quintessentially political question to Congress." House Report at 8 (H.R. 809).

[12] *Cordova*'s incompatibility with the more recent *en banc Igartua* opinion was recognized by this Court recently in its Judgment denying the mandamus petition filed by Thomas Farmer, Case No. 14-1969.  That petition, which thoroughly addresses the issues presented herein, sought review of a district court order finding Section 1 to be applicable in an antitrust case related to the instant *Peake* case.  The

had already made Puerto Rico a commonwealth before *Shell* was decided, as set forth in *Shell* itself).

Because Puerto Rico is not a State, the Government has not alleged or proven an essential element of a Section 1 violation, which requires a conspiracy "among the several States." The "default rule" referenced by the Government does not compel a different conclusion. GB44. The "default rule," codified at 48 U.S.C § 734, was enacted in 1900 – long before the Supreme Court's *Shell* opinion in 1937. It was cited and discussed in the *Shell* opinion. 402 U.S. at 260. The "rule" simply makes federal law applicable to Puerto Rico unless local law prohibits it; it does not itself make or alter federal law. The default rule therefore supports the premise that Puerto Rico is a territory embraced by Section 3, as this is what the Supreme Court held in *Shell*.

Because of the non-waivable defect in the Indictment, which charges Peake only with violating 15 U.S.C. § 1, the case must be dismissed.

## VI.  IF PEAKE'S CONVICTION IS NOT OVERTURNED, HE SHOULD BE RESENTENCED DUE TO ERROR IN THE APPLICATION OF THE VOLUME OF COMMERCE GUIDELINE.

"When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing

---

panel declined to grant a writ of mandamus due to the extraordinary nature of the writ, but underscored the question regarding the continued vitality of *Cordova* in light of *Igartua*. Peake adopts the arguments set forth in the Farmer petition.

sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence." *United States v. Isaacson*, 752 F.3d 1305 (11th Cir. 2014) (internal quotation omitted) (reversing and remanding for failure to introduce adequate evidence in support of sentencing enhancement). Here, the Government did not introduce reliable and competent evidence in support of its volume of commerce numbers, as required by U.S.S.G. § 6A1.3(a). Accordingly, for the reasons set forth in Peake's Initial Brief, the case should be remanded for a new sentencing hearing at which the Government is forced to meet its evidentiary burden.

## CONCLUSION

For the foregoing reasons, Peake's conviction and sentence should be reversed and remanded for a new trial or resentencing.

29

Respectfully submitted,

**MARKUS & MARKUS, PLLC**

/s/ DAVID OSCAR MARKUS
DAVID OSCAR MARKUS
Fla. Bar No. 119318
MONA E. MARKUS
Fla. Bar. No. 153648
A. MARGOT MOSS
Fla. Bar. No. 091870
40 N.W. 3rd Street
Penthouse One
Miami, Florida 33128
Telephone (305) 379-6667
Facsimile (305) 379-6668
www.markuslaw.com

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contains 6,903 words, exclusive of signature block and certificates of counsel.

/s/David Oscar Markus
David Oscar Markus

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed this 26th day of November, 2014, and served on all appropriate parties through that system.

/s/ David Oscar Markus
David Oscar Markus